# EXHIBIT I

Loidy Tang
11/02/2017                                          1

Page 1

1          IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2

3   SCOMA CHIROPRACTIC, P.A.,        )
    et al.,                         )
                                    )
4                 Plaintiffs,       )
                                    )
5       -vs-                        )   No.
                                    )   2:16-cv-00041-UA-
6   DENTAL EQUITIES, LLC,           )   MRM
    et al.,                         )
7                                   )
                 Defendants.        )
8                                   )
                                    )
9

10          The deposition of LOIDY TANG, taken

11   in the above-entitled cause, before Marybeth

12   Lynch Farrell, a Certified Shorthand Reporter in

13   the State of Illinois, on the 2nd day of

14   November, 2017, at the hour of 10:00 a.m. at

15   20 South Clark Street, Chicago, Illinois,

16   pursuant to notice.

17

18

19

20

21

22

23

24   Reported by:  Marybeth Lynch Farrell, CSR

25   License No.: 084.002943

                                         Exhibit I

**Page 2**

```
 1  APPEARANCES:
 2       EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
          BY:  HEATHER A. KOLBUS, ESQ.
 3       20 South Clark Street, Suite 1500
          Chicago, Illinois  60603
 4
              Representing the Plaintiff class;
 5
 6
         ANDERSON & WANCA
 7       BY:  MR. ROSS M. GOOD
          3701 Algonquin Road, Suite 760
 8       Rolling Meadows, Illinois  60008
 9            Representing the Plaintiff class;
10
11       WARNER LAW GROUP
          BY:  CURTIS C. WARNER, ESQ.
12       350 South Northwest Highway
          Park Ridge, Illinois 60068
13
              Representing Plaintiff
14            Florence Mussat, M.D., S.C.;
15
16       DORSEY & WHITNEY LLP
          BY:  JONATHAN MONTCALM, ESQ.
17       51 West 52nd Street
          New York, New York 10019
18
              Representing Mastercard
19            International Incorporated;
20
21
22
23
24
25
```

**Page 3**

```
 1             I N D E X
 2  WITNESS                    PAGES
 3  LOIDY TANG
 4
     Examination by
 5
        Mr. Montcalm              4
 6
        Mr. Warner              60
 7
 8
 9
             E X H I B I T S
10
11  NUMBER            FOR IDENTIFICATION
12  Exhibit No. 69            8
13  Exhibit No. 70           48
14  Exhibit No. 71           64
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                 LOIDY TANG,
 2  called as a witness herein, having been duly
 3  sworn, was examined and testified as follows:
 4                 EXAMINATION
 5  BY MR. MONTCALM:
 6       Q.   Good morning.
 7       A.   Good morning.
 8       Q.   My name is Jonathan Montcalm.  I work
 9  at the law firm Dorsey & Whitney and we
10  represent Mastercard in this lawsuit.
11            Can you state your full name for the
12  record, please?
13       A.   Yes, my name is Loidy Tang.
14       Q.   And Tang is spelled?
15       A.   T-a-n-g, yes.
16       Q.   Are you currently employed?
17       A.   Yes.
18       Q.   Where are you employed?
19       A.   Florence Mussat, M.D., S.C.
20       Q.   What do you do there?
21       A.   I'm the office manager.
22       Q.   How long have you held that position?
23       A.   That position for about -- I've been
24  working there since 2006.  So that position has
25  been since 2011.
```

**Page 5**

```
 1       Q.   What are your primary roles as an
 2  office manager?
 3       A.    To just oversee the office running
 4  smoothly, following Dr. Mussat's orders.  It's a
 5  small office.
 6       Q.   How many employees?
 7       A.   Just Dr. Mussat and myself and somebody
 8  else.
 9       Q.   Who is the third employee?
10       A.   It's Erika.  She is the receptionist.
11       Q.   What's her last name?
12       A.   Vasquez, V-a-s-q-u-e-z.
13       Q.   Do you know how long Ms. Vasquez has
14  been working for Dr. Mussat?
15       A.   Since about 2011.
16       Q.   So Dr. Mussat is the only doctor that
17  works at that office?
18       A.   Correct.
19       Q.   And what kind of doctor is she?
20       A.   She is a board certified reconstructive
21  and plastic surgeon.
22       Q.   Have you ever been deposed before?
23       A.   Yes.
24       Q.   How many times?
25       A.   I can't remember.  I can't remember.  I
```

Page 6

```
1   can't give you an exact number.
2        Q.   Can you estimate for me?
3        A.   Twice I think.
4        Q.   When was the last time you were
5   deposed?
6        A.   I can't -- a couple of years ago, but I
7   don't remember when.
8        Q.   What was the case about that you were
9   deposed in?
10       A.   For my own personal matter.
11       Q.   So that case had nothing to do with
12  Florence Mussat?
13       A.   Correct.
14       Q.   And what about the time before that,
15  when was that deposition?
16       A.   It was also a personal matter if it was
17  even twice.  I honestly can't remember.
18       Q.   Have you ever been deposed before in
19  your position as an office manager at Florence
20  Mussat?
21       A.   I don't think so, no.
22       Q.   So I'm going to go over some of the
23  ground rules for the deposition and you may be
24  familiar with some of them.
25            The first is obviously you are under
```

Page 7

```
1   oath and so the testimony you give is just like
2   testifying in the court; do you understand that?
3        A.   I do.
4        Q.   I need a verbal response to my
5   questions.  This is going to be -- it's very
6   unlike a regular conversation because the court
7   reporter is taking down everything we say and
8   she can't record a nod of the head or a shake of
9   the head or a shrug of the shoulders.  So all of
10  your responses need to be verbal, okay?
11       A.   Okay.
12       Q.   I'd ask you that -- another way in
13  which this is pretty different from a normal
14  conversation is that I would ask that you wait
15  until I am completely finished with my question
16  before you give your answer.
17            Again, that's for the benefit of the
18  court reporter and so that we have a clear
19  record, okay?
20       A.   Understood.
21       Q.   Also, if you don't understand one of my
22  questions, please just ask me to rephrase it.
23  I'll be happy to do so.  Do you understand?
24       A.   Yes, thank you.
25       Q.   This is certainly not an endurance test
```

Page 8

```
1   in any way.  If at any time you need to take a
2   break, please just ask for one.
3            I would only ask that if I posed a
4   question, that you answer that question before
5   asking to take the break, okay?
6        A.   Okay.
7        Q.   Is there anything that would prevent
8   you from testifying truthfully here today?
9        A.   No.
10       MR. MONTCALM:  Off the record for a second.
11            (Discussion off the record.)
12       MR. MONTCALM:  Back on the record.
13            (Deposition Exhibit No. 69,
14            marked for identification.)
15  BY MR. MONTCALM:
16       Q.   Ms. Tang, I'm handing you what has been
17  marked as Exhibit 69.  It's a three-page
18  document.
19            Would you please take a moment to
20  review it and then let me know when you're ready
21  and I will ask you a couple of questions about
22  it.
23       A.   Okay.
24       Q.   Have you seen this document before?
25       A.   Yes.
```

Page 9

```
1        Q.   When did you see it?
2        A.   There's so many papers, I saw it --
3        MR. CURTIS:  Let the record reflect that she
4   is pointing to a binder on the table.
5   BY MR. MONTCALM:
6        Q.   Dose that binder contain documents that
7   you reviewed to prepare for today's deposition?
8        A.   That contains documents I can refer to
9   that's already available to you.
10       Q.   Excuse me, that is already available?
11       A.   Available to you, yes.
12       Q.   Have you reviewed the documents that
13  are in that binder?
14       A.   I have looked at them.
15       Q.   Will you please turn to Page No. 3.
16  Just so you know they're all double sided.
17       A.   Okay.
18       Q.   Do you see a list of topics there?
19       A.   I do.
20       Q.   And are you prepared to testify about
21  those topics today?
22       A.   Yes.
23       Q.   And do you understand --
24       MR. WARNER:  I was just going to say subject
25  to our objections that we previously sent to you
```

Page 10

1  regarding the scope.
2      MR. MONTCALM:  Okay.  If something comes up
3  during the questioning, we can deal with it.
4      MR. WARNER:  We're just going to preserve
5  that objection and I'm going to let you continue
6  subject to that objection.
7      MR. MONTCALM:  Okay.
8  BY MR. MONTCALM:
9      Q.    And do you understand that you are
10  testifying on behalf of Florence Mussat, M.D.,
11  S.C. today?
12      A.    Uh-huh.
13      Q.    You can put that to the side.
14          Can you describe to me your
15  understanding of what this case is about?
16      A.    My understanding is that Florence
17  Mussat, M.D., S.C., the company, has filed suit
18  regarding an unsolicited fax that we received
19  under the Telephone Communication Protection
20  Act.
21          My understanding is that this
22  unsolicited fax affected about 380,665 others.
23  So The Company, if I can refer to instead of
24  saying the whole name.
25      Q.    Actually I was just going to say why

Page 11

1  don't we for purposes of the deposition say The
2  Company.  And that will refer to Florence --
3  plaintiff Florence Mussat, M.D., S.C., and then
4  if you're referring to the person, you can say
5  Florence Mussat or Dr. Mussat and I'll do the
6  same in my questioning to you.
7      A.    Thank you.
8          Yes, so like I was saying, the file is
9  being done as an individual and as a
10  representative of others, like I mentioned, the
11  380,665.
12          The Company doesn't have a direct
13  established relationship with Dental Equities or
14  I believe it's -- the name is difficult to say
15  but Dr. Shahmohammadi.
16      Q.    Yes, and again for the sake of both the
17  court reporter and everyone here, you can say --
18  let's refer to him as Dr. Shah, S-h-a-h.
19      A.    Okay, yes.  And then also it would be
20  the Arkansas, First Arkansas Bank & Trust and
21  Mastercard International.
22      Q.    Okay.  And to clarify, those people
23  that you just mentioned, Dental Equities,
24  Dr. Shah, First Arkansas Bank, and Mastercard,
25  are those the people that the company is suing

Page 12

1  in this lawsuit?
2      A.    My understanding is that that's why
3  they filed a suit for that unsolicited one page
4  fax that was an advertisement for a credit card.
5      Q.    And do you have an understanding as to
6  whether -- strike that.
7          Why is the company suing Mastercard?
8      A.    My understanding is that the Telephone
9  Communication Protection Act protects you
10  against such things that, you know, you're not
11  requesting to have.
12          So because we don't -- the company does
13  not have an established relationship it was
14  never consented to.
15      Q.    That's why you're suing Mastercard
16  specifically?
17      A.    Correct, because my understanding is
18  that there's laws in place that protect us
19  against acts like that.
20      Q.    So what is your understanding of what
21  Mastercard did in this lawsuit?
22      A.    My understanding is that there was a
23  consent that needed to be gained and it wasn't.
24          So that's my understanding, that
25  through the process, that's one of the people

Page 13

1  that is part of the suit.  So does that answer
2  your question?
3      Q.    Well, I'll follow up.
4          Why is Mastercard part of this suit?
5      A.    My understanding is that in the
6  discovery process this came to light as them
7  being part of it.  So that's all I know.
8      Q.    Do you know why they are part of it,
9  Mastercard, that is?
10      A.    I guess Mastercard was part of
11  purchasing a list of just these numbers.  And I
12  guess this list contained the company as part of
13  it and they just send out faxes to the company
14  and all these people knowing that it was just a
15  list.  I guess that's my understanding.
16      Q.    And do you know specifically what part
17  of obtaining this list that Mastercard allegedly
18  played?
19      A.    Can you please rephrase that?
20      Q.    Yes, I will.  That was a bad question.
21          What part of obtaining a list did
22  Mastercard -- what part, if any, did Mastercard
23  play in obtaining the list you were just
24  testifying about?
25      A.    So I believe that they paid money to

Page 14

1  Dr. Shah.  I'm not exactly sure how, but my
2  understanding is that it was -- we were part of
3  a list with no consent.
4      Q.    What causes of action are you bringing
5  against Mastercard?
6      A.    That -- I guess I feel like I've
7  already said it.
8      Q.    Well, can you say it again, please.
9      A.    Yes, that the action is having certain
10 advertised facts which is an advertisement that
11 we have no established relationship with them.
12         And so the law in place gives us that
13 right to advocate for our company so that this
14 can be avoided in the future from anyone who is
15 just going to shoot a fax list, Mastercard, or
16 play any role in this, you know.
17     Q.    So is it fair to say then that you're
18 bringing a cause of action under that law you
19 were talking about?
20     A.    Correct, well, that's my understanding.
21     Q.    Is The Company bringing any other
22 claims against Mastercard?
23     A.    That would be something that Dr. Mussat
24 would have discussed with her lawyer.  I'm not
25 exactly sure.

Page 15

1          As far as I know this is what the
2  lawsuit is about.
3      Q.    You understand though that you are here
4  to testify on behalf of the entire company,
5  correct?
6      A.    Correct.
7      Q.    Where is this lawsuit filed?
8      A.    Well, I believe it's a multi-district,
9  so it's in Florida.
10     Q.    Is it also in any other districts?
11     A.    Not currently.
12     Q.    Has it been in any other districts
13 prior to being in Florida?
14     A.    As it stands, no, just in Florida.
15     Q.    What about at any time in the past, was
16 it ever -- was The Company's lawsuit ever before
17 another court besides the court in Florida?
18     A.    In Illinois.
19     Q.    Which court in Illinois?
20     A.    The Northern District.
21     Q.    Has The Company lawsuit been in any
22 other districts besides in Florida and in the
23 Northern District of Illinois?
24     A.    I don't know.
25     Q.    Have you seen the fax that this case is

Page 16

1  based upon?
2      A.    Yes.
3      Q.    Can you describe the content of the
4  fax?
5      A.    Yes, it looks like a holiday type
6  looking fax.  And it just has the credit card on
7  it, just like this advertisement.
8      Q.    You've referenced -- you've
9  characterized the fax a couple of times as an
10 advertisement.
11         What was the fax advertising?
12     A.    Well, now having looked at it a lot of
13 times I can tell you, but when you look at it
14 it's a credit card.
15         It says, Doctor, I think, if I remember
16 specifically, but I can't recall unless I was
17 looking at it now.  Can I look?
18     Q.    For now I just want to talk about, you
19 know, we may look at some documents later, but
20 I'd like to just talk about what your
21 recollections are right now.
22         Do you recall any other details about
23 the credit card?
24     A.    Not right now, no, I mean just that.
25     Q.    Did The Company receive the fax at its

Page 17

1  office?
2      A.    The Company received the fax, yes.
3      Q.    When did The Company receive the fax?
4      A.    It was December 18th.
5      Q.    Of what year?
6      A.    Of 2016.
7      Q.    And how --
8      A.    I could be wrong, is it the 26th,
9  sorry.
10     Q.    And how was the fax received at The
11 Company's office?
12     A.    We have our service with Vonage eFax.
13     Q.    Can you describe how that eFax service
14 with Vonage works?
15     A.    Sure, it does have a portal that you
16 log in and you're able to get your fax, print
17 them out.
18     Q.    Does one need to log onto the portal in
19 order to print the fax that has been received by
20 The Company?
21     A.    Not always, not always because we can
22 get them in our e-mail.
23     Q.    When do you get them?  When if at all
24 do you get faxes in your e-mail?
25     A.    I would think all the time, but your

Page 18

1   question was is it necessary to log on.  So it's
2   not necessary, but we do.
3       Q.   How often do you log onto the portal to
4   view the faxes?
5       A.   Well, we have to daily check faxes.  It
6   is a medical office, so there's important
7   documents that need to be printed out.
8            So that's why we have a company policy
9   that just because it makes it easier for The
10  Company to not miss any important documents,
11  everything has to be printed out and placed on
12  Dr. Mussat's desk for her review.
13      Q.   And the policy you just referenced is
14  that policy recorded in writing anywhere?
15      A.   It's oral.  So per Dr. Mussat's order
16  that's how it's done in the office regardless of
17  who is accessing whether it be her or anybody.
18  It's just you print it out and you place it on
19  her desk.
20      Q.   Does this oral policy dictate how often
21  faxes should be printed out and placed on
22  Dr. Mussat's desk?
23      A.   Regardless, you just have to print it
24  out and place it on the desk to not miss any
25  documents.

Page 19

1       Q.   My question was just a little bit
2   different than that.  That's okay.
3            My question was does the oral policy
4   dictate a specific amount of time or how often
5   you have to look for the faxes?
6       A.   So throughout the day we have to look
7   at incoming faxes because, you know, we have
8   patient reports, labs, and that's done during
9   the time that we're there.
10      Q.   Is there a -- does the Vonage system
11  contain a notification process so that you know
12  when a new fax comes in?
13      A.   It's checked, I believe that it has
14  features, but just for purposes of being simple
15  and easy it's just checked throughout the day.
16  And we're there from 9:00 to 5:00.
17           If we're there later, we are
18  continuously checking, so it's daily per our
19  regular office hours.
20      Q.   And you testified before that it's not
21  necessary to log onto the portal to access the
22  faxes, but that's your procedure for accessing
23  faxes, correct?
24      A.   Yes, it's just the simplest way to not
25  miss any documents.

Page 20

1       Q.   Do you ever receive the faxes in your
2   e-mail?
3       A.   Yes, but the problem with that would be
4   it can end up in Junk and then we'd miss
5   something important.
6            Because your question was can you log
7   in, and yes, we log in, yes, it's the easiest
8   way.
9       Q.   Have you ever printed a fax from your
10  e-mail as opposed to through the Vonage portal?
11      A.   Yes, but then it's not -- I can't
12  remember when I did that.  So it's just I want
13  to say yes, because there might have been a time
14  where I did.
15           But for purposes of just making sure we
16  don't miss anything it's easier to log in and
17  print out.
18      Q.   Did the company print the fax that is
19  at issue in this case?
20      A.   It's part of the policy so regardless
21  everything has to be printed up.
22      Q.   But my question was was this specific
23  fax printed out?
24      A.   Yes, every single fax has to abide by
25  our oral policy.

Page 21

1       Q.   And was this fax printed out through
2   the Vonage portal?
3       A.   Correct.
4       Q.   Do you know who printed out the fax
5   from the Vonage portal?
6       A.   I don't remember specifically who it
7   was, but it might have been Dr. Mussat, I don't
8   remember.
9            One of the nice things about having
10  this policy in place is that, you know, it's
11  reviewed on her desk.  So we don't -- you know,
12  we don't run the risk of like missing an
13  important document.  It's just easier to put it
14  on her desk and she does it.
15           So I don't know who it was, but it goes
16  through the same procedure.
17      Q.   Did Dr. Mussat read the fax if you
18  know?
19      A.   Dr. Mussat reads everything.
20      Q.   So that's a yes?
21      A.   Yes.
22      Q.   And what was -- what if anything was
23  done after the fax was read?
24      A.   Okay.  So then it has to be, you know,
25  it has to be reviewed by Dr. Mussat and she

Page 22

1    determines what happens to it.
2        Q.    So for the specific fax that is at
3    issue in this lawsuit what did Dr. Mussat
4    determine should happen next?
5        A.    Other than she puts them aside and then
6    she says to send it to her lawyer.
7        Q.    And who is that lawyer?
8        A.    Mr. Warner.
9        Q.    And that's the gentleman sitting to
10   your right?
11       A.    Correct, yes.
12       Q.    Do you know when Dr. Mussat sent the
13   fax to Mr. Warner?
14       A.    It's a really busy office, so if
15   it's -- you know, every moment is very
16   important.  So it must have been done sometime
17   around I think it was on the 5th of January.
18       Q.    And how would that fax have been sent
19   to Mr. Warner?
20       A.    Scanned and then e-mail.
21       Q.    Are all -- strike that.
22             Is there a policy at the company of how
23   to deal specifically with faxes that are
24   unsolicited?
25       A.    It would have -- we don't decide what's

Page 23

1    unsolicited.  It has to be reviewed by
2    Dr. Mussat and then she will give the order of
3    what to do for the fax.  So, no.
4        Q.    So when Dr. Mussat decides that a fax
5    is unsolicited is there a policy about what she
6    does next?
7        A.    Well, we follow -- to follow her
8    orders.  So if she says to send it to
9    Mr. Warner, that's what we do.
10       Q.    How many unsolicited faxes has the
11   company sent to Mr. Warner?
12       A.    There has been several.
13       Q.    Can you give me a range?  Is it more
14   than 10?
15       A.    It could be.  I honestly don't even --
16   yes, it could be.
17       Q.    Do you think it could be more than 20?
18       A.    I want to say, no, but I'm going to say
19   it could be.
20       Q.    We've been discussing the Vonage portal
21   through which the company receives faxes.
22             Does the company also have a fax
23   machine?
24       A.    Not right now.
25       Q.    Did it used to have a fax machine?

Page 24

1        A.    Uh-huh.
2        Q.    And when did it dispose of that fax
3    machine?
4        A.    Well, we don't use the fax machine, but
5    we still have the fax machine.
6        Q.    So when did the company stop using the
7    fax machine?
8        A.    You know, it stopped when we started
9    with Vonage and I think it might be in there,
10   the information.  I don't know the specific
11   dates, but I'm pretty sure the dates are -- I
12   think it was part of the discovery of, you know,
13   days and like when we started.
14       Q.    But it was before -- whenever the exact
15   date was that you stopped using the fax machine
16   that date was before the fax was received in
17   this case?
18       A.    Correct.
19       Q.    When did the company hire Mr. Warner --
20   strike that.
21             Does Mr. Warner work for a law firm?
22       A.    Mr. Warner has his law firm.
23       Q.    Do you know the name of it?
24       A.    Warner Law.
25       Q.    When did the company hire Warner Law to

Page 25

1    represent it in this case?
2        A.    Oh, my gosh, if you're asking for a
3    specific date, I don't remember, but it was
4    before this case.
5        Q.    And does the company have a written
6    agreement with Warner Law for Warner Law's
7    representation in this case?
8        A.    Yes.
9        Q.    And did someone from the company sign
10   that agreement?
11       A.    Dr. Mussat.
12       Q.    Have you seen the agreement?
13       A.    Yes.
14       Q.    And so you've read the agreement?
15       A.    Yes.
16       Q.    Do you know whether Dr. Mussat read it
17   before it was signed?
18       A.    Yes, before she signs anything she has
19   to review and read.  She won't just sign without
20   reviewing what she is signing.
21       Q.    Are you familiar generally with the
22   terms of that agreement?
23       A.    Yes.
24       Q.    Does the agreement contain any terms
25   about who is responsible for paying for the

Page 26

1  expenses related to this case?
2      A.   Yes, so you're speaking of the retainer
3  agreement?
4      Q.   Correct.
5      A.   Yes, sorry, correct.
6           So yes, it does make mention that the
7  law firm advances all the costs and that it's
8  contingent upon the outcome of the case.
9      Q.   So when you say it's contingent upon
10  the outcome of the case what do you mean?
11      A.   It means that we don't have to front
12  any costs, but upon Mr. Warner's discretion he
13  has the ability to see who is liable.
14      Q.   Has anyone explained to The Company
15  that if The Company loses the case, the court
16  could order that The Company has to pay costs?
17      A.   Correct.  So in the retainer agreement
18  it does state that upon Mr. Warner's discretion
19  it is, you know, it determines who is liable I
20  guess.
21      Q.   Does the agreement contain any terms
22  about the money The Company would receive if it
23  wins the case?
24      A.   I believe it states that it has fees
25  that are -- that will be taken for the law firm

Page 27

1  and then it states, yes, it does.
2      Q.   So you mention fees for the law firm.
3  What about any money that The Company would
4  receive if it succeeds?
5      A.   I believe that if it succeeds, then
6  yes, then we'll get a percentage, but it's
7  all -- I don't want to say percentage, you know,
8  because we're just being representatives.
9           It says that -- my understanding is is
10  the law firm is, you know, getting all these
11  costs.
12           But for representation, you know, if we
13  are found to be liable, then whoever is liable
14  is the one responsible for any costs associated
15  with the lawsuit.
16      Q.   Is The Company represented in this case
17  by any other law firm?
18      A.   Currently in this case there is
19  Anderson & Wanca, so Mr. Ross Good, he is the
20  lead counsel, and then we have where we are
21  today, Edelman & Combs, right?
22      Q.   Yes.  So just for the sake of making
23  things easier we will refer to Anderson & Wanca
24  as Anderson; do you understand?
25      A.   Uh-huh.

Page 28

1      Q.   And our gracious host here today,
2  Edelman Combs, and I don't remember the last two
3  names, we'll refer to them as Edelman, okay?
4      A.   Okay.
5      Q.   Did the company initiate contact with
6  the Anderson firm about representation in this
7  case?
8      A.   I believe this would be Mr. Warner is
9  our counsel, the company's counsel.  So that
10  would have been something in communication
11  between Dr. Mussat and Mr. Warner.
12      Q.   Is there a written agreement between
13  The Company and the Anderson firm for --
14      A.   Yes.
15      Q.   -- representation?
16           I'll just remind you even though it's
17  obvious where my questions are going oftentimes,
18  let me get through it first, please.
19      A.   Sorry.
20      Q.   It's really okay.  Most people we have
21  to remind over and over and over again and this
22  is the first time.  So I will just reask the
23  question.
24           Does the company have a written
25  agreement for representation by the Anderson

Page 29

1  firm in this case?
2      A.   Yes.
3      Q.   Who at The Company signs that
4  agreement?
5      A.   Dr. Mussat.
6      Q.   And have you seen that agreement?
7      A.   Uh-huh.
8      Q.   And you've read that agreement?
9      A.   Yes.
10      Q.   Are you familiar generally with the
11  terms of that agreement?
12      A.   General, it's a lot of stuff.  It's a
13  lot of writing.
14      Q.   Does that agreement contain any
15  provisions about who would pay the expenses for
16  the litigation?
17      A.   I believe the agreement would also have
18  that retainer agreement which would explain the
19  cost and it does, so yes.
20      Q.   And does The Company have a written
21  agreement with the Edelman firm for
22  representation in this case?
23      A.   Yes.
24      Q.   Have you read that agreement?
25      A.   I have.

Loidy Tang
11/02/2017
30 to 33

Page 30

1  Q.  And who signed the agreement on behalf
2  of The Company?
3  A.  That would be Dr. Mussat herself.
4  Q.  And you've already testified a bit
5  about your agreement with Mr. Warner's firm and
6  with the Anderson firm.
7  Is there anything in the agreement
8  with -- the retainer agreement with the Edelman
9  firm that is different or that sticks out to you
10  as different than those other agreements?
11  A.  No.
12  Q.  Before The Company contacted Mr. Warner
13  about the facts at issue in this case was it The
14  Company's intent to file a class action lawsuit?
15  A.  Oh, can you repeat that again?
16  MR. MONTCALM: Can you read it back, please.
17  (Record read.)
18  THE WITNESS:  It was -- I'm so sorry, just
19  repeat it one more time
20  (Record read.).
21  THE WITNESS:  Okay.  So before, so before
22  this was sent to Mr. Warner it was sent for his
23  review and his advice.
24  So there was no intent other than just
25  showing him, to review it, and advise.

Page 31

1  BY MR. MONTCALM:
2  Q.  What does the company hope to gain from
3  this lawsuit?
4  MR. WARNER:  Objection, form.
5  THE WITNESS:  I think I'd like to take the
6  advice.
7  MR. WARNER:  You can answer.  I'm just
8  objecting to the form of the question.
9  THE WITNESS:  Okay, sorry.  Then repeat the
10  question again, please.
11  (Record read.)
12  THE WITNESS:  It's really time consuming and
13  especially when you're running a small office to
14  have to deal with these things.
15  So Dr. Mussat is completely annoyed by
16  that and it takes time, it takes effort, and it
17  takes -- to have these annoyances is, you know,
18  so we would hope that, you know, being
19  representative of these others because it seems
20  like a lot of people are affected, that, you
21  know, we can just, you know, protect our rights
22  as a company.
23  BY MR. MONTCALM:
24  Q.  Anything else?
25  A.  Unh-unh.

Page 32

1  Q.  Is that a no?
2  A.  Sorry, no.
3  Q.  Is The Company seeking to recover money
4  in this case?
5  A.  The Company is seeking to protect its
6  rights under the TCPA.
7  Q.  Does protecting the company's rights
8  under the TCPA include seeking the recovery of
9  money?
10  A.  Not receiving something without
11  consent.  It's something that, you know, it's
12  done to us without us asking for it, so to
13  preserve our rights.
14  MR. MONTCALM:  Can you read the question back
15  again.
16  I will ask that you just please listen
17  to the question again and respond to it.
18  (Record read.)
19  THE WITNESS:  We're representatives, so if
20  there is a compensation, that is not the
21  motivation.
22  BY MR. MONTCALM:
23  Q.  Do you know whether there is -- whether
24  money is being sought in the lawsuit?
25  A.  I know that there are laws that give

Page 33

1  you, you know, it's statutory damages and so it
2  allows for -- you know, it gives an amount.  So
3  that's my understanding.
4  Q.  And so The Company is seeking the
5  statutory damages that are allowed?
6  A.  I think The Company is seeking what is
7  right under the law.  So if there are monies to
8  be awarded under the law as compensation for the
9  violation, then that would be -- you know, that
10  would be part of preserving your rights.  Does
11  that answer your question?
12  Q.  Let me put it this way.  I'll represent
13  to you that the TCPA does provide for statutory
14  damages.
15  My question is is The Company seeking
16  those statutory damages in this lawsuit?
17  A.  The Company is following the advice of
18  the counsel.  So if he determines that, you
19  know, what is going to be -- I don't know how to
20  say it.
21  I guess we're seeking to represent and
22  if there is money awarded, then that is part of
23  representing The Company -- I mean that is part
24  of filing suit.
25  Q.  Do you understand that when a party

Loidy Tang
11/02/2017

34 to 37

Page 34

1  files a suit they have to ask the court for the
2  relief that they're seeking?
3      A.   Uh-huh.
4      Q.   And do you understand that The Company
5  has asked the court in this case for relief from
6  the defendants?
7      A.   Okay.
8      Q.   I'm sorry, I'm asking if you understand
9  that The Company has done that?
10     A.   Yes, uh-huh.
11     Q.   So then my question is as part of the
12  relief that The Company has asked for in this
13  case, is money damages part of that relief?
14     A.   I believe so, yes.
15     Q.   If The Company is successful, who would
16  that monetary relief come from?
17     A.   From the people in the suit, right, the
18  ones I mentioned earlier.
19     Q.   Those were Dental Equities, First
20  Arkansas Bank, Mastercard?
21     A.   Mastercard and Dr. Shah.
22     Q.   What factors influence the amount The
23  Company would receive in the case if it's
24  successful?
25     MR. WARNER:   I would just object that it's

Page 35

1  not on the schedule.  So if your only
2  question -- but I'm just going to again reassert
3  our objections to relevance and such, but have
4  her answer, what we've sent to you in writing.
5      THE WITNESS:   Can you repeat that question
6  again, please.
7  BY MR. MONTCALM:
8      Q.   Sure.  What factors influence the
9  amount that The Company would receive in this
10  case if it was successful?
11     A.   I guess I don't know why I'm not
12  understanding your question so that I can
13  answer.  So one more time, can you repeat that?
14     (Record read.)
15     THE WITNESS:   I guess the factors would be
16  that it was done without our consent.  We don't
17  have an established business relationship with
18  any of them.  And that's what I understand from
19  my understanding, that's what it is.
20  BY MR. MONTCALM:
21     Q.   Are you familiar with the term of
22  incentive payment as it applies in class action
23  litigation?
24     A.   Uh-huh.
25     Q.   Is that a yes?

Page 36

1      A.   Yes.
2      Q.   What is your understanding of that
3  term?
4      A.   An incentive I guess is like an amount
5  that is awarded that it will be determined by
6  the judge to be fair for the time it takes to be
7  a representative in the class action.
8      Q.   And so which parties could potentially
9  receive an incentive payment?
10     A.   That would be The Company and there are
11  two others.  I'm trying to think of the names,
12  Scoma Chiropractic, and I can't think of the
13  other name.
14     Q.   Are you referring to the class
15  representative plaintiffs in this lawsuit?
16     A.   Yes.
17     Q.   Does The Company expect to receive an
18  incentive payment in this lawsuit?
19     A.   It doesn't expect to.
20     Q.   Has The Company been promised an
21  incentive payment?
22     A.   No.
23     Q.   Did you meet with your attorneys to
24  prepare for today's deposition?
25     A.   I didn't meet, me.

Page 37

1      Q.   What if anything you did to prepare
2  for the deposition?
3      A.   I looked at the topics and then there
4  is that binder that has information.  I tried to
5  think of important dates, but I can't give you
6  exact dates, but pretty much that, yes.
7      Q.   Did you have any telephone calls with
8  your attorney to prepare for the deposition?
9      A.   I had a phone call and we talked about
10  that we were going to come here and mainly what
11  these topics were.
12     Q.   How long was that, did that phone call
13  last?
14     A.   That was like around 10, 15 minutes or
15  less.
16     Q.   When did that phone call occur?
17     A.   This has been a very busy week for me,
18  so I'm sorry, you know, if I blank out and am
19  not giving you specific times and dates, but it
20  was sometime this week or the end of last week.
21     The reason I don't remember is because
22  I have my mother in Hospice.
23     Q.   I'm sorry.
24     A.   I'm trying to coordinate days and I
25  have a lot.  So but I did -- I can tell you I

Page 38

1  did talk to him and that we talked about --
2      Q.   Just sorry to interrupt you, but just
3  to be clear, I'm not asking for you to inform me
4  about anything that was said back and forth
5  between you and your attorney.
6          I was just asking when the call
7  occurred and I think you've answered that.
8      A.   But I had so many calls this week that
9  I don't want to confuse talking to Mr. Warner
10 with talking to somebody else.
11         So please, I'm sorry, I apologize if,
12 you know, I'm trying to -- but it probably was
13 this week.  Can you ask him?
14 MR. MONTCALM:  No, that's okay.  I'll move on
15 to the next question.
16         Can we go off the record a second.
17             (Discussion off the record.)
18 MR. MONTCALM:  Back on.
19 BY MR. MONTCALM:
20     Q.   Was anybody else on that phone call
21 besides you and Mr. Warner?
22     A.   No.
23     Q.   You touched on this briefly already,
24 but did you review any documents to prepare for
25 the deposition?

Page 39

1      A.   Yes, I looked at the complaint.  I
2  looked at the retainer agreement.  So things
3  relevant to this case that are, yes.
4      Q.   Did you discuss today's deposition with
5  anyone other than your attorney?
6      A.   That would be just Dr. Mussat.
7      Q.   Okay.
8      A.   She was the one that was supposed to be
9  here, but her dad also passed away so she has to
10 take a trip.
11     Q.   Sorry to hear that.
12         How many times did you discuss the
13 deposition with Dr. Mussat?
14     A.   It was that she was the one preparing
15 to come and last minute I had to come in for
16 her. That was what we talked about.
17     Q.   So was it just one conversation?
18     A.   Yes, she just had mentioned in her
19 schedule to block out because it was going to be
20 her coming in.  So she was the one preparing and
21 then at the last minute it was, you have to do
22 it.
23     Q.   How did you meet Mr. Warner?
24     A.   He helped me with a personal matter.
25     Q.   And how did The Company meet

Page 40

1  Mr. Warner?
2      A.   Through me.
3      Q.   Do you have a personal relationship
4  with Mr. Warner or anyone at his law firm?
5      A.   Not a personal relationship.
6      Q.   Are you aware of anyone else at The
7  Company having a personal relationship with
8  anyone at Mr. Warner's firm?
9      A.   No.
10     Q.   Earlier I was asking you about
11 preparing for today's deposition.
12         Did you have any discussions with
13 anyone at the Anderson firm or Edelman firm to
14 prepare for today's deposition?
15     A.   No.
16     Q.   Prior to today have you ever met anyone
17 from the Anderson firm?
18     A.   No.
19     Q.   And the same question for the Edelman
20 firm?
21     A.   No.
22     Q.   Does anyone employed by the company
23 have a personal relationship with anyone from
24 the Anderson firm?
25     A.   Unh-unh.

Page 41

1      Q.   Is that a no?
2      A.   No.
3      Q.   And does anyone from the company have a
4  personal relationship with anyone employed by
5  the Edelman firm?
6      A.   No.
7      Q.   Did the company play any role in
8  selecting the Anderson firm to serve as lead
9  counsel?
10     A.   No.
11     Q.   Do you know who made that decision?
12     A.   That would have been a discussion
13 between Dr. Mussat and Mr. Warner.
14     Q.   Can you briefly describe for me your
15 understanding of what has happened in the case
16 so far?
17     A.   So where -- I guess there was
18 discovery.  There was a discovery process.  We
19 gathered -- well, I gathered information and
20 provided that information.
21         And then it was through the process
22 that we are now -- well, The Company is filing a
23 lawsuit in -- so it's Mr. Ross Good.  He is the
24 lead counselor.
25         Whatever is happening it's communicated

Loidy Tang
11/02/2017

42 to 45

Page 42

1  between them and then it's discussed with
2  Dr. Mussat.
3      Q.   Can you estimate about how much time
4  Dr. Mussat has spent or The Company has spent on
5  the litigation?
6      A.   Well, every document that has come
7  through, it's lengthy, and so she has taken time
8  to review all of that before she signs, so I'm
9  not sure, but a lot of time.
10     Q.   Do you review the documents from the
11 lawsuit that come through from the attorneys?
12     A.   I don't review it unless Dr. Mussat
13 tells me to.
14     Q.   You talked earlier just briefly about
15 The Company first filing this lawsuit in
16 Illinois; do you remember that?
17     A.   Yes.
18     Q.   And at the time the lawsuit was filed
19 in Illinois was Mr. Warner the company's
20 attorney?
21     A.   Yes.
22     Q.   At that time did the company have any
23 other attorneys for this case?
24     A.   No.
25     Q.   Did the company review the complaint

Page 43

1  before it was filed in Illinois?
2      A.   Dr. Mussat reviewed the complaint.
3      Q.   And when the complaint was filed in
4  Illinois by The Company who were the defendants?
5      A.   I believe the defendants at the time
6  were Dental Equities and UMB Bank if that's what
7  it's called.
8      Q.   And again, I'm talking now about the
9  action when it was filed in Illinois by The
10 Company.
11          Were there any other plaintiffs besides
12 The Company when the case was started in
13 Illinois by The Company?
14     A.   I believe -- I think it was -- I don't
15 recall.  I don't recall right now aside from the
16 names I've mentioned.
17     Q.   When The Company began its case in
18 Illinois was that case begun as a class action?
19     A.   I believe so.
20     Q.   And when The Company started the action
21 in Illinois what claims was it asserting against
22 the defendants?
23     A.   It was the unsolicited fax.  The claim
24 was that we received that unsolicited fax
25 without our consent.

Page 44

1      Q.   Were there any other claims?
2      A.   I don't recall.
3      Q.   Was that complaint -- strike that.
4           So you testified earlier that the
5  lawsuit is no longer in Illinois.  It's in
6  Florida now.  Is that an accurate summary of
7  what you said?
8      A.   Yes.
9      Q.   What happened to move the lawsuit from
10 Illinois to Florida?
11     A.   That would have been a discussion
12 between Dr. Mussat and Mr. Warner.
13     Q.   Do you have any knowledge about the
14 content -- strike that.
15          Were you present for that discussion
16 between Dr. Mussat and the lawyer?
17     A.   No.
18     Q.   Do you have an understanding as to
19 whether the lawsuit in Illinois is still active?
20     A.   It has been dismissed.
21     Q.   Who made the decision to dismiss it?
22     A.   I think that's another conversation
23 Dr. Mussat and her lawyer had.
24     Q.   How did the company become aware of the
25 lawsuit in Florida?

Page 45

1      A.   Again, that's a discussion that it
2  happened between Dr. Mussat and Mr. Warner.
3      Q.   Which lawsuit was filed first, the
4  company's lawsuit in Illinois, or the lawsuit in
5  Florida?
6      A.   I don't know.
7      Q.   Did the company file any documents in
8  the Illinois suit that were related to the
9  Florida suit?
10     A.   I don't know.
11     Q.   Did The Company ever try to have the
12 Florida case, Florida suit transferred to
13 Illinois?
14     A.   I don't know that.
15     Q.   Was The Company ever offered -- strike
16 that.
17          Was The Company ever offered money to
18 settle the lawsuit whether in Illinois or
19 Florida?
20     A.   I believe there was a rejected amount.
21 I think it was like $1,500, something like that,
22 that was rejected.
23     Q.   Apart from anything that your attorney
24 may have told you or told The Company does The
25 Company have an independent understanding as to

Page 46

1  what would have happened to the lawsuit if it
2  had accepted that offer?
3      MR. WARNER:  Objection, it calls for a legal
4  conclusion, but you can answer.
5      THE WITNESS:  Can you rephrase your question?
6  BY MR. MONTCALM:
7      Q.   Sure.  So without divulging any
8  information that was communicated between your
9  attorneys does The Company have an understanding
10 of the effect, what the effect would have been
11 of accepting that offer?
12     MR. WARNER:  Same objection.
13     THE WITNESS:  Dr. Mussat reviewed the
14 retainer agreement and my belief is she is fully
15 aware of what that would have been.
16 BY MR. MONTCALM:
17     Q.   So did The Company end up filing a
18 complaint in Florida related to the fax?
19     A.   I think it was -- it was filed as
20 multi-district, with a multi-district panel.  So
21 it was transferred.
22          There's two other cases.  So my
23 understanding is that it all just became part of
24 the three merged.
25     Q.   After the three merged was -- did the

Page 47

1  three plaintiffs together file a complaint in
2  Florida?
3      A.   I believe it is in Florida.
4      Q.   Who are the defendants in Florida?
5      A.   So I think Scoma Chiropractic and I
6  can't think of the others.
7      Q.   So I actually asked who the defendants
8  were sort of?
9      A.   I'm sorry.
10     Q.   That's okay, no worries.
11     A.   I believe it is Dr. Shah and
12 Mastercard, so yes, and I think it's Dental
13 Equities and the Arkansas Bank & Trust, the ones
14 I originally mentioned.
15     Q.   So other than the lawsuit we've been
16 discussing, the Illinois lawsuit and the lawsuit
17 that is now in Florida, is The Company aware of
18 any other lawsuits relating to the faxes at
19 issue in this case?
20     A.   Say that again, please.
21     Q.   Sure.
22     A.   Rephrase it, please.
23     Q.   Sure.  Is The Company aware of any
24 lawsuits, other lawsuits involving the faxes
25 where The Company is not a plaintiff?

Page 48

1      A.   Oh, I believe we're aware of the ones
2  that I mentioned, but not, no.
3      Q.   Does The Company have any knowledge
4  about a lawsuit involving these faxes that was
5  filed in Arkansas?
6      A.   No.
7      Q.   Has The Company settled any claims
8  against any of the defendants in this case?
9      A.   No.
10          (Deposition Exhibit No. 70,
11          marked for identification.)
12 BY MR. MONTCALM:
13     Q.   Has The Company received -- well,
14 strike that.
15          The court reporter is handing you what
16 has been marked as Exhibit 70.  It's a multipage
17 document.
18          Would you please take a moment to
19 review it and then let me know when you're ready
20 and I'll ask you a couple of questions.
21     A.   I'm ready.
22     Q.   Do you recognize this document?
23     A.   Yes.
24     Q.   What is it?
25     A.   This is the complaint -- oh, sorry, can

Page 49

1  I just take a moment.  I'm just going to review
2  it.
3      Q.   Please take a moment.
4      A.   All right.  Yes, okay.
5      Q.   What is it?
6      A.   It's what it says, the interrogatories,
7  so it's the answers The Company has provided.
8      Q.   If you can turn to the second to last
9  page.  Just so you know it's this one, the one
10 near your left hand?
11     A.   Okay.
12     Q.   Do you see on the bottom there there is
13 a signature?
14     A.   Uh-huh.
15     Q.   Is that Dr. Mussat's signature?
16     A.   Yes.
17     Q.   And what's the date?
18     A.   It says here 7/26/12.
19     Q.   I think --
20     A.   No, 17, she writes her seven with a
21 little thing.
22     Q.   I was just going to ask about that.
23     A.   Okay.
24     Q.   So and The Company understands that by
25 signing the interrogatories it's certifying that

Loidy Tang
11/02/2017

50 to 53

Page 50

1  the responses are true; is that correct?
2      A.    Yes.
3      Q.    And did The Company read these
4  responses before they signed them?
5      A.    Yes.
6      Q.    Did The Company draft any part of the
7  responses?
8      A.    When you say draft like what do you
9  mean?
10     Q.    Like write them?
11     A.    Oh, yes.
12     Q.    So if we can turn your attention to
13  page -- the pages aren't numbered.  It's the
14  response to Interrogatory No. 11 on the fourth
15  page in, the fifth maybe, about two thirds of
16  the way down it says Interrogatory No. 11.
17     A.    Okay.
18     Q.    So Interrogatory No. 11 states:
19  Identify all TCPA lawsuits to which you have
20  been a plaintiff, (class actions or otherwise),
21  including the case name, the court where filed,
22  the case or action number, all named plaintiffs
23  and defendants, counsel, a description of the
24  nature of that litigation, and the current
25  status or final result/outcome of such

Page 51

1  litigation, including any damages or settlement
2  payments you received.
3          Do you see that?
4      A.    Uh-huh.
5      MR. WARNER:  Just for the record we've given
6  you our written objection to the scope and
7  relevance of Topic No. 6 which seems to be where
8  we're heading.
9      MR. MONTCALM:  Okay.
10     MR. WARNER:  If I may have a continuing
11  objection without me saying anything to your
12  question.
13     MR. MONTCALM:  Your objection is noted,
14  absolutely.
15  BY MR. MONTCALM:
16     Q.    Can you take a moment, please, and
17  you'll see that the answer to Interrogatory
18  No. 11 is separated out over three pages into
19  paragraphs numbering A through N; do you see
20  that?
21     A.    Uh-huh.
22     Q.    My question is, are these all of the
23  TCPA lawsuits to which The Company has been a
24  plaintiff?
25     A.    Yes.

Page 52

1      Q.    And in how many of these lawsuits did
2  the plaintiff -- was there a settlement on
3  behalf of the class -- oh, strike that.  Strike
4  that.
5          Let me go back.  Give me a moment here.
6          One other thing I neglected to ask you
7  about earlier, you had testified that The
8  Company received the fax that is at issue in
9  this case around December 18th; do you remember
10  that?
11     A.    Yes.
12     Q.    Did The Company receive any other faxes
13  similar to the one that is at issue in this
14  case?
15     A.    I don't recall.
16     Q.    Is The Company alleging in the lawsuit
17  that it received any more faxes than the one fax
18  you testified about earlier?
19     A.    No.
20     Q.    If you will go back to I guess the
21  third page in, I want to focus your attention on
22  Interrogatory No. 2?
23     A.    Okay.
24     Q.    Paraphrasing that interrogatory it asks
25  The Company to identify every fax they received

Page 53

1  and where it says fax it means the fax that's at
2  issue in this case.
3          In the response that goes on to the
4  next page about seven lines down in that
5  response there is a sentence that says,
6  investigation continues; do you see that?
7      A.    I hope I'm looking at the right thing.
8      Q.    I think so.  If you start on the page
9  that has Interrogatory No. 2 on it.
10     A.    Okay.
11     Q.    Take a moment and read the answer that
12  starts on the bottom of the page and read the
13  entire answer and then I'll ask my question
14  again.
15     A.    Okay.
16     Q.    So actually start with the sentence
17  before.  It says, without waiving and subject to
18  said objections, Mussat is producing a copy of
19  the Fax which bears a time stamp and date of
20  12/31, 12/18/15, and further identifies that it
21  was sent to 1-773-868-3700, which is her fax
22  number.  Investigation continues.
23          Do you see that?
24     A.    Yes.
25     Q.    Has that investigation resulted in

Page 54

1  identifying any other faxes that were sent by
2  the defendants to the company?
3      A.   Just that one fax received 12/18.
4      Q.   Has the company completed the
5  investigation that's referred to in the response
6  to Interrogatory No. 2?
7      MR. WARNER:  I'm going to object as it calls
8  for communication between counsel and
9  Dr. Mussat.
10     MR. MONTCALM:  Are you instructing her not to
11 answer?
12     MR. WARNER:  If you can paraphrase it another
13 way.  We have made a supplemental interrogatory.
14     MR. MONTCALM:  You made a supplemental
15 interrogatory response, but not to this
16 interrogatory.
17     MR. WARNER:  Correct.
18     MR. MONTCALM:  I would -- I guess I would
19 point out that this response is part of the
20 interrogatory response.
21         It's referring to a response that was
22 provided and says investigation continues.  So I
23 think it's fair game for the question that I
24 asked.
25     MR. WARNER:  Sure, it is.  And maybe the best

Page 55

1  way to do it is on cross examination, but --
2  BY MR. MONTCALM:
3      Q.   Do you know whether The Company has
4  concluded an investigation into whether it
5  received any other faxes from the defendants?
6      A.   Well, during the process of gathering
7  all the information Vonage has this -- their
8  system does not allow -- did not allow us a
9  whole log of that.
10         So continually I asked for production
11 of all the logs of those dates.  And so from
12 what we have, you know, we were unable to get
13 documentation from Vonage because they stated
14 from various -- and I was bouncing around with
15 different representatives that they could not
16 give me a log.  And some said, yes, we will give
17 it to you, but they did not provide a log.
18     Q.   Earlier you had testified that if
19 Dr. Mussat sees a fax that's unsolicited, she
20 makes the decision whether or not to send it to
21 Mr. Warner; do you remember that?
22     A.   Yes.
23     Q.   And I believe you testified that when
24 that occurs the fax is scanned and e-mailed to
25 Mr. Warner's firm; is that correct?

Page 56

1      A.   Correct.
2      Q.   Other than the fax at issue in this
3  case, the one referenced in the response to
4  Interrogatory No. 2, has The Company scanned any
5  other faxes that were sent, allegedly sent by
6  the defendants to The Company?
7      A.   I don't -- whatever she says scan and
8  if it was provided multiple times, then, you
9  know, it's possible she thought I already sent
10 it, the same thing.  So honestly I don't know.
11     Q.   And I apologize, that was a very
12 confusing question.  I think I can ask a simpler
13 question.
14         Are you aware of any other faxes that
15 said the word Mastercard on them anywhere that
16 Dr. Mussat sent on to Mr. Warner?
17     A.   I am not aware.
18     Q.   Can you articulate the difference
19 between a lawsuit brought on behalf of an
20 individual party and one that's a class action?
21     A.   Yes, my understanding is that when
22 it's an individual you're representing yourself,
23 but when you're a representative you represent a
24 pool of people who also have had the same thing
25 happen to them.

Page 57

1          And in this case that would be 380,665
2  people.  That's a lot of people.
3      MR. MONTCALM:  I would just move to strike
4  the nonresponsive part of that answer.
5  BY MR. MONTCALM:
6      Q.   Does a class representative owe any
7  duties to the other class members?
8      A.   The class representative, you have the
9  duty to advocate for the right that has been
10 violated.
11     Q.   Does The Company want to be a class
12 representative in this case?
13     A.   Yes.
14     Q.   Does The Company believe it would make
15 a good class representative?
16     A.   Yes.
17     Q.   Up until now how would you describe The
18 Company's role in the case?
19     A.   The Company -- well, The Company has
20 provided documentation, has provided the
21 interrogatories, has produced all of the
22 information that has been requested for
23 relevance of this case.
24         Whatever it has, The Company has been
25 asked to do regarding this case The Company has

1  done its best to provide.
2      Q.   Does The Company participate in
3  decisions about what to do in the case?
4      A.   The Company --
5      MR. WARNER:  Objection, form.
6      THE WITNESS:  I guess The Company decides
7  based on the communications it would have with
8  the owner, Dr. Mussat and her counsel.
9  BY MR. MONTCALM:
10     Q.   How frequently does The Company
11  communicate with Mr. Warner?
12     A.   I wouldn't be able to tell you how
13  frequently, but as many times as they have to.
14     Q.   And by what method does The Company
15  typically communicate with Mr. Warner?
16     A.   There is cell phone, e-mail, office
17  phone.
18     Q.   How frequently does The Company
19  communicate with the Anderson firm?
20     A.   It's all done through Mr. Warner.
21     Q.   Does The Company supervise Mr. Warner's
22  actions in this case?
23     MR. WARNER:  Objection, form.
24     THE WITNESS:  I believe that's communication
25  that happens between Dr. Mussat and her lawyer.

1  Can you just ask that again?
2  BY MR. MONTCALM:
3      Q.   Yes, I can ask it in a slightly
4  different way.
5          Does The Company play a supervisory
6  role with respect to its attorneys in this
7  action?
8      A.   Well, the counsel advises and then if
9  The Company needs to make a decision, then it
10  will get advice from the counsel.
11         But as far as when you say supervisory,
12  it's based on communications that happen between
13  Dr. Mussat and her counsel.
14     Q.   Are you familiar with the phrase absent
15  class members?
16     A.   I know what absent means and class
17  members.  I'm thinking so people that are not
18  there, right, yes.
19     Q.   And as class representative what is
20  your -- The Company's relationship to absent
21  class members?
22     A.   To make sure that the decisions that
23  are being made are for the benefit of the whole
24  class.
25     MR. MONTCALM:  Off the record.

1          (Brief recess.)
2      MR. MONTCALM:  So subject to any recross I
3  don't have any more questions.
4          I just want to make a request on the
5  record for the three engagement agreements that
6  we discussed with the witness today.  Those
7  being with all three law firms who are
8  represented here at today's deposition and we'll
9  follow up that request in writing as well.
10         As I said, subject to any recross I
11  don't have further questions.
12             EXAMINATION
13  BY MR. WARNER:
14     Q.   Ms. Tang, do you know what the duties
15  are of a proposed class representative such as
16  Florence Mussat, M.D., S.C. in a class action
17  case?
18     A.   Yes, to be familiar with the case, to
19  be able to give to the best of your knowledge
20  information relevant to the case as it is like
21  we have those documents there.  I should be able
22  to know what's in there, but to make myself
23  available and to be prepared for this
24  deposition.
25     Q.   And making either yourself or anyone

1  from the office available would that include
2  anything regarding court?
3      A.   Yes.
4      MR. MONTCALM:  Object to the form.
5  BY MR. WARNER:
6      Q.   And what things for the court might the
7  company make itself available for?
8      A.   For trial, for being cross examined,
9  for anything that to make yourself available for
10  whatever and however the case is moving forward
11  and how you're needed.
12     Q.   And are you aware that Florence Mussat,
13  M.D., S.C. has been found to be an adequate
14  class representative in other class actions?
15     A.   Yes.
16     Q.   And are you aware that either the owner
17  or other designated persons have attended
18  settlement conferences?
19     A.   Yes.
20     Q.   And are you aware how as a resolution
21  of a class action settlement monies are provided
22  to Florence Mussat, M.D., S.C.?
23     A.   Yes.
24     Q.   And how are those monies provided to
25  Florence Mussat, M.D., S.C.?

Loidy Tang
11/02/2017                                           62 to 65

Page 62

1      A.   No. That would be -- I'm sorry, one
2  more time.
3      Q.   I'm leaving the question open so I
4  don't get an objection for leading.
5      A.   Oh, I see.  We're made aware that
6  whatever monies are awarded, that whatever the
7  judge decides that The Company gets that's what
8  will be awarded.
9           There are I guess things that are set
10 in place like such as statutory damages that
11 have like a number on it per violation that I'm
12 aware that if there is an incentive, the judge
13 will say what is fair and then will give that to
14 the class representative.
15     Q.   Do you know what the statutory damages
16 are in a TCPA case such as this?
17     A.   I believe that it is $500 and $1,500
18 for -- it's 500 for like unwillful and $1,500
19 for willful.
20     Q.   And that would be an amount per fax?
21     A.   Per fax.
22     MR. MONTCALM:  Objection to the form.
23 BY MR. WARNER:
24     Q.   Can I finish my question, sorry.
25          Would that be an amount per fax that

Page 63

1  Florence Mussat, M.D., S.C. would be seeking
2  for the class members in this case?
3      A.   Yes.
4      Q.   And you had mentioned that Florence
5  Mussat, M.D., S.C. had used a different fax
6  machine previous?
7      A.   Yes.
8      Q.   And was that a standalone fax machine?
9      A.   Yes.
10     Q.   And does the current setup of the
11 machine act as a fax machine that is used by
12 Florence Mussat, M.D., S.C.?
13     MR. MONTCALM:  I object to the form.
14     THE WITNESS:  So right now we have Vonage.
15 It's through like a web portal.
16          The actual machine that we used before,
17 and I can't remember specifically the date when
18 we stopped using it, but our phone number, fax
19 number remains the same regardless of which
20 machine was used.
21 BY MR. WARNER:
22     Q.   So the machines currently used at
23 Florence Mussat, M.D., S.C. are the equivalent
24 of a fax machine?
25     MR. MONTCALM:  Object to the form.

Page 64

1      THE WITNESS:  Yes, so it is the same as
2  having a fax machine.  It has the same -- it has
3  the same function.  It's a fax and does the
4  function.
5  BY MR. WARNER:
6      Q.   Can you take a look at this document.
7  I'm going to give you a copy.  I haven't made
8  copies, but we can make copies and enter it as
9  Exhibit 71.
10     A.   Okay.
11          (Deposition Exhibit No. 71,
12          marked for identification.)
13 BY MR. WARNER:
14     Q.   And if you can take a look at this
15 document I'm going to hand you.
16     A.   Yes.
17          (Deposition Exhibit No. 71,
18          marked for identification.)
19 BY MR. WARNER:
20     Q.   Do you know what this document is?
21     A.   Yes, I do.
22     Q.   Let's give it to defense counsel.  I
23 apologize for not -- I took it out of the
24 binder.
25          What we have is three printed pages

Page 65

1  front and back.
2          Can you explain to me what this
3  document is?
4      A.   Yes.
5      Q.   Or can you identify the sender of the
6  document?
7      A.   Yes, so the sender, this was for our
8  request for opting out and Dr. Mussat filled out
9  the signed off on the opt out and I e-mailed it
10 back.
11     Q.   Does this refresh your memory about
12 there was a question about any other cases
13 involving the same fax?
14     A.   Yes, I apologize.  I'm trying to the
15 best of my ability to remember.
16          And Dr. Mussat was the one that was
17 going to be deposed.  And so this is, yes, I do
18 recall this document in that case that was opted
19 out.
20     MR. WARNER:  I have nothing else.
21     MR. MONTCALM:  Can I see the document again
22 real quick?
23     MR. WARNER:  Sure.
24     MR. MONTCALM:  I would note for the record,
25 please correct me if I'm wrong, that this

Page 66

```
 1   document has not been produced in this case.
 2       MR. WARNER:  It was not responsive, correct.
 3       MR. MONTCALM:  But it has not been produced,
 4   correct?
 5       MR. WARNER:  Correct, it wasn't responsive in
 6   our opinion.
 7       MR. MONTCALM:  So I'll object on that basis
 8   to the questions and answers arising from that
 9   document.
10       MR. WARNER:  First Arkansas didn't provide
11   this to you either?
12       MR. MONTCALM:  No.
13       MR. WARNER:  I have no further questions.
14   We'll reserve signature.
15       MR. MONTCALM:  No further questions.  Thank
16   you for your time.
17           FURTHER DEPONENT SAITH NAUGHT...
18
19
20
21
22
23
24
25
```

Page 67

```
 1       IN THE UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
 2
     SCOMA CHIROPRACTIC, P.A.,)
 3   et al.,                 )
                             )
 4       Plaintiffs,         )
                             )
 5   -v-              ) No: 2:16-cv-00041
                             )
 6   DENTAL EQUITIES, LLC,   )
     et al.,                 )
 7                           )
                             )
 8       Defendants.         )
 9     This is to certify that I have read the
10   transcript of my deposition taken in the
11   above-entitled cause by Marybeth Lynch Farrell,
12   Certified Shorthand Reporter, on November 2,
13   2017, and that the foregoing transcript
14   accurately states the questions asked and the
15   answers given by me as they now appear.
16
         _____
17           LOIDY TANG
18   SUBSCRIBED AND SWORN to
     before me this _____day
19   of _____, 2017.
20
21   -----------------------
     Notary Public
22
23
24
25
```

Page 68

```
 1   STATE OF ILLINOIS )
                       )
 2   COUNTY OF COOK    ) SS:
                       )
 3     I, MARYBETH LYNCH FARRELL, a Certified
 4   Shorthand Reporter in the State of Illinois, do
 5   certify that heretofore, to-wit, on the 2nd day
 6   of November, 2017, personally appeared before me
 7   at 20 South Clark Street, Chicago, Illinois,
 8   LOIDY TANG, in a cause now pending and
 9   undetermined in the United States District
10   Court, Middle District of Florida, wherein Scoma
11   Chiropractic, P.A., et al., are the Plaintiffs
12   and Dental Equities, et al., are the Defendants.
13     I further certify that the said witness was
14   first duly sworn to testify the truth, the whole
15   truth and nothing but the truth in the cause
16   aforesaid; that the testimony then given by said
17   witness was reported stenographically by me in
18   the presence of the said witness, and afterwards
19   reduced to typewriting by Computer-Aided
20   Transcription, and the foregoing is a true and
21   correct transcript of the testimony so given by
22   said witness as aforesaid.
23     I further certify that the signature to the
24   foregoing deposition was not waived by counsel
25   for the respective parties.
```

Page 69

```
 1     I further certify that the taking of this
 2   deposition was pursuant to Notice, and that
 3   there were present at the deposition the
 4   attorneys hereinbefore mentioned.
 5     I further certify that I am not counsel for
 6   nor in any way related to the parties to this
 7   suit, nor am I in any way interested in the
 8   outcome thereof.
 9
10
11
12
              Marybeth Farrell
13       License No. 084-002943
14
15
16
17
18
19
20
21
22
23
24
25
```

Loidy Tang
11/02/2017                                                         1

---

**$**

**$1,500** 45:21 62:17,18
**$500** 62:17

---

**1**

**1-773-868-3700** 53:21
**10** 23:14 37:14
**11** 50:14,16,18 51:18
**12/18** 54:3
**12/18/15** 53:20
**12/31** 53:20
**15** 37:14
**17** 49:20
**18th** 17:4 52:9

---

**2**

**2** 52:22 53:9 54:6 56:4
**20** 23:17
**2006** 4:24
**2011** 4:25 5:15
**2016** 17:6
**26th** 17:8

---

**3**

**3** 9:15
**380,665** 10:22 11:11 57:1

---

**5**

**500** 62:18
**5:00** 19:16
**5th** 22:17

---

**6**

**6** 51:7
**69** 8:13,17

---

**7**

**7/26/12** 49:18
**70** 48:10,16
**71** 64:9,11,17

---

**9**

**9:00** 19:16

---

**A**

**abide** 20:24
**ability** 26:13 65:15
**absent** 59:14,16,20
**absolutely** 51:14
**accepted** 46:2
**accepting** 46:11
**access** 19:21
**accessing** 18:17 19:22
**accurate** 44:6
**act** 10:20 12:9 63:11
**action** 14:4,9,18 30:14 35:22
    36:7 43:9,18,20 50:22 56:20
    59:7 60:16 61:21
**actions** 50:20 58:22 61:14
**active** 44:19
**acts** 12:19
**actual** 63:16
**adequate** 61:13
**advances** 26:7
**advertised** 14:10
**advertisement** 12:4 14:10
    16:7,10
**advertising** 16:11
**advice** 30:23 31:6 33:17
    59:10
**advise** 30:25
**advises** 59:8
**advocate** 14:13 57:9
**affected** 10:22 31:20
**agreement** 25:6,10,12,14,
    22,24 26:3,17,21 28:12,25
    29:4,6,8,11,14,17,18,21,24
    30:1,5,7,8 39:2 46:14
**agreements** 30:10 60:5
**allegedly** 13:17 56:5
**alleging** 52:16
**allowed** 33:5
**amount** 19:4 33:2 34:22
    35:9 36:4 45:20 62:20,25
**Anderson** 27:19,23,24 28:6,
    13,25 30:6 40:13,17,24 41:8
    58:19

---

**annoyances** 31:17
**annoyed** 31:15
**answers** 49:7
**apologize** 38:11 56:11 64:23
    65:14
**applies** 35:22
**Arkansas** 11:20,24 34:20
    47:13 48:5
**articulate** 56:18
**asks** 52:24
**asserting** 43:21
**attended** 61:17
**attention** 50:12 52:21
**attorney** 37:8 38:5 39:5
    42:20 45:23
**attorneys** 36:23 42:11,23
    46:9 59:6
**avoided** 14:14
**awarded** 33:8,22 36:5 62:6,8
**aware** 40:6 44:24 46:15
    47:17,23 48:1 56:14,17
    61:12,16,20 62:5,12

---

**B**

**back** 8:12 30:16 32:14 38:4,
    18 52:5,20 65:1,10
**bad** 13:20
**Bank** 11:20,24 34:20 43:6
    47:13
**based** 16:1 58:7 59:12
**bears** 53:19
**began** 43:17
**begun** 43:18
**behalf** 10:10 15:4 30:1 52:3
    56:19
**belief** 46:14
**benefit** 7:17 59:23
**binder** 9:4,6,13 37:4 64:24
**bit** 19:1 30:4
**blank** 37:18
**block** 39:19
**board** 5:20
**bottom** 49:12 53:12
**bouncing** 55:14
**break** 8:2,5
**briefly** 38:23 41:14 42:14
**bringing** 14:4,18,21
**brought** 56:19

---

business 35:17
busy 22:14 37:17

## C

call 37:9,12,16 38:6,20
called 4:2 43:7
calls 37:7 38:8 46:3 54:7
card 12:4 16:6,14,23
case 6:8,11 10:15 15:25
  20:19 24:17 25:1,4,7 26:1,8,
  10,15,23 27:16,18 28:7
  29:1,22 30:13 32:4 34:5,13,
  23 35:10 39:3 41:15 42:23
  43:12,17,18 45:12 47:19
  48:8 50:21,22 52:9,14 53:2
  56:3 57:1,12,18,23,25 58:3,
  22 60:17,18,20 61:10 62:16
  63:2 65:18
cases 46:22 65:12
cell 58:16
certified 5:20
certifying 49:25
characterized 16:9
check 18:5
checked 19:13,15
checking 19:18
Chiropractic 36:12 47:5
claim 43:23
claims 14:22 43:21 44:1
  48:7
clarify 11:22
class 30:14 35:22 36:7,14
  43:18 50:20 52:3 56:20
  57:6,7,8,11,15 59:15,16,19,
  21,24 60:15,16 61:14,21
  62:14 63:2
clear 7:18 38:3
Combs 27:21 28:2
communicate 58:11,15,19
communicated 41:25 46:8
communication 10:19 12:9
  28:10 54:8 58:24
communications 58:7 59:12
company 10:17,23 11:2,12,
  25 12:7,12 13:12,13 14:13,
  21 15:4,21 16:25 17:2,3,20
  18:8,10 20:18 22:22 23:11,
  21,22 24:6,19,25 25:5,9
  26:14,15,16,22 27:3,16
  28:5,13,24 29:3,20 30:2,12

31:2,22 32:3,5 33:4,6,15,17,
  23 34:4,9,12,15,23 35:9
  36:10,17,20 39:25 40:7,22
  41:3,7,22 42:4,15,22,25
  43:4,10,12,13,17,20 44:24
  45:7,11,15,17,24,25 46:9,17
  47:17,23,25 48:3,7,13 49:7,
  24 50:3,6 51:23 52:8,12,16,
  25 54:2,4 55:3 56:4,6 57:11,
  14,19,24,25 58:2,4,6,10,14,
  18,21 59:5,9 61:7 62:7
company's 15:16 17:11 28:9
  30:14 32:7 42:19 45:4 57:18
  59:20
compensation 32:20 33:8
complaint 39:1 42:25 43:2,3
  44:3 46:18 47:1 48:25
completed 54:4
completely 7:15 31:15
concluded 55:4
conclusion 46:4
conferences 61:18
confuse 38:9
confusing 56:12
consent 12:23 14:3 32:11
  35:16 43:25
consented 12:14
consuming 31:12
contact 28:5
contacted 30:12
contained 13:12
content 16:3 44:14
contingent 26:8,9
continually 55:10
continue 10:5
continues 53:6,22 54:22
continuing 51:10
continuously 19:18
conversation 7:6,14 39:17
  44:22
coordinate 37:24
copies 64:8
copy 53:18 64:7
correct 5:18 6:13 12:17
  14:20 15:5,6 19:23 21:3
  22:11 24:18 26:4,5,17 50:1
  54:17 55:25 56:1 65:25
cost 29:19
costs 26:7,12,16 27:11,14

counsel 27:20 28:9 33:18
  41:9 50:23 54:8 58:8 59:8,
  10,13 64:22
counselor 41:24
couple 6:6 8:21 16:9 48:20
court 7:2,6,18 11:17 15:17,
  19 26:15 34:1,5 48:15 50:21
  61:2,6
credit 12:4 16:6,14,23
cross 55:1 61:8
current 50:24 63:10
CURTIS 9:3

## D

dad 39:9
daily 18:5 19:18
damages 33:1,5,14,16 34:13
  51:1 62:10,15
date 24:15,16 25:3 49:17
  53:19 63:17
dates 24:11 37:5,6,19 55:11
day 19:6,15
days 24:13 37:24
deal 10:3 22:23 31:14
December 17:4 52:9
decide 22:25
decides 23:4 58:6 62:7
decision 41:11 44:21 55:20
  59:9
decisions 58:3 59:22
defendants 34:6 43:4,5,22
  47:4,7 48:8 50:23 54:2 55:5
  56:6
defense 64:22
Dental 11:13,23 34:19 43:6
  47:12
deposed 5:22 6:5,9,18 65:17
deposition 6:15,23 8:13 9:7
  11:1 36:24 37:2,8 38:25
  39:4,13 40:11,14 48:10
  60:8,24 64:11,17
describe 10:14 16:3 17:13
  41:14 57:17
description 50:23
designated 61:17
desk 18:12,19,22,24 21:11,
  14
details 16:22

Loidy Tang
11/02/2017

3

determine 22:4
determined 36:5
determines 22:1 26:19
  33:18
dictate 18:20 19:4
difference 56:18
difficult 11:14
direct 11:12
discovery 13:6 24:12 41:18
discretion 26:12,18
discuss 39:4,12
discussed 14:24 42:1 60:6
discussing 23:20 47:16
discussion 8:11 38:17 41:12
  44:11,15 45:1
discussions 40:12
dismiss 44:21
dismissed 44:20
dispose 24:2
District 15:20,23
districts 15:10,12,22
divulging 46:7
doctor 5:16,19 16:15
document 8:18,24 21:13
  42:6 48:17,22 64:6,15,20
  65:3,6,18,21
documentation 55:13 57:20
documents 9:6,8,12 16:19
  18:7,10,25 19:25 38:24
  42:10 45:7 60:21
Dorsey 4:9
Dose 9:6
double 9:16
draft 50:6,8
duly 4:2
duties 57:7 60:14
duty 57:9

E

e-mail 17:22,24 20:2,10
  22:20 58:16
e-mailed 55:24 65:9
earlier 34:18 40:10 42:14
  44:4 52:7,18 55:18
easier 18:9 20:16 21:13
  27:23
easiest 20:7
easy 19:15

Edelman 27:21 28:2,3 29:21
  30:8 40:13,19 41:5
efax 17:12,13
effect 46:10
effort 31:16
employed 4:16,18 40:22
  41:4
employee 5:9
employees 5:6
end 20:4 37:20 46:17
endurance 7:25
engagement 60:5
enter 64:8
entire 15:4 53:13
Equities 11:13,23 34:19
  43:6 47:13
equivalent 63:23
Erika 5:10
established 11:13 12:13
  14:11 35:17
estimate 6:2 42:3
exact 6:1 24:14 37:6
examination 4:4 55:1 60:12
examined 4:3 61:8
Excuse 9:10
Exhibit 8:13,17 48:10,16
  64:9,11,17
expect 36:17,19
expenses 26:1 29:15
explain 29:18 65:2
explained 26:14

F

factors 34:22 35:8,15
facts 14:10 30:13
fair 14:17 36:6 54:23 62:13
familiar 6:24 25:21 29:10
  35:21 59:14 60:18
fax 10:18,22 12:4 14:15
  15:25 16:4,6,9,11,25 17:2,3,
  10,16,19 19:12 20:9,18,23,
  24 21:1,4,17,23 22:2,13,18
  23:3,4,22,25 24:2,4,5,7,15,
  16 43:23,24 46:18 52:8,17,
  25 53:1,19,21 54:3 55:19,24
  56:2 62:20,21,25 63:5,8,11,
  18,24 64:2,3 65:13
faxes 13:13 17:24 18:4,5,21
  19:5,7,22,23 20:1 22:23

23:10,21 47:18,24 48:4
  52:12,17 54:1 55:5 56:5,14
features 19:14
feel 14:6
fees 26:24 27:2
file 11:8 30:14 45:7 47:1
filed 10:17 12:3 15:7 42:18
  43:1,3,9 45:3 46:19 48:5
  50:21
files 34:1
filing 33:24 41:22 42:15
  46:17
filled 65:8
final 50:25
finish 62:24
finished 7:15
firm 4:9 24:21,22 26:7,25
  27:2,10,17 28:6,13 29:1,21
  30:5,6,9 40:4,8,13,17,20,24
  41:5,8 55:25 58:19
firms 60:7
Florence 4:19 6:12,19
  10:10,16 11:2,3,5 60:16
  61:12,22,25 63:1,4,12,23
Florida 15:9,13,14,17,22
  44:6,10,25 45:5,9,12,19
  46:18 47:2,3,4,17
focus 52:21
follow 13:3 23:7 60:9
form 31:4,8 58:5,23 61:4
  62:22 63:13,25
forward 61:10
found 27:13 61:13
fourth 50:14
frequently 58:10,13,18
front 26:11 65:1
full 4:11
fully 46:14
function 64:3,4
future 14:14

G

gain 31:2
gained 12:23
game 54:23
gathered 41:19
gathering 55:6
General 29:12

**generally** 25:21 29:10
**gentleman** 22:9
**give** 6:1 7:1,16 23:2,13
  32:25 37:5 52:5 55:16 60:19
  62:13 64:7,22
**giving** 37:19
**good** 4:6,7 27:19 41:23
  57:15
**gosh** 25:2
**gracious** 28:1
**ground** 6:23
**guess** 13:10,12,15 14:6
  26:20 33:21 35:11,15 36:4
  41:17 52:20 54:18 58:6 62:9

## H

**hand** 49:10 64:15
**handing** 8:16 48:15
**happen** 22:4 56:25 59:12
**happened** 41:15 44:9 45:2
  46:1
**happening** 41:25
**happy** 7:23
**head** 7:8,9
**heading** 51:8
**hear** 39:11
**held** 4:22
**helped** 39:24
**hire** 24:19,25
**holiday** 16:5
**honestly** 6:17 23:15 56:10
**hope** 31:2,18 53:7
**Hospice** 37:22
**host** 28:1
**hours** 19:19

## I

**identification** 8:14 48:11
  64:12,18
**identifies** 53:20
**identify** 50:19 52:25 65:5
**identifying** 54:1
**Illinois** 15:18,19,23 42:16,19
  43:1,4,9,13,18,21 44:5,10,
  19 45:4,8,13,18 47:16
**important** 18:6,10 20:5
  21:13 22:16 37:5

**incentive** 35:22 36:4,9,18,21
  62:12
**include** 32:8 61:1
**including** 50:21 51:1
**incoming** 19:7
**independent** 45:25
**individual** 11:9 56:20,22
**influence** 34:22 35:8
**inform** 38:3
**information** 24:10 37:4
  41:19,20 46:8 55:7 57:22
  60:20
**initiate** 28:5
**instructing** 54:10
**intent** 30:14,24
**International** 11:21
**interrogatories** 49:6,25
  57:21
**interrogatory** 50:14,16,18
  51:17 52:22,24 53:9 54:6,
  13,15,16,20 56:4
**interrupt** 38:2
**investigation** 53:6,22,25
  54:5,22 55:4
**involving** 47:24 48:4 65:13
**issue** 20:19 22:3 30:13
  47:19 52:8,13 53:2 56:2

## J

**January** 22:17
**Jonathan** 4:8
**judge** 36:6 62:7,12
**Junk** 20:4

## K

**kind** 5:19
**knowing** 13:14
**knowledge** 44:13 48:3 60:19

## L

**labs** 19:8
**law** 4:9 14:12,18 24:21,22,
  24,25 25:6 26:7,25 27:2,10,
  17 33:7,8 40:4 60:7
**Law's** 25:6
**laws** 12:18 32:25

**lawsuit** 4:10 12:1,21 15:2,7,
  16,21 22:3 27:15 30:14 31:3
  32:24 33:16 36:15,18 41:23
  42:11,15,18 44:5,9,19,25
  45:3,4,18 46:1 47:15,16
  48:4 52:16 56:19
**lawsuits** 47:18,24 50:19
  51:23 52:1
**lawyer** 14:24 22:6,7 44:16,
  23 58:25
**lead** 27:20 41:8,24
**leading** 62:4
**leaving** 62:3
**left** 49:10
**legal** 46:3
**lengthy** 42:7
**liable** 26:13,19 27:13
**light** 13:6
**lines** 53:4
**list** 9:18 13:11,12,15,17,21,
  23 14:3,15
**listen** 32:16
**litigation** 29:16 35:23 42:5
  50:24 51:1
**log** 17:16,18 18:1,3 19:21
  20:6,7,16 55:9,16,17
**logs** 55:11
**Loidy** 4:1,13
**long** 4:22 5:13 37:12
**longer** 44:5
**looked** 9:14 16:12 37:3 39:1,
  2
**loses** 26:15
**lot** 16:12 29:12,13 31:20
  37:25 42:9 57:2

## M

**M.D.** 4:19 10:10,17 11:3
  60:16 61:13,22,25 63:1,5,
  12,23
**machine** 23:23,25 24:3,4,5,
  7,15 63:6,8,11,16,20,24
  64:2
**machines** 63:22
**made** 41:11 44:21 54:13,14
  59:23 62:5 64:7
**make** 26:6 57:14 59:9,22
  60:4,22 61:7,9 64:8

makes 18:9 55:20
making 20:15 27:22 60:25
manager 4:21 5:2 6:19
marked 8:14,17 48:11,16
 64:12,18
Mastercard 4:10 11:21,24
 12:7,15,21 13:4,9,10,17,22
 14:5,15,22 34:20,21 47:12
 56:15
matter 6:10,16 39:24
means 26:11 53:1 59:16
medical 18:6
meet 36:23,25 39:23,25
members 57:7 59:15,17,21
 63:2
memory 65:11
mention 26:6 27:2
mentioned 11:10,23 34:18
 39:18 43:16 47:14 48:2 63:4
merged 46:24,25
met 40:16
method 58:14
minute 39:15,21
minutes 37:14
missing 21:12
moment 8:19 22:15 48:18
 49:1,3 51:16 52:5 53:11
monetary 34:16
money 13:25 26:22 27:3
 32:3,9,24 33:22 34:13 45:17
monies 33:7 61:21,24 62:6
Montcalm 4:5,8 8:10,12,15
 9:5 10:2,7,8 30:16 31:1,23
 32:14,22 35:7,20 38:14,18,
 19 46:6,16 48:12 51:9,13,15
 54:10,14,18 55:2 57:3,5
 58:9 59:2,25 60:2 61:4
 62:22 63:13,25 65:21,24
morning 4:6,7
mother 37:22
motivation 32:21
move 38:14 44:9 57:3
moving 61:10
multi-district 15:8 46:20
multipage 48:16
multiple 56:8
Mussat 4:19 5:7,14,16 6:12,
 20 10:10,17 11:3,5 14:23
 21:7,17,19,25 22:3,12 23:2,
 4 25:11,16 28:11 29:5 30:3

31:15 39:6,13 41:13 42:2,4,
 12 43:2 44:12,16,23 45:2
 46:13 53:18 54:9 55:19
 56:16 58:8,25 59:13 60:16
 61:12,22,25 63:1,5,12,23
 65:8,16
Mussat's 5:4 18:12,15,22
 49:15

## N

named 50:22
names 28:3 36:11 43:16
nature 50:24
needed 12:23 61:11
neglected 52:6
nice 21:9
nod 7:8
nonresponsive 57:4
normal 7:13
Northern 15:20,23
note 65:24
noted 51:13
notification 19:11
number 6:1 50:22 53:22
 62:11 63:18,19
numbered 50:13
numbering 51:19
numbers 13:11

## O

oath 7:1
object 34:25 54:7 61:4
 63:13,25
objecting 31:8
objection 10:5,6 31:4 46:3,
 12 51:6,11,13 58:5,23 62:4,
 22
objections 9:25 35:3 53:18
obtaining 13:17,21,23
obvious 28:17
occur 37:16
occurred 38:7
occurs 55:24
offer 46:2,11
offered 45:15,17
office 4:21 5:2,3,5,17 6:19
 17:1,11 18:6,16 19:19 22:14
 31:13 58:16 61:1

oftentimes 28:17
open 62:3
opposed 20:10
opt 65:9
opted 65:18
opting 65:8
oral 18:15,20 19:3 20:25
order 17:19 18:15 23:2
 26:16
orders 5:4 23:8
originally 47:14
outcome 26:8,10
oversee 5:3
owe 57:6
owner 58:8 61:16

## P

pages 50:13 51:18 64:25
paid 13:25
panel 46:20
papers 9:2
paragraphs 51:19
paraphrase 54:12
Paraphrasing 52:24
part 13:1,4,7,8,10,12,16,21,
 22 14:2 20:20 24:12 33:10,
 22,23 34:11,13 46:23 50:6
 54:19 57:4
participate 58:2
parties 36:8
party 33:25 56:20
passed 39:9
past 15:15
patient 19:8
pay 26:16 29:15
paying 25:25
payment 35:22 36:9,18,21
payments 51:2
people 11:22,25 12:25 13:14
 28:20 31:20 34:17 56:24
 57:2 59:17
percentage 27:6,7
person 11:4
personal 6:10,16 39:24
 40:3,5,7,23 41:4
persons 61:17
phone 37:9,12,16 38:20
 58:16,17 63:18

Loidy Tang
11/02/2017

6

phrase 59:14
place 12:18 14:12 18:18,24 21:10 62:10
plaintiff 11:3 47:25 50:20 51:24 52:2
plaintiffs 36:15 43:11 47:1 50:22
plastic 5:21
play 13:23 14:16 41:7 59:5
played 13:18
point 54:19
pointing 9:4
policy 18:8,13,14,20 19:3 20:20,25 21:10 22:22 23:5
pool 56:24
portal 17:15,18 18:3 19:21 20:10 21:2,5 23:20 63:15
posed 8:3
position 4:22,23,24 6:19
potentially 36:8
prepare 9:7 36:24 37:1,8 38:24 40:14
prepared 9:20 60:23
preparing 39:14,20 40:11
present 44:15
preserve 10:4 32:13
preserving 33:10
pretty 7:13 24:11 37:6
prevent 8:7
previous 63:6
previously 9:25
primary 5:1
print 17:16,19 18:18,23 20:17,18
printed 18:7,11,21 20:9,21, 23 21:1,4 64:25
prior 15:13 40:16
problem 20:3
procedure 19:22 21:16
process 12:25 13:6 19:11 41:18,21 55:6
produced 57:21
producing 53:18
production 55:10
promised 36:20
proposed 60:15
protect 12:18 31:21 32:5
protecting 32:7
Protection 10:19 12:9

protects 12:9
provide 33:13 55:17 58:1
provided 41:20 49:7 54:22 56:8 57:20 61:21,24
provisions 29:15
purchasing 13:11
purposes 11:1 19:14 20:15
put 10:13 21:13 33:12
puts 22:5

---

## Q

question 7:15 8:4 13:2,20 18:1 19:1,3 20:6,22 28:23 31:8,10 32:14,17 33:11,15 34:11 35:2,5,12 38:15 40:19 46:5 51:12,22 53:13 54:23 56:12,13 62:3,24 65:12
questioning 10:3 11:6
questions 7:5,22 8:21 28:17 48:20 60:3,11
quick 65:22

---

## R

range 23:13
read 21:17,23 25:14,16,19 29:8,24 30:16,17,20 31:11 32:14,18 35:14 50:3 53:11, 12
reads 21:19
ready 8:20 48:19,21
real 65:22
reask 28:22
reason 37:21
reassert 35:2
recall 16:16,22 43:15 44:2 52:15 65:18
receive 16:25 17:3 20:1 26:22 27:4 34:23 35:9 36:9, 17 52:12
received 10:18 17:2,10,19 24:16 43:24 48:13 51:2 52:8,17,25 54:3 55:5
receives 23:21
receiving 32:10
receptionist 5:10
recess 60:1
recognize 48:22

recollections 16:21
reconstructive 5:20
record 4:12 7:8,19 8:10,11, 12 9:3 30:17,20 31:11 32:18 35:14 38:16,17 51:5 59:25 60:5 65:24
recorded 18:14
recover 32:3
recovery 32:8
recross 60:2,10
refer 9:8 10:23 11:2,18 27:23 28:3
referenced 16:8 18:13 56:3
referred 54:5
referring 11:4 36:14 54:21
reflect 9:3
refresh 65:11
regular 7:6 19:19
rejected 45:20,22
related 26:1 45:8 46:18
relating 47:18
relationship 11:13 12:13 14:11 35:17 40:3,5,7,23 41:4 59:20
relevance 35:3 51:7 57:23
relevant 39:3 60:20
relief 34:2,5,12,13,16
remains 63:19
remember 5:25 6:7,17 16:15 20:12 21:6,8 25:3 28:2 37:21 42:16 52:9 55:21 63:17 65:15
remind 28:16,21
repeat 30:15,19 31:9 35:5,13
rephrase 7:22 13:19 46:5 47:22
reporter 7:7,18 11:17 48:15
reports 19:8
represent 4:10 25:1 33:12, 21 56:23
representation 25:7 27:12 28:6,15,25 29:22
representative 11:10 31:19 36:7,15 56:23 57:6,8,12,15 59:19 60:15 61:14 62:14
representatives 27:8 32:19 55:15
represented 27:16 60:8
representing 33:23 56:22

Loidy Tang
11/02/2017

7

**request** 60:4,9 65:8
**requested** 57:22
**requesting** 12:11
**resolution** 61:20
**respect** 59:6
**respond** 32:17
**response** 7:4 50:14 53:3,5
 54:5,15,19,20,21 56:3
**responses** 7:10 50:1,4,7
**responsible** 25:25 27:14
**result/outcome** 50:25
**resulted** 53:25
**retainer** 26:2,17 29:18 30:8
 39:2 46:14
**review** 8:20 18:12 25:19
 30:23,25 38:24 42:8,10,12,
 25 48:19 49:1
**reviewed** 9:7,12 21:11,25
 23:1 43:2 46:13
**reviewing** 25:20
**rights** 31:21 32:6,7,13 33:10
**risk** 21:12
**role** 14:16 41:7 57:18 59:6
**roles** 5:1
**Ross** 27:19 41:23
**rules** 6:23
**run** 21:12
**running** 5:3 31:13

S

**S-H-A-H** 11:18
**S.C.** 4:19 10:11,17 11:3
 60:16 61:13,22,25 63:1,5,
 12,23
**sake** 11:16 27:22
**scan** 56:7
**scanned** 22:20 55:24 56:4
**schedule** 35:1 39:19
**Scoma** 36:12 47:5
**scope** 10:1 51:6
**seeking** 32:3,5,8 33:4,6,15,
 21 34:2 63:1
**sees** 55:19
**selecting** 41:8
**send** 13:13 22:6 23:8 55:20
**sender** 65:5,7
**sentence** 53:5,16

**separated** 51:18
**serve** 41:8
**service** 17:12,13
**set** 62:9
**settle** 45:18
**settled** 48:7
**settlement** 51:1 52:2 61:18,
 21
**setup** 63:10
**Shah** 11:18,24 14:1 34:21
 47:11
**Shahmohammadi** 11:15
**shake** 7:8
**shoot** 14:15
**shoulders** 7:9
**showing** 30:25
**shrug** 7:9
**side** 10:13
**sided** 9:16
**sign** 25:9,19
**signature** 49:13,15
**signed** 25:17 30:1 50:4 65:9
**signing** 25:20 49:25
**signs** 25:18 29:3 42:8
**similar** 52:13
**simple** 19:14
**simpler** 56:12
**simplest** 19:24
**single** 20:24
**sitting** 22:9
**slightly** 59:3
**small** 5:5 31:13
**smoothly** 5:4
**sort** 47:8
**sought** 32:24
**speaking** 26:2
**specific** 19:4 20:22 22:2
 24:10 25:3 37:19
**specifically** 12:16 13:16
 16:16 21:6 22:23 63:17
**spelled** 4:14
**spent** 42:4
**stamp** 53:19
**standalone** 63:8
**stands** 15:14
**start** 53:8,16
**started** 24:8,13 43:12,20
**starts** 53:12

**state** 4:11 26:18
**stated** 55:13
**states** 26:24 27:1 50:18
**status** 50:25
**statutory** 33:1,5,13,16
 62:10,15
**sticks** 30:9
**stop** 24:6
**stopped** 24:8,15 63:18
**strike** 12:6 22:21 24:20 44:3,
 14 45:15 48:14 52:3 57:3
**stuff** 29:12
**subject** 9:24 10:6 53:17
 60:2,10
**succeeds** 27:4,5
**successful** 34:15,24 35:10
**suing** 11:25 12:7,15
**suit** 10:17 12:3 13:1,4 33:24
 34:1,17 45:8,9,12
**summary** 44:6
**supervise** 58:21
**supervisory** 59:5,11
**supplemental** 54:13,14
**supposed** 39:8
**surgeon** 5:21
**sworn** 4:3
**system** 19:10 55:8

T

**T-A-N-G** 4:15
**table** 9:4
**takes** 31:16,17 36:6
**taking** 7:7
**talk** 16:18,20 38:1
**talked** 37:9 38:1 39:16 42:14
**talking** 14:19 38:9,10 43:8
**Tang** 4:1,13,14 8:16 60:14
**TCPA** 32:6,8 33:13 50:19
 51:23 62:16
**telephone** 10:19 12:8 37:7
**tells** 42:13
**term** 35:21 36:3
**terms** 25:22,24 26:21 29:11
**test** 7:25
**testified** 4:3 19:20 30:4 44:4
 52:7,18 55:18,23
**testify** 9:20 15:4

Loidy Tang
11/02/2017

8

testifying  7:2 8:8 10:10
  13:24
testimony  7:1
thing  49:21 52:6 53:7 56:10,
  24
things  12:10 21:9 27:23
  31:14 39:2 61:6 62:9
thinking  59:17
thirds  50:15
thought  56:9
three-page  8:17
time  6:4,14 8:1 15:15 17:25
  19:4,9 20:13 28:22 30:19
  31:12,16 35:13 36:6 42:3,7,
  9,18,22 43:5 53:19 62:2
times  5:24 16:9,13 37:19
  39:12 56:8 58:13
today  8:8 9:21 10:11 27:21
  28:1 40:16 60:6
today's  9:7 36:24 39:4
  40:11,14 60:8
told  45:24
Topic  51:7
topics  9:18,21 37:3,11
touched  38:23
transferred  45:12 46:21
trial  61:8
trip  39:10
true  50:1
Trust  11:20 47:13
truthfully  8:8
turn  9:15 49:8 50:12
type  16:5
typically  58:15

U

uh-huh  10:12 24:1 27:25
  29:7 34:3,10 35:24 49:14
  51:4,21
UMB  43:6
unable  55:12
understand  7:2,21,23 9:23
  10:9 15:3 27:24 33:25 34:4,
  8 35:18
understanding  10:15,16,21
  12:2,5,8,17,20,22,24 13:5,
  15 14:2,20 27:9 33:3 35:12,
  19 36:2 41:15 44:18 45:25
  46:9,23 56:21

understands  49:24
Understood  7:20
Unh-unh  31:25 40:25
unlike  7:6
unsolicited  10:18,22 12:3
  22:24 23:1,5,10 43:23,24
  55:19
unwillful  62:18

V

V-A-S-Q-U-E-Z  5:12
Vasquez  5:12,13
verbal  7:4,10
view  18:4
violated  57:10
violation  33:9 62:11
Vonage  17:12,14 19:10
  20:10 21:2,5 23:20 24:9
  55:7,13 63:14

W

wait  7:14
waiving  53:17
Wanca  27:19,23
Warner  9:24 10:4 22:8,13,19
  23:9,11 24:19,21,22,24,25
  25:6 26:8,11 30:12,22 31:4,
  7 34:25 38:9,21 39:23 40:1,
  4 41:13 42:19 44:12 45:2
  46:3,12 51:5,10 54:7,12,17,
  25 55:21 56:16 58:5,11,15,
  20,23 60:13 61:5 62:23
  63:21 64:5,13,19 65:20,23
Warner's  26:12,18 30:5 40:8
  55:25 58:21
web  63:15
week  37:17,20 38:8,13
Whitney  4:9
willful  62:19
wins  26:23
word  56:15
work  4:8 24:21
working  4:24 5:14
works  5:17 17:14
worries  47:10
write  50:10
writes  49:20

writing  18:14 29:13 35:4
  60:9
written  25:5 28:12,24 29:20
  51:6
wrong  17:8 65:25

Y

year  17:5
years  6:6

# EXHIBIT J

# ANDERSON + WANCA
## ATTORNEYS AT LAW

---

## FIRM PROFILE

Founded in 1998, Anderson + Wanca is a boutique class-action law firm practicing all aspects of complex business and class action litigation in state and federal courts across the country. Anderson + Wanca has been appointed class counsel in over a hundred cases, securing as many class certifications for its clients. Because of the evolving nature of class-action law, Anderson + Wanca has developed a dedicated appellate team, an electronic discovery team, and proprietary software to handle over 100 million pieces of data at once, and it has its own in-house notice capabilities. Anderson + Wanca is also one of the few firms with real class-action trial experience. The ability and knowledge to try a class action case gives Anderson + Wanca added skills at the mediation and settlement phase. Our attorneys have decades of class-action experience in all ranges of case sizes and complexities.

## ATTORNEY PROFILES

### Brian J. Wanca
#### Owner

For over 25 years, Mr. Wanca focused his practice on commercial litigation involving breach of contract, shareholder derivative actions, consumer fraud, employment disputes, among other matters. In 1998, Mr. Wanca established his own firm, Anderson + Wanca, which has since become one of the premier litigation firms in the Chicago area, focusing primarily on consumer class-action cases. He was selected as a SuperLawyer in 2014.

Mr. Wanca attended Rutgers College, Brunswick, New Jersey, where he received a Bachelor of Arts with High Distinction. He graduated in 1976, *magna cum laude*. He received his J.D. from Indiana University School of Law, Indianapolis, Indiana, graduating in 1979, *cum laude*. After law school, he clerked for two years with the Honorable S. Hugh Dillon, U.S. District Court, Southern District of Indiana.

### Admissions

Illinois, 1980
U.S. District Court – Northern District of Indiana, 1979
U.S. District Court – Northern District of Illinois, 1981
U.S. District Court – Central District of Illinois, 2009
U.S. District Court – Southern District of Illinois, 2010
U.S. District Court – Eastern District of Michigan, 2010
U.S. District Court – Western District of Michigan, 2010

U.S. District Court – Western District of Wisconsin, 2010
U.S. District Court – Eastern District of Wisconsin, 2011
U.S. District Court – Northern District of Ohio, 2012
U.S. District Court – Southern District of Indiana, 2014
U.S. District Court – Eastern District of Missouri, 2015

**Memberships**

Chicago Bar Association
Lake County Bar Association
Illinois Bar Association
American Bar Association

### Wallace Solberg
#### Attorney

Mr. Solberg has substantial experience in business and commercial litigation as well as government relations. His extensive experience includes a wide variety of civil litigation matters such as consumer class litigation, civil rights class litigation, contract actions, business torts, consumer fraud, trade secret actions, declaratory judgment actions, employment litigation, employment discrimination, general commercial litigation, and injunctive relief, including enforcement of covenants not to compete, multi-state regulatory actions, defamation actions, real estate litigation including zoning actions, and appellate representation.

Mr. Solberg received his J.D. from the Chicago-Kent College of Law in 1986. Before law school, he attended the University of Illinois, Urbana-Champaign, where he received a Bachelor of Arts degree in History.

**Admissions**

Illinois, 1986
U.S. District Court – Northern District of Illinois (Trial Bar), 1988
U.S. District Court – Central District of Illinois, 1990
U.S. District Court – Western District of Michigan, 2014
U.S. District Court – Eastern District of Michigan, 2014
U.S. District Court – Northern District of Ohio, 2014
U.S. Court of Appeals – 7th Circuit, 1988
U.S. Court of Appeals – 6th Circuit, 2015

### Jeffrey A. Berman
#### Attorney

Mr. Berman brings to the firm over 32 years of litigation experience in trial and appellate courts, in a wide range of complex commercial litigation. He regularly appears in state and federal courts, nationwide. At Anderson + Wanca, he is concentrating his practice primarily on consumer class actions and related insurance coverage litigation,

2

seeking to recover benefits for class members, and class action appeals. Mr. Berman has tried several cases to judgment and led several others that settled on the eve of trial.

Mr. Berman received a Bachelor of Science degree in Accountancy, with honors, in 1984 from the University of Illinois, Urbana-Champaign. He is an Illinois Certified Public Accountant. Mr. Berman received his J.D. from the University of Illinois, where he was an editor of the Law Review, and graduated in 1987 *magna cum laude*. Mr. Berman is AVVO Rated: Superb. He has been selected as a *Super Lawyer*, each year since 2015, and as a *Leading Lawyer*, since 2011. He has been a member of the *Leading Lawyers* Illinois Advisory Board since 2016. Mr. Berman also has an extensive history of civic and community involvement, including serving for twenty years as an elected Village Trustee for the Village of Buffalo Grove.

**Admissions**

Illinois, 1987
U.S. District Court – Northern District of Illinois (Trial Bar), 1987
U.S. District Court – Central District of Illinois, 1990
U.S. District Court – Eastern District of Michigan, 2012
U.S. District Court – Western District of Michigan, 2013
U.S. District Court – Eastern District of Wisconsin, 2012
U.S. District Court – Eastern District of Missouri, 2016
U.S. District Court – District of Columbia, 2016
U.S. District Court – Northern District of Indiana, 2017
U.S. District Court – Northern District of Texas, 2018
U.S. Court of Appeals – 1st Circuit, 2013
U.S. Court of Appeals – 3rd Circuit, 2015
U.S. Court of Appeals – 6th Circuit, 2013
U.S. Court of Appeals – 7th Circuit, 1990
U.S. Court of Appeals – 8th Circuit, 2014
U.S. Court of Appeals – 10th Circuit, 2014
U.S. Court of Appeals – 11th Circuit, 2013
U.S. Court of Appeals – D.C. Circuit, 2014
U.S. Supreme Court, 2013

**Memberships**

American Bar Association
Lake County Bar Association
Lake County Bar Foundation Board of Trustees
President, Lake County Bar Foundation Board of Trustees, 2017-2019
Editorial Board, *The Docket*, Lake County Bar Association
Co-Editor, *The Docket*, since 2016

## Glenn L. Hara
### Attorney

Mr. Hara focuses on class-action litigation and appeals. He joined Anderson + Wanca in 2013, bringing more than 10 years of experience with a wide range of class actions, including ERISA, securities fraud, and constitutional class actions, including *Sogg v. Zurz*, 905 N.E.2d 187 (Ohio 2009) (argued) (holding State of Ohio unconstitutionally failed to pay interest to unclaimed-property claimants). At Anderson + Wanca, Mr. Hara has successfully argued several TCPA cases in federal courts of appeals, including *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923 (9th Cir. 2018); *Radha Geismann, M.D., P.C. v. ZocDoc, Inc.*, 909 F.3d 534 (2d Cir. 2018); *Physicians Healthsource, Inc. v. Boehringer Ingelheim Pharm., Inc.*, 847 F.3d 92 (2d Cir. 2017); and *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992 (8th Cir. 2016). Mr. Hara recently argued before the United States Supreme Court in *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, No. 17-1705 (argued Mar. 25, 2019).

Mr. Hara is past Chair of the Chicago Bar Association Class Litigation Committee. He earned his undergraduate degree from DePaul University in 1997 and graduated, *cum laude*, from Loyola University Chicago School of Law in 2003, where he was student articles editor of the Loyola Consumer Law Review.

### Admissions

Illinois, 2003
U.S. District Court – Northern District of Illinois, 2003
U.S. District Court – Southern District of Illinois, 2005
U.S. District Court – Eastern District of Wisconsin, 2006
U.S. District Court – Southern District of Indiana, 2011
U.S. District Court – Western District of Michigan, 2014
U.S. District Court – Eastern District of Michigan, 2014
U.S. District Court – Northern District of Ohio, 2014
U.S. Court of Appeals – 1st Circuit, 2013
U.S. Court of Appeals – 2nd Circuit, 2014
U.S. Court of Appeals – 3rd Circuit, 2018
U.S. Court of Appeals – 4th Circuit, 2016
U.S. Court of Appeals – 6th Circuit, 2015
U.S. Court of Appeals – 7th Circuit, 2010
U.S. Court of Appeals – 8th Circuit, 2015
U.S. Court of Appeals – 9th Circuit, 2016
U.S. Court of Appeals – 11th Circuit, 2017
U.S. Court of Appeals – D.C. Circuit, 2014
U.S. Supreme Court, 2018

### Ryan Kelly
**Attorney**

Ryan Kelly joined the firm in 2005 bringing with him years of experience in insurance defense. His concentration at the firm is in class-action discovery and certification briefing and oral arguments. Mr. Kelly travels extensively for court appearances and depositions across the country. Mr. Kelly has tried several class actions to a judgment, as well as a number of cases that settled eve of trial or during trial.

Mr. Kelly attended the University of Illinois, Urbana-Champaign, where he earned a Bachelor of Science degree, *cum laude*, in 1996. He received his J.D. from Loyola University Chicago School of Law in 1999.

<u>**Admissions**</u>

Illinois, 1999
Florida, 2011
U.S. District Court – Northern District of Illinois, 1999
U.S. District Court – Eastern District of Michigan, 2011
U.S. District Court – Western District of Michigan, 2011
U.S. District Court – Eastern District of Wisconsin, 2010
U.S. District Court – Western District of Wisconsin, 2011
U.S. District Court – Southern District of Florida, 2011
U.S. District Court – Middle District of Florida, 2011
U.S. District Court – Northern District of Ohio, 2012
U.S. District Court – Eastern District of Missouri, 2015
U.S. District Court – Northern District of Indiana 2015
U.S. District Court – Connecticut 2017
U.S. District Court – Northern District Florida 2017

<u>**Memberships**</u>

Florida Bar Association
Illinois Bar Association

### Ross Good
**Attorney**

Ross Good received his J.D. from The John Marshall Law School in 2013. Mr. Good has helped develop the firm's electronic discovery capabilities and in-house notice services. Mr. Good concentrates on class-action, civil and commercial litigation, and class-action discovery and briefing.

Mr. Good attended the University of Illinois, Urbana-Champaign, where he earned his Bachelor of Arts in Political Science. He interned with Congressman Zack Space (D-Ohio) from January through May 2009, in Washington, D.C.

## Admissions

Illinois, 2013
Florida, 2015
U.S. District Court – Northern District of Illinois, 2013
U.S. District Court – Northern District of Ohio, 2014
U.S. District Court – Eastern District of Michigan, 2014
U.S. District Court – Western District of Michigan, 2015
U.S. District Court – Eastern District of Missouri, 2015
U.S. District Court – Western District of Wisconsin, 2015
U.S. District Court – Southern District of Florida, 2015
U.S. District Court – Middle District of Florida, 2015
U.S. District Court – Central District of Illinois, 2016
U.S. District Court – Northern District of Indiana, 2016

## Memberships

American Bar Association
Lake County Bar Association
Northwest Suburban Bar Association

# *Patrick J. Solberg*
### *Attorney*

Patrick Solberg joined Anderson + Wanca in 2016. Prior to joining the firm, Mr. Solberg acquired extensive experience in civil litigation while working as an Assistant Attorney General for the State of Illinois, representing officials and agencies of the State in the Circuit Courts of Illinois, the Northern District of Illinois and before the Illinois Civil Service Commission. At Anderson + Wanca, Mr. Solberg focuses on all aspects of class-action, civil and commercial litigation, and appeals.

Mr. Solberg attended the University of Illinois, Urbana-Champaign, where he earned a Bachelor of Arts degree in 1994. He received his J.D. from Northwestern University School of Law in 1997.

## Bar Admissions

Illinois Supreme Court
U.S. District Court – Northern District of Illinois

6

**ANDERSON + WANCA**

Appointed class counsel in the following certified class action cases:

**_FEDERAL COURTS_:**

| | |
|---|---|
| *Duenes and Molina v. Trend Technologies and Cam Fran Tool Co.* | Race Discrimination |
| U.S. District Court, Northern District of IL | |
| | |
| *Duenes and Molina v. Beck* | Race Discrimination |
| U.S. District Court, Northern District of IL | |
| | |
| *Hinman and Italia Foods v. M & M Rental Center* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *CE Design v. Exterior Systems* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *Loy v. Motorola* | FMLA |
| U.S. District Court, Northern District of IL | |
| | |
| *CE Design v. Cy's Crab House* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *G.M. Sign v. Group C Communications* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *G.M. Sign v. Franklin Bank* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *G.M. Sign v. Finish Thompson* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *Green v. Service Master on Location* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *Holtzman v. Turza* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *Targin Sign v. Preferred Chiropractic* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *Paldo Sign and Display Company v. Topsail Sportswear, Inc.* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *CE Design Ltd., et al. v. King Supply Company* | TCPA |
| U.S. District Court, Northern District of IL | |
| | |
| *Bridgeview Health Care Center, Ltd. v. Jerry Clark* | TCPA |
| U.S. District Court, Northern District of IL | |

1

*Wilder Chiropractic, Inc. v. Pizza Hut of Southern Wisconsin, Inc.*                    TCPA
   U.S. District Court, Western District of WI

*Reliable Money Order v. McKnight Sales*                    TCPA
   U. S. District Court, Eastern District of WI

*American Copper & Brass, Inc. v. Lake City Industrial Products, Inc., et al.*                    TCPA
   U.S. District Court, Western District, MI

*Imhoff Investment, LLC v. Sammichaels, Inc.*                    TCPA
   U.S. District Court, Eastern District, MI

*Exclusively Cats v. Anesthetic Vaporizer*                    TCPA
   U.S. District Court, Eastern District of MI

*Jackson's Five Star Catering, Inc. v. John R. Beason, et al.*                    TCPA
   U.S. District Court, Eastern District of MI

*Avio, Inc. v. Creative Office Solutions, Inc.*                    TCPA
   U.S. District Court, Eastern District of MI

*Van Sweden Jewelers, Inc. v. 101 VT, Inc., et al.*                    TCPA
   U.S. District Court, Western District of MI

*The Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.*                    TCPA
   U.S. District Court, Northern District of OH

*Bailey Brothers Plumbing, Heating and Air Conditioning v. Papa's*                    TCPA
*Leatherbarn, LLC*
   U.S. District Court, Western District of OK

*Americana Art China Company, Inc. v. Foxfire Printing*                    TCPA
*and Packaging, Inc.*
   U.S. District Court, Northern District of IL

*Sparkle Hill, Inc., et al. v. Interstate Mat Corporation*                    TCPA
   U.S. District Court, District of MA

*Addison Automatics, Inc. v. Precision Electronic Glass, Inc.*                    TCPA
   U.S. District Court, Northern District of IL

*Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*                    TCPA
   U.S. District Court, Eastern District of WI

*The Savanna Group v. Trynex*                    TCPA
   U.S. District Court, Northern District of IL

*A & L Industries, Inc. v. P. Cipollini Inc.*                    TCPA
   U.S. District Court, District of New Jersey

| | |
|---|---|
| *Physicians Healthsource, Inc. v. Stryker Sales Corporation et al.*<br>U.S. District Court, Western District of Michigan | TCPA |
| *A Aventura Chiropractic Center, Inc. v. Med Waste Management et al.*<br>U.S. District Court, Southern District of Florida | TCPA |
| *The Hymed Group Corporation v. Stevens & Ricci, Inc.*<br>U.S. District Court, Eastern District of Pennsylvania | TCPA |
| *Arnold Chapman and Paldo Sign and Display Company v. Wagener*<br>U.S. District Court, Northern District of Illinois | TCPA |
| *Spine and Sports Chiropractic, Inc. v, Zirmed, Inc.*<br>U.S. District Court, Western District of Kentucky | TCPA |
| *Sandusky Wellness Center, LLC v. Wagner Wellness Inc. and Robert Wagner*<br>U.S. District Court, Northern District of Ohio | TCPA |
| *Hawk Valley, Inc. v. Elaine G. Taylor, Environmental Process Systems, Inc.*<br>U.S. District Court, Eastern District of Pennsylvania | TCPA |
| *Physicians Healthsource, Inc. v. Doctor Diabetic Supply, LLC*<br>U.S. District Court, Southern District of Florida | TCPA |
| *Jonathan Small and Jotmar, Inc. v. Target Corporation*<br>U.S. District Court, District of Minnesota | TCPA |
| *JWD Automotive v. DJM Advisory, et al.*<br>U.S. District Court, Middle District of Florida | TCPA |
| *Medical & Chiropractic Clinic v. KMH Cardiology Centres*<br>U.S. District Court, Middle District of Florida | TCPA |
| *Avio, Inc. v. Alfoccino Of Auburn Hills, et al.*<br>U.S. District Court, Eastern District of Michigan | TCPA |
| *Daisy, Inc. v. Pollo Operations, Inc.*<br>U.S. District Court, Middle District of Florida | TCPA |
| *Vinny's Landscaping v. Klochko Equipment Rental, et al.*<br>U.S. District Court, Eastern District of Michigan | TCPA |
| *Dennis R. Seramur v. Rotobrush International*<br>U.S. District Court, Northern District of Texas | TCPA |
| *Sandusky Wellness Center v. Medtox Scientific, Inc., et al.*<br>U.S. District Court, District of Minnesota | TCPA |
| *Avio, Inc. v. Alfoccino, Inc.*<br>U.S. District Court, Eastern District of Michigan | TCPA |

*Todd Elwert, Sandusky Wellness v. Alliance Healthcare Services, Inc.*
 U.S. District Court, Northern District of Ohio                                TCPA

*G.M. Sign, Inc. v. Stealth Security*
 U.S. District Court, Northern District of Illinois                            TCPA

*Bridging Communities, Inc. v. Top-Flite Financial*
 U.S. District Court, Eastern District of Michigan                             TCPA

*Russel M. Holsein, PH.D., LLC v. Banner Life Insurance Company, et al.*
 U.S. District Court, New Jersey                                               TCPA

*John C. Etter v. Allstate Insurance Company, et al.*
 U.S. District Court, Northern District of California                          TCPA

*Physicians Healthsource, Inc. v. Vertex Pharmaceuticals, Inc. et al.*
 U.S. District Court, District of Massachusetts                                TCPA

*Tickling Keys, Inc. v. Transamerica World Financial, et al.*
 U.S. District Court, Middle District of Florida                               TCPA

*13-50 River Road Corp. v. Ansam*
 U.S. District Court, District of New Jersey                                   TCPA

*Physicians Healthsource, Inc. v. IPC, Inc.*
 U.S. District Court, Southern District of Ohio                                TCPA

*Shaun Fauely v. Heska Corporation*
 U.S. District Court, Northern District of Illinois                            TCPA

*Community Vocational Schools of Pittsburgh, Inc. v. Mildon Bus Lines*
 U.S. District Court, Western District of Pennsylvania                         TCPA

### **_STATE TRIAL COURTS_**

### **_ILLINOIS_**:

*PJ's Concrete vs. Nextel West Corp.*                              Cell Phone
 Circuit Court of Lake County, IL

*Bouschard v. Southwestern Bell Mobile Systems*                   Cell Phone
 Circuit Court of Lake County, IL

*Kowalewski v. Prairie Title*                                     Recording Fees
 Circuit Court of Lake County, IL

*Wilson v. Premier Title*                                         Recording Fees
 Circuit Court of Cook County, IL

4

| | |
|---|---|
| *Mann v. Lawyer's Title* | Recording Fees |
|   Circuit Court of Cook County, IL | |
| | |
| *Stonecrafters v. Brother International* | TCPA |
|   Circuit Court of McHenry County, IL | |
| *CE Design v. Federal Schedules* | TCPA |
|   Circuit Court of Cook County, IL | |
| | |
| *Telecommunications Network Design v. Paradise Distributing* | TCPA |
|   Circuit Court of Cook County, IL | |
| | |
| *Telecommunications Network Design v. McLeod* | TCPA |
|   Circuit Court of Cook County, IL | |
| | |
| *Eclipse Manufacturing Company v. U.S. Compliance Corp.* | TCPA |
|   Circuit Court of Lake County, IL | |
| | |
| *CE Design v. Lyman Contracting Corp.* | TCPA |
|   Circuit Court of Kane County, IL | |
| | |
| *Tabass v. Castle Screen Print Corp.* | TCPA |
|   Circuit Court of DuPage County, IL | |
| | |
| *Stonecrafters v. Handleman Insurance Agency* | TCPA |
|   Circuit Court of McHenry County, IL | |
| | |
| *G.M. Sign v. Santana Equipment Trading Company* | TCPA |
|   Circuit Court of Lake County, IL | |
| | |
| *CE Design v. North American Industries* | TCPA |
|   Circuit Court of Lake County, IL | |
| | |
| *CE Design v. Franklin Edison* | TCPA |
|   Circuit Court of Lake County, IL | |
| | |
| *G.M. Sign v. Global Shop Solutions* | TCPA |
|   Circuit Court of Lake County, IL | |
| | |
| *G.M. Sign v. Pennswood Partners* | TCPA |
|   Circuit Court of Lake County, IL | |
| | |
| *Derose Corp. v. Goyke* | TCPA |
|   Circuit Court of Cook County, IL | |
| | |
| *FlexiCorps v. Amber Enterprises* | TCPA |
|   Circuit Court of Cook County, IL | |
| | |
| *Miller v. Professional National Title Network* | Recording Fees |
|   Circuit Court of Cook County, IL | |

| | |
|---|---|
| *Heger v. Attorneys Title Guaranty Fund*<br>  Circuit Court of Lake County, IL | Recording Fees |
| *Chapman v. CT Phoenix*<br>  Circuit Court of Cook County, IL | TCPA |
| *Chapman v. United Electronics*<br>  Circuit Court of Lake County, IL | TCPA |
| *CE Design v. Woodland Windows*<br>  Circuit Court of DuPage County, IL | TCPA |
| *CE Design v. Matrix*<br>  Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign v. Backhauline*<br>  Circuit Court of Lake County, IL | TCPA |
| *G.M. Sign v. 400 Freight*<br>  Circuit Court of Lake County, IL | TCPA |
| *Green v. Vehicle Alignment, Brakes & Tires*<br>  Circuit Court of Cook County, IL | TCPA |
| *Rob-Lyn Enterprises v. Competitive Door and Supply*<br>Circuit Court of Cook County, IL | TCPA |
| *Targin Sign v. XData Solutions*<br>  Circuit Court of Cook County, IL | TCPA |
| *Tree Care Enterprises v. Millennium Stone Crete*<br>  Circuit Court of Cook County, IL | TCPA |
| *Telecommunications Network Design, Inc. v. Agility Computer Network Services, LLC*<br>  Circuit Court of Cook County, IL | TCPA |
| *CE Design Ltd. v. Letrix USA, Inc.*<br>  Circuit Court of Cook County, IL | TCPA |
| *Brodsky v NIP Group*<br>  Circuit Court of Cook County, IL | TCPA |
| *Windmill Nursing Pavilion v. Res-Care Illinois*<br>  Circuit Court of Cook County, IL | TCPA |
| *Quality Management and Consulting Services v. Blackhawk Paving*<br>  Circuit Court of Cook County, IL | TCPA |
| *Locklear Electric v. Florissant Injury & Pain Relief Center*<br>  Circuit Court of St. Clair County, IL | TCPA |

*Rob-Lynn Enterprises v. Taste of India*                      TCPA
  Circuit Court of Cook County, IL

*CE Design v. Custom Mechanical Equipment, Inc., et al.*      TCPA
  Circuit Court of Cook County, IL

*Windmill Nursing Pavilion, Ltd. v. Unitherm, Inc.*          TCPA
  Circuit Court of Cook County, IL

*G.M. Sign, Inc. v. Schane*                                  TCPA
  Circuit Court of Lake County, IL

*Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*       TCPA
  Circuit Court of Cook County, IL

*Fauley v. Thomas Veterinary Drug, Inc.*                     TCPA
  Circuit Court of Cook County, IL

*Mixon Insurance Agency v. Taylorville Chiropractic Clinic, et al.*   TCPA
  Circuit Court of St. Clair County, IL

*Targin Sign Systems, Inc. v. CYC Golden Palace Corporation, et al.*  TCPA
  Circuit Court of Cook County, IL

*Pardridge Motors, Inc. v. Tackitt*                          TCPA
  Circuit Court of Cook County, IL

*CE Design Ltd. v. David Litt d/b/a Nationwide Security Services, Inc.*   TCPA
  Circuit Court of Cook County, IL

*Quality Management and Consulting Services v. PPP-MP, Inc.,*   TCPA
*PPP-SCH, Inc. and PPP, Inc.*
  Circuit Court of Cook County, IL

*Italia Foods, Inc. v. Sun Tours*                            TCPA
  Circuit Court of Lake County, IL

*Addison Automatics, Inc. v. Domino Plastics Company, Inc.*   TCPA
  Circuit Court of Cook County, IL

*Pekin Ins. Co. v. XData Solutions, Inc., et al.*            TCPA
  Circuit Court of Cook County, IL

*Loncarevic and Associates, Inc. v. Stanley Foam Corp.*      TCPA
  Circuit Court of Cook County, IL

*CE Design Ltd. v. C&T Pizza, Inc., et al.*                  TCPA
  Circuit Court of Cook County, IL

*Windmill Nursing Pavilion v. Gornick's Auto Rebuilders, Inc., et al.*      TCPA
  Circuit Court of Cook County, IL

*Nack v. LexisNexis*      TCPA
  Circuit Court of Lake County, IL

*Quality Management and Consulting Services, Inc. v. Commercial*      TCPA
*Asphalt Maintenance, LLC*
  Circuit Court of Cook County, IL

*Mt. Lookout Chiropractic Center Inc. v. Quest Diagnostics et al.*      TCPA
  Circuit Court of Lake County, IL

*Lawrence Brodsky v. Kaigler & Company*      TCPA
  Circuit Court of Cook County, IL

*Community Vocational Schools of Northeast Pennsylvania and Nuts To*      TCPA
*You, Inc. v. CBRE, Inc. and Steven T. Italiano*
  Circuit Court of Lake County, IL

*Radha Geismann M.D., P.C. v. Byram Healthcare Centers, Inc.*      TCPA
  Circuit Court of Lake County, IL

*Carradine Chiropractic Center, Inc. v. SmartHealth, Inc., Consolea*      TCPA
*Company d/b/a Sharper Cards*
  Circuit Court of Lake County, IL

*Flashtric Sign, Inc. v. Georgia Printco, L.L.C.*      TCPA
  Circuit Court of Cook County, IL

*Shaun Fauley, Sabon, Inc., Sandy Rothschild & Associates, Inc., Debaun*      TCPA
*Development, Inc. and Christopher Lowe Hicklin DC PLC v. Metropolitan*
*Life Insurance Company, Storick Group Co., The Storick Group*
*Corporation and Scott R. Storick*
  Circuit Court of Lake County, IL

*G.M. Sign, Inc. v. Dodson Company LLC and Jeffrey Dodson*      TCPA
  Circuit Court of Lake County, IL

*Budd Engineering Corporation v. David L. Hansen d/b/a DLH Insurance*      TCPA
*Consultants*
  Circuit Court of Lake County, Illinois

*William P. Sawyer, M.D. and Physicians Healthsource, Inc., v. Stericycle,*      TCPA
*Inc., Stericycle Specialty Waste Solutions, Inc., Stericycle Communications*
*Solutions, Inc., Stericycle Management, LLC and Stericycle International,*
*LLC*
  Circuit Court of Cook County, IL

*Irish Sisters, Inc. and Lanciloti Law Offices v. Crown Mortgage Company*      TCPA
  Circuit Court of Cook County, IL

*Flexicorps, Inc. and Christopher Lowe Hicklin DC PLC d/b/a Clark Road*                   TCPA
*Chiropractic v. National Pen Co. LLC and National Pen Holding, LLC*
 Circuit Court of Cook County, IL

*Shaun Fauley, Sabon, Inc., Sandy Rothschild &Associates, Inc., Debaun*                   TCPA
*Development, Inc. and Christopher Lowe Hicklin DC PLC v. Metropolitan*
*Life Insurance Company, Storick Group Corporation, Scott R. Storick*
 Circuit Court of Lake County, IL

*Byer Clinic of Chiropractic, Ltd. v. Lensink Agency, Inc.*                               TCPA
 Circuit Court of Cook County, IL

*Keith Bunch Associates v. La-Z-Boy Incorporated, et al.*                                 TCPA
 Circuit Court of Lake County, IL

*Evanston Northshore Hotel v. Poolman of Wisconsin*                                       TCPA
Circuit Court of Lake County, IL

*Dairyland Animal Clinic v. Amatheon, Inc.*                                               TCPA
Circuit Court of Lake County, IL

*Lawrence Brodsky v. Kaigler & Company*                                                   TCPA
Circuit Court of Cook County, IL

*Physicians Healthsource, Inc. v. Salix Pharmaceuticals*                                  TCPA
Circuit Court of Lake County, IL

*Spine & Sports Chiropractic v. Advantage Medical Equipment*                              TCPA
Circuit Court of Lake County, IL

*Wilder Chiropractic, Inc. v. Scrip, Inc.*                                                TCPA
Circuit Court of Lake County, IL

*Foley Motors, Inc. v. iMotorsports, Inc.*                                                TCPA
Circuit Court of Lake County, IL

*New United, Inc. v. Reif, CBM Plumbing*                                                  TCPA
Circuit Court of Cook County, IL

*Family Health, ChiroChicago Chiropractic v. M.D. On-Line Solutions*                      TCPA
Circuit Court of Lake County, IL

*Tiffany Florist, Inc. v. PayScout, Inc.*                                                 TCPA
Circuit Court of Lake County, IL

*Robert A. Green v. Dahn Yoga*                                                            TCPA
 Circuit Court of Cook County, IL

*Physicians Healthsource, Inc. Quinn Medical, Inc.*                                       TCPA
Circuit Court of Lake County, IL

*Physicians Healthsource, Inc. v. Endo Pharmaceuticals et al.*
 Circuit Court of Lake County, IL                         TCPA
*Lauren Minniti v. Tillys, Inc.*
 Circuit Court of Lake County, IL                         TCPA


### *STATE TRIAL COURTS*
### *MISSOURI:*

*Little v. Hiar Holdings*                                           TCPA
  Circuit Court of St. Louis County, MO

*Boschert v. Professionals Direct Insurance Services*            TCPA
  Circuit Court of St. Charles County, MO

*Goans Acquisition, Inc. v. Hard Wok Cafes, Inc.*               TCPA
  Circuit Court of Greene County, MO

*All American Painting, L.L.C. v. Chiropractic & Sports Injury*    TCPA
*Center of Creve Coeur, P.C., et al.*
  Circuit Court of St. Louis County, MO

*Medical West Ballas Pharmacy, Ltd. v. Bios Biochemicals Corp.*   TCPA
  Circuit Court of St. Louis County, MO

*Douglas Phillip Brust D.C., P.C. v. Bobby's Frozen Custard, Inc.*   TCPA
  Circuit Court of St. Louis County, MO

*Radha Geismann, M.D., P.C. v. Contexo Media, LLC*             TCPA
  Circuit Court of St. Louis County, MO

*Radha Geismann, M.D., P.C. v. GE Healthcare, Inc.*              TCPA
  Circuit Court of City of St. Louis, MO

*Michael C. Zimmer, D.C, P.C. v. Moore Medical LLC and McKesson*   TCPA
*Medical-Surgical Inc.*
  Circuit Court of St. Louis County, MO

*Physicians Healthsource, Inc. v. Esaote North America, Inc.*      TCPA
 Circuit Court of City of St. Louis, MO

*Alan L. Laub, DDS, Inc. v. Den-Mat Holdings, LLC*             TCPA
 Circuit Court of St. Louis County, MO

*Radha Geismann, M.D., P.C. v. Be-Thin, Inc., et al.*             TCPA
 Circuit Court of City of St. Louis, MO

*Central Alarm Signal v. Business Financial Services, et al.*      TCPA
 Circuit Court of City of St. Louis, MO

| | |
|---|---|
| *John Olsen v. Siddiqui, Global Bizdimensions*<br>  Circuit Court of St. Louis County, MO | TCPA |
| *All American Painting, LLC v. Poettker Construction Company*<br>  Circuit Court of City of St. Louis, MO | TCPA |
| *Goodland Foods v. Best Buy Builders*<br>  Circuit Court of City of St. Louis, MO | TCPA |
| *Career Counseling, Inc. v. Amsterdam Printing, et al.*<br>  Circuit Court of City of St. Louis, MO | TCPA |
| *Radha Geismann, M.D., P.C.,John H. Lary Jr., M.D. v. Rexall et al.*<br>  Circuit Court of City of St. Louis, MO | TCPA |
| *Gorss Motels, Inc. v. BES Industries*<br>  Circuit Court of City of St. Louis, MO | TCPA |

### *STATE TRIAL COURTS*
### *KANSAS:*

| | |
|---|---|
| *Critchfield Physical Therapy v. The Taranto Group*<br>  District Court of Johnson County, Kansas | TCPA |
| *Fun Services of Kansas City, Inc. v. Streetglow, Inc.*<br>  District Court of Johnson County, Kansas | TCPA |
| *Anderson Office Supply, Inc. v. Advanced Medical Associates, P.A.*<br>  District Court of Harvey County, KS | TCPA |

### *STATE TRIAL COURTS*
### *NEW JERSEY:*

| | |
|---|---|
| *Local Baking v. Westfield Rental-Mart*<br>  Superior Court of Essex County, NJ | TCPA |
| *Local Baking v. Vieira & Gomes*<br>  Superior Court of Essex County, NJ | TCPA |
| *Nafplion v. Ansam Commercial Kitchen and Ventilation Specialists*<br>  Superior Court of Bergan County, NJ | TCPA |

### *STATE TRIAL COURTS*
### *FLORIDA:*

| | |
|---|---|
| *Florida First Financial Group, Inc. v. Magnum Painting, Inc., et al.*<br>  Circuit Court of Hillsborough County, FL | TCPA |

| | |
|---|---|
| *Florida First Financial Group, Inc. v. Spivey Mowers, Inc.*<br>  Circuit Court of Hillsborough County, FL | TCPA |
| *Robert A. Dalzell, Inc. v. European Tile & Floors, Inc., et al.*<br>  Circuit Court of Pinellas County, FL | TCPA |
| *Florida First Financial Group, Inc. v. Termprovider Financial Services, LLC, et al.*<br>  Circuit Court of Hillsborough County, FL | TCPA |
| *Dewar v. Florida Freezz of Southwest Florida, et al.*<br>  Circuit Court of Lee County, FL | TCPA |
| *Dewar v. Kolesov & Associates*<br>  Circuit Court of Lee County, FL | TCPA |
| *Sabon, Inc. v. Aqualogic, et al.*<br>  Circuit Court of Broward County, FL | TCPA |
| *Lee Alan Reed & Associates, Inc. v. Tsunami of Brandon, Inc.*<br>  Circuit Court of Hillsborough County, FL | TCPA |
| *Florida First Financial Group, Inc. v. Superior Pharmacy LLC, Ike C. Okeke, Yvonne Okeke, and Hilda Anadiume*<br>  Circuit Court of Hillsborough County, FL | TCPA |
| *Nathan S. Kaner and Another Level Health, Inc. v. Robert R. Schiffman, D.C., P.C. and Robert R. Schiffman*<br>  Circuit Court of Palm Beach County, FL | TCPA |
| *Florida First Financial Group v. Termprovider*<br>  Circuit Court of Hillsborough County, FL | TCPA |

### STATE TRIAL COURTS
### OTHER STATES:

| | |
|---|---|
| *National Vocational Schools of Boston, Inc. v. Nature Springs Water Company, Inc.*<br>  Superior Court, Middlesex County, MA | TCPA |
| *Collins and National Vocational Schools of Boston, Inc. v. Locks & Keys of Woburn, Inc.*<br>  Superior Court, Suffolk County, MA | TCPA |
| *Big Thyme Enterprises, Inc. v. Palmetto Gold Buying Service, Inc.*<br>  Court of Common Pleas, Richland County, SC | TCPA |
| *Wilder Chiropractic, Inc. v. Easy PC Solutions LLC*<br>  Circuit Court of Waukesha County, WI | TCPA |

*Slater v. Richgeis, LLC*                                    TCPA
  Superior Court, Providence County, RI

*B.Z.B. Enterprises, Inc. v. Mag & Son, LLC*                TCPA
  Superior Court of Providence County, RI

*Percic Enterprises v. European Autoworks*                  TCPA
  District Court of Hennepin County, MN

*Wilder Chiropractic, Inc. v. Microwize Technology, Inc.*   TCPA
  Circuit Court of Dane County, WI

*Blue Wave Corporation v. North End Chiropractic LLC and Kevin Loughlin*   TCPA
  Superior Court of Suffolk County, MA

# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MEYERS DIVISION**

SCOMA CHIROPRACTIC, P.A., WILLIAM )
P. GRESS, and FLORENCE MUSSAT M.D., )
S.C., individually and as the representatives )
of a class of similarly-situated persons, )
                                         )   No. 2:16-cv-00041-UA-MRM
                          Plaintiffs,    )
                                         )
             v.                          )
                                         )
MASTERCARD INTERNATIONAL INC.,           )
                                         )
                          Defendant.     )

**DECLARATION OF CURTIS C. WARNER**

I, Curtis C. Warner declare that the following statements are true:

1.      I received my undergraduate degree from Grand Valley State University, Allendale,

Michigan, in 1993, my Masters Degree in Education from Wayne State University, Detroit,

Michigan, in 1998, and my Juris Doctorate from Michigan State University – Detroit College of

Law (now Michigan State University – College of Law), *cum laude*, in 2002.  During law school,

I was the Editor-in-Chief for the Michigan State University – Detroit College of Law *Journal of*

*Medicine and Law* and interned with the United States Army Judge Advocate General's Office at

Fort Carson in Colorado in the claims department.

2.      In August 2002, I began working as an associate attorney at Collins & Blaha, P.C.,

an employment law firm that represents various school districts in the State of Michigan.

3.      From April 2003 to March 2005, I worked as a staff attorney at Michigan Migrant

Legal Assistance Project, Inc., (now Migrant Legal Aid) in Grand Rapids, Michigan, representing

migrant farm workers in various labor and consumer disputes before administrative agencies,

federal and state courts.  During that time, I represented a client before the Michigan Supreme

Court. *Lopez v. Hardy's Holsteins LLC,* 2005 MIWCLR (LRP) LEXIS 151 (Mich. WCAC, June 24, 2005) *sub nom. Lopez v. Worker's Compensation Appellate Comm'n.,* No. 263842, 2005 Mich. App. LEXIS 3312 (Mich. App., Sept. 23, 2005); 704 N.W. 2d 709, 474 Mich. 893 (Mich. 2005). I am currently a board member of Migrant Legal Aid and am counsel in pending cases in which Migrant Legal Aid is also counsel of record.

4.      From March 2005 to September 2006, I was an associate attorney at the consumer class action law firm of Edelman Combs Latturner & Goodwin LLC in Chicago, Illinois ("Edelman Combs"). "Edelman, Combs, Latturner & Goodwin, LLC, [is] a small Chicago law firm specializing in consumer credit, debt collection, FDCPA, predatory lending practices, and class action litigation." *Miller v. Midland Credit Mgmt.,* 08 C 780, 2009 U.S. Dist. LEXIS 16273 * 6-7 (N.D. Ill. Mar. 2, 2009).

5.      In October 2006, I started Warner Law Firm, LLC, an Illinois Limited Liability Company, and practiced law under that corporate structure until October 2019.

6.      I am currently a solo practitioner and do not have any staff.

7.      I am a member of the bars of the States of Michigan (Admitted 2002), Illinois (Admitted 2004) and New York (Admitted 2020).

8.      I am also admitted to practice before the following Courts: Supreme Court of the United States, Seventh Circuit Court of Appeals, Sixth Circuit Court of Appeals, Northern District of Illinois, Central District of Illinois, Eastern District of Michigan, Western District of Michigan, Northern District of Indiana, Southern District of Indiana and Eastern District of Wisconsin.  I have also been permitted to practice *pro hac vice* in the District of New Jersey, the Eastern District of Virginia, Monterey County, California, and the Middle and Southern Districts of Florida.

2

9.     I am a member of the Trial Bar of the Northern District of Illinois, having twice served the Court as appointed counsel in Title VII cases, once in a bank financing case, once in a FCRA case and once in a prisoner rights case.  I have also performed *pro bono* work for the Legal Assistance Foundation of Metropolitan Chicago taking a mortgage fraud case to trial after 3 ½ years of litigation and obtaining a modest five-figure judgment against one defendant, a six-figure settlement from the other defendants, and waived my legal fees for the benefit of the indigent client whose home was taken from her.

10.     Since becoming a solo practitioner in 2006, I have been approved as a class counsel in the following matters to which final approval has been granted: *Pilarski v. Rent Recover of Better NOI LLC,* 1:17-cv-8659 (N.D. Ill. Sept. 25, 2019) (FDCPA); *Loveday v. Financial Asset Management Systems, Inc.,* 2:18-cv-10218-GAD-MKM (E.D. Mich. May 24, 2019) (FDCPA); *Dilallo et al. v. Miller and Steeno, P.C., et al.,* 16 C 51 (N.D. Ill. Mar. 16, 2018) (FDCPA); *Patel v. AT&T Services, Inc.*, 15 C 8174 (N.D. Ill. Sept. 20, 2017) (TCPA – Autodialer); *Florence Mussat, M.D., S.C. v. E.S. Medical Supplies and Equipment Inc.,* 16 C 1240 (N.D. Ill. Sept. 13, 2017) (TCPA – Junk Fax); *Tsang v. Zara USA, Inc.*, 15-cv-11160 (N.D. Ill. Nov. 2, 2016) (FCRA – Receipt); *Vasquez v. Zara USA, Inc.,* 15 C 3433 (N.D. Ill. March 8, 2016) (FCRA – Receipt); *Florence Mussat, M.D., S.C. v. Insurance Group of America Holdings, LLC.*, 13 C 7798 (N.D. Ill. May 7, 2015) (TCPA – Junk Fax); *Krishnan et al. v. Autovest LLC*, 13 C 8654 (N.D. Ill. Mar. 27, 2015) (FDCPA); *Paci v. Elmhurst Auto Werks, LTD,* 14 C 1158 (N.D. Ill. Feb. 2, 2015) (FCRA – Receipt); *Pursak v. Lumber Liquidators, Inc.,* 12 C 6984 (N.D. Ill Nov. 17, 2014) (FCRA – Receipt); *Florence Mussat M.D., S.C. v. Betterdoctor, Inc.*, 13 C 8377 (N.D. Ill. July 10, 2014) (TCPA Junk Fax); *Sanders et. al. v. W&W Wholesale, Inc.,* 11 C 3557 (N.D. Ill. Apr. 11, 2014) (FCRA – Receipt); *Bargains in a Box, Inc.*, 13 C 3964 (N.D. Ill. Mar. 27, 2014) (FCRA – Receipt);

3

*Florence Mussat M.D., S.C. v. Global Healthcare Resource, LLC,* 11 C 7035 (N.D. Ill. Nov. 1, 2013) (TCPA Junk Fax); *Tang v. Medical Recovery Specialists Inc*., 11 C 2109 (N.D. Ill) (FDCPA); *Tang v. Pita Inn Inc*, 11 C 3833 (N.D. Ill. May 2, 2012) (FCRA – Receipt); *Balbarin v. North Star Acquisition,* LLC, 10 C 1846 (N.D. Ill. Apr. 12, 2012) (TCPA Autodialer); *O'Hara v. Medieval Times USA, Inc.*, 3:10-cv-751 (D. N.J. Mar. 6, 2012) (FCRA – Receipt); *Todd v. HB Windows and Doors*, *Inc.*, 10 C 4986 (N.D. Ill. Aug. 18, 2011) (FCRA – Receipt); *Seppanen v. Krist Oil Co.*, 2:09-cv-195 (W.D. Mich. Aug. 9, 2011) (FCRA – Receipt); *Vallejo v. National Credit Adjusters,* LLC, 10-cv-103 (N.D. Ind. Nov. 3, 2010) (FDCPA); *Mitchem v. Northstar Location Services,* LLC, 09 C 6711, (N.D. Ill. May 13, 2010) (FDCPA); *Housenkamp v. Weltman, Weinberg & Reis, Co. of Michigan*, Case No. 1:09-cv-10613-TLL-CEB (E.D. Mich. May 11, 2010) (FDCPA); *Kern v. LVNV Funding, Inc.*, 09 C 2202, (N.D. Ill. Jan. 21, 2010) (FDCPA); *Prieto et al. v. HBLC, Inc. and Steven J. Fink & Assoc., P.C.*, 08 C 2817 (N.D. Ill. Dec. 15, 2008) (FDCPA); *Dobson v. Asset Acceptance LLC*, 07 C 6203, (assigned as related to 07 C 5967) (N.D. Ill. 2008) (FDCPA); *Horton v. IQ Telecom*, 07 C 2478 (N.D. Ill. May 5, 2008) (FDCPA).

11.     In *Cavin v. Home Loan Center, Inc.* 236 F.R.D 387 (N.D. Ill. 2007), a specific finding regarding my ability as class counsel was made in that, "[t]he Court finds that Mr. Warner [is]. . . 'experienced, competent, qualified and able to conduct the litigation vigorously'", and therefore met the adequacy of class counsel requirement under Rule 23(a)(4)). *Id*. at 395.

12.     I was the primary brief writer on *Mitchem v. Illinois Collection Service*, 271 F.R.D. 617 (N.D. Ill. 2011) and *Balbarin v. North Star Capital Acquisition*, 2011 U.S. Dist. LEXIS 686 (N.D. Ill. Jan. 5, 2011), which are the first two cases in the nation granting a contested class certification motion for claims brought under the Telephone Communication Protection Act for calls to cellular telephones without express prior consent.

13.     I contributed to the writing of the plaintiffs' joint brief in a TCPA matter of first impression and was second chair at oral argument in the Seventh Circuit in *Soppet v. Enhanced Recovery, Co., LLC*, 679 F.3d 637 (7th Cir. 2012).

14.     I have represented successful objectors before the Seventh Circuit in reversing the District Court's approval of a nationwide class action settlement. *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014).

15.     I have filed a petition for writ of certiorari to the United States Supreme Court. *Nicaj v. Shoe Carnival, Inc.*, 135 S. Ct. 1429 (2015) (*cert denied*).

16.     Since beginning the practice of law, I have been involved in the litigation of over 250 cases on behalf of consumers in the courts to which I am admitted.

17.     Since becoming a solo practitioner in 2006, I have filed over 100 cases on behalf of consumers throughout the federal district courts of Illinois, Michigan and Indiana and have represented clients' interests before the Seventh and the Sixth Circuit Court of Appeals.

I Curtis C. Warner declare under penalty of perjury that the foregoing is true and correct.

Executed on March 12, 2020

/s/ *Curtis Warner*

Curtis C. Warner

Curtis C. Warner
5 E. Market St.
Suite 250
Corning, NY 14830
(888) 551-8685 (TEL)
cwarner@warner.legal

# EXHIBIT L

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MEYERS DIVISION**

| | | |
|---|---|---|
| SCOMA CHIROPRACTIC, P.A., WILLIAM P. GRESS, and FLORENCE MUSSAT M.D., S.C., individually and as the representatives of a class of similarly-situated persons, | ) ) ) ) ) | |
| | ) | No. 2:16-cv-00041-UA-MRM |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MASTERCARD INTERNATIONAL INC., | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF DANIEL A. EDELMAN

Daniel A. Edelman declares under penalty of perjury, as provided for by 28 U.S.C. §1746, that the following statements are true:

1.      Edelman, Combs, Latturner & Goodwin, LLC, has 8 principals, Daniel A. Edelman, Cathleen M. Combs, James O. Latturner, Tara L. Goodwin, Julie Clark, Heather Kolbus, Cassandra P. Miller, and Tiffany N. Hardy, and four associates.

2.      **Daniel A. Edelman** is a 1976 graduate of the University of Chicago Law School.  From 1976 to 1981 he was an associate at the Chicago office of Kirkland & Ellis with heavy involvement in the defense of consumer class action litigation (such as the General Motors Engine Interchange cases).  In 1981 he became an associate at Reuben & Proctor, a medium-sized firm formed by some former Kirkland & Ellis lawyers, and was made a partner there in 1982.  From the end of 1985 he has been in private practice in downtown Chicago.  Virtually all of his practice involves litigation on behalf of consumers, through both class and individual actions.  He is the author of the chapters on the "Fair Debt Collection Practices Act," "Truth in Lending Act," and "Telephone Consumer Protection Act" in *Illinois Causes of Action* (Ill. Inst. For Cont. Legal Educ.  2014 and earlier editions), author of the chapter on the Telephone Consumer Protection Act in *Federal Deception Law* (National Consumer Law Center 2013 Supp.), author of  *Collection Litigation: Representing the Debtor*  (Ill. Inst. Cont. Legal Educ. 2008, 2011, 2014, 2019), and *Collection Litigation: Representing the Debtor* (Ill. Inst. Cont. Legal Educ. 2014); author of Chapter 6, "Predatory Lending and Potential Class Actions," in *Real Estate Litigation* (Ill. Inst. For Cont. Legal Educ. 2004, 2008, 2013), co-author of Rosmarin & Edelman, *Consumer Class Action Manual* (2d-4th editions, National Consumer Law Center 1990, 1995 and 1999); author of  *Representing Consumers in Litigation with Debt Buyers* (Chicago Bar Ass'n 2008);  *Predatory Mortgage Lending* (Ill. Inst. for Cont. Legal. Educ. 2008, 2011), author of Chapter 6, "Predatory Lending and Potential Class Actions," in *Real Estate Litigation* (Ill. Inst. For Cont. Legal Educ. 2004, 2008, 2014), *Illinois Consumer Law*, in Consumer Fraud and Deceptive Business Practices Act and Related Areas Update (Chicago Bar Ass'n 2002);  *Payday Loans:  Big Interest Rates and Little Regulation*, 11 Loy.Consumer L.Rptr. 174 (1999); author of *Consumer Fraud and Insurance Claims*, in Bad Faith and Extracontractual Damage Claims in Insurance Litigation, Chicago Bar Ass'n 1992; co-author of

1

Chapter 8, "Fair Debt Collection Practices Act," *Ohio Consumer Law* (1995 ed.); co-author of *Fair Debt Collection: The Need for Private Enforcement*, 7 Loy.Consumer L.Rptr. 89 (1995); author of *An Overview of The Fair Debt Collection Practices Act*, in Financial Services Litigation, Practicing Law Institute (1999); co-author of *Residential Mortgage Litigation*, in Financial Services Litigation, Practicing Law Institute (1996); author of *Automobile Leasing: Problems and Solutions*, 7 Loy.Consumer L.Rptr. 14 (1994); author of *Current Trends in Residential Mortgage Litigation*, 12 Rev. of Banking & Financial Services 71 (April 24, 1996); co-author of *Illinois Consumer Law* (Chicago Bar Ass'n 1996); co-author of D. Edelman and M. A. Weinberg, *Attorney Liability Under the Fair Debt Collection Practices Act* (Chicago Bar Ass'n 1996); and author of *The Fair Debt Collection Practices Act: Recent Developments*, 8 Loy.Consumer L. Rptr. 303 (1996), among others.   Mr. Edelman is also a frequent speaker on consumer law topics for various legal organizations including the Chicago Bar Association, the National Consumer Law Center's Consumer Rights Litigation Conference, and the Illinois Institute for Continuing Legal Education, and he has testified on behalf of consumers before the Federal Trade Commission and the Illinois legislature.  He is a member of the Illinois bar and admitted to practice in the following courts: United States Supreme Court, Seventh Circuit Court of Appeals, First Circuit Court of Appeals, Second Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, Sixth Circuit Court of Appeals, Eighth Circuit Court of Appeals, Ninth Circuit Court of Appeals, Tenth Circuit Court of Appeals, Eleventh Circuit Court of Appeals, United States District Courts for the Northern and Southern Districts of Indiana, United States District Courts for the Northern, Central, and Southern Districts of Illinois, United States District Courts for the Eastern and Western Districts of Wisconsin, and the Supreme Court of Illinois.  He is a member of the Northern District of Illinois trial bar.

3.    **Cathleen M. Combs** is a 1976 graduate of Loyola University Law  School.  From 1984-1991, she supervised the Northwest office of the Legal Assistance Foundation of Chicago, where she was lead or co-counsel in class actions in the areas of unemployment compensation, prison law, social security law, and consumer law.  She joined what is now Edelman, Combs, Latturner & Goodwin, LLC in early 1991 and became a named partner in 1993.  Ms. Combs received an Award for Excellence in Pro Bono Service from the Judges of the United States District Court for the Northern District of Illinois and the Chicago Chapter of the Federal Bar Association on May 18, 2012.  Ms. Combs has argued over fifteen cases in the 1st, 3rd and 7th Circuit Court of Appeals and the Illinois Appellate Court, and she is a frequent speaker on consumer law topics at various legal organizations including the Chicago Bar Association, the National Consumer Law Center's Consumer Rights Litigation Conferences,  and the Practicing Law Institute's Consumer Financial Services Institute. Ms. Combs is coauthor of *The Bankruptcy Practitioner's Guide to Consumer Financial Services Actions After the Subprime Mortgage Crisis*  (LRP Publications 2010).  Her reported decisions include: *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636 (7th Cir. 2014) (en banc); *Siwulec v. J.M. Adjustment Servs., LLC*, 465 Fed. Appx. 200 (3d Cir. 2012); *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002); *Chandler v. American General Finance, Inc.*, 329 Ill. App.3d 729, 768 N.E.2d 60 (1st Dist. 2002);  *Miller v. McCalla Raymer*, 214 F.3d 872 (7th Cir. 2000);  *Bessette v. Avco Financial Services*, 230 F.3d 439 (1st Cir. 2000); *Emery v. American Gen. Fin., Inc.*, 71 F.3d 1343 (7th Cir. 1995);  *McDonald v. Asset Acceptance, LLC*, 296 F.R.D. 513 (E.D.Mich. 2013); and  *Tocco v. Real Time Resolutions*, 48 F.Supp.3d 535 (S.D.N.Y. 2014).  She is a member of the Illinois bar and admitted to practice in the following courts:  United States District Courts for the Northern, Central and Southern Districts of Illinois, United States District Courts for the Northern and Southern Districts of Indiana, Seventh Circuit Court of Appeals, Third Circuit Court of Appeals, Fifth Circuit Court of Appeals, and Tenth Circuit Court of Appeals.  She is a member of the Northern District of Illinois trial bar.

4.    **James O. Latturner** is a 1962 graduate of the University of Chicago Law

School.  Until 1969, he was an associate and then a partner at the Chicago law firm of Berchem, Schwanes & Thuma.  From 1969 to 1995 he was Deputy Director of the Legal Assistance Foundation of Chicago, where he specialized in consumer law, including acting as lead counsel in over 30 class actions.  His publications include Chapter 8 ("Defendants") in *Federal Practice Manual for Legal Services Attorneys* (M. Masinter, Ed., National Legal Aid and Defender Association 1989); *Governmental Tort Immunity in Illinois*, 55 Ill.B.J. 29 (1966); *Illinois Should Explicitly Adopt the Per Se Rule for Consumer Fraud Act Violations*, 2 Loy.Consumer L.Rep. 64 (1990), and *Illinois Consumer Law* (Chicago Bar Ass'n 1996).  He has taught in a nationwide series of 18 Federal Practice courses sponsored by the Legal Services Corporation, each lasting four days and designed for attorneys with federal litigation experience.  He has argued over 30 appeals, including two cases in the United States Supreme Court, three in the Illinois Supreme Court, and numerous cases in the Seventh, Third, Fifth, and Eleventh Circuits.  Mr. Latturner was involved in many of the significant decisions establishing the rights of Illinois consumers.  He is a member of the Northern District of Illinois trial bar.

5.    **Tara L. Goodwin** is a graduate of the University of Chicago (B.A., with general honors, 1988) and Illinois Institute of Technology, Chicago-Kent College of Law (J.D., with high honors,1991).  Ms. Goodwin was Chair of the Chicago Bar Association's Consumer Law Committee from 2007 - 2010, and she has previously been on the faculty of the Practicing Law Institute's Consumer Financial Services Institute in Chicago, speaking on issues relating to the Fair Debt Collection Practices Act and mortgage litigation. Ms. Goodwin spoke at the 2016 Conference on Consumer Finance Law on mortgage servicing issues. Ms. Goodwin has also been a frequent speaker at the Chicago Bar Association, speaking on topics such as how to assist consumers with credit reporting problems, developments in class action law and arbitration agreements in consumer contracts.  **Reported Cases.** *Aleksic v. Experian Information Solutions, Inc.*, 2014 WL 2769122 (N.D.Ill. June 18, 2014); *Taylor v. Screening Reports, Inc*., 2015 WL 4052824 (N.D.Ill. July 2, 2015); *Williams v. Chartwell Financial Services, Ltd.*, 204 F.3d 748 (7th Cir. 2000); *Hillenbrand v. Meyer Medical Group*, 288 Ill.App.3d 871, 682 N.E.2d 101 (1st Dist. 1997), later opinion, 308 Ill.App.3d 381, 720 N.E.2d 287 (1st Dist. 1999); *Bessette v. Avco Fin. Servs.*, 230 F.3d 439 (1st Cir. 2000); *Large v. Conseco Fin. Servicing Co.*, 292 F.3d 49 (1st Cir. 2002); *Flippin v. Aurora Bank, FSB*, 12 C 1996, 2012 WL 3260449 , 2012 U.S. Dist. LEXIS 111250 (N.D.Ill. Aug. 8, 2012); *Henry v. Teletrack, Inc.,* 11 C 4424,  2012 WL 769763, 2012 U.S. Dist. LEXIS 30495 (N.D.Ill.  March 7, 2012); *Kesten v. Ocwen Loan Servicing, LLC*, 11 C 6981, 2012 WL 426933, 2012 U.S. Dist. LEXIS 16917  (N.D.Ill. Feb. 9, 2012); *Bunton v. Cape Cod Village, LLC*, No. 09-1044, 2009 WL 2139441, 2009 U.S. Dist. LEXIS 57801 (C.D.Ill. July 6, 2009); *Wilson v. Harris N.A.*, No. 06 C 5840, 2007 WL 2608521, 2007 U.S. Dist. LEXIS 65345  (N.D.Ill. Sept. 4, 2007); *Carbajal v. Capital One*, 219 F.R.D. 437 (N.D.Ill. 2004); *Russo v. B&B Catering*, 209 F.Supp.2d 857 (N.D.Ill. 2002);  *Romaker v. Crossland Mtg. Co.*, No. 94 C 3328,  1996 WL 254299, 1996 U.S.Dist. LEXIS 6490  (N.D.Ill. May 10, 1996);  *Mount v. LaSalle Bank Lake View*, 926 F.Supp. 759 (N.D.Ill 1996).  Ms. Goodwin is a member of the Illinois bar and is admitted in the Seventh, First, and D.C. Circuit Courts of Appeals, and the United States District Courts for the Northern and Central Districts of Illinois, and the Northern District of Indiana.  She is also a member of the Northern District of Illinois trial bar.

6.    **Julie Clark** (neé Cobalovic) is a graduate of Northern Illinois University (B.A., 1997) and DePaul University College of Law (J.D., 2000). **Reported Cases:** *Ballard RN Center, Inc. v. Kohll's Pharmacy and Homecare, Inc.*, 2015 IL 118644, 48 N.E.3d 1060 (Ill.Sup.Ct.) **;** *Record-A-Hit, Inc. v. Nat'l. Fire Ins. Co.*, 377 Ill. App. 3d 642; 880 N.E.2d 205 (1st Dist. 2007); *Qualkenbush v. Harris Trust & Savings Bank*,  219 F. Supp.2d 935 (N.D.Ill. 2002); *Covington-McIntosh v. Mount Glenwood Memory Gardens*, 00 C 186,  2002 WL 31369747 (N.D.Ill., Oct. 21, 2002), later opinion, 2003 WL 22359626 (N.D.Ill. Oct. 15, 2003); *Western  Ry. Devices Corp. v. Lusida Rubber Prods.*, 06 C 52, 2006 WL 1697119, 2006 U.S. Dist. LEXIS 43867

3

(N.D.Ill. June 13, 2006); *Nautilus Ins. Co. v. Easy Drop Off, LLC*, 06 C 4286, 2007 U.S. Dist. LEXIS 42380 (N.D.Ill. June 4, 2007); *Ballard Nursing Center, Inc.  v. GF Healthcare Products, Inc.*, 07 C 5715, 2007 WL 3448731, 2007 U.S. Dist. LEXIS 84425 (N.D.Ill. Nov. 14,  2007); *Sadowski v. Med1 Online, LLC*, 07 C 2973, 2008 WL 2224892, 2008 U.S. Dist. LEXIS 41766 (N.D.Ill. May 17,  2008); *Sadowski v. OCO Biomedical, Inc.*, 08 C 3225, 2008 WL 5082992, 2008 U.S. Dist. LEXIS 96124 (N.D.Ill. Nov. 25, 2008); *ABC Bus. Forms, Inc. v. Pridamor, Inc.*, 09 C 3222, 2009 WL 4679477, 2009 U.S. Dist. LEXIS 113847 (N.D.Ill. Dec. 1, 2009); *Glen Ellyn Pharmacy v. Promius Pharma, LLC*, 09 C 2116, 2009 WL 2973046, 2009 U.S. Dist. LEXIS 83073 (N.D.Ill. Sept. 11, 2009); *Garrett v. Ragle Dental Lab., Inc.*, 10 C 1315, 2010 WL 4074379, 2010 U.S. Dist. LEXIS 108339 (N.D.Ill. Oct. 12, 2010); *Garrett v. Sharps Compliance, Inc.*, 10 C 4030, 2010 WL 4167157, 2010 U.S. Dist. LEXIS 109912 (N.D.Ill. Oct. 14, 2010).

7.      **Heather A. Kolbus** (neé Piccirilli) is a graduate of DePaul University (B.S. *cum laude*, 1997), and Roger Williams University School of Law (J.D., 2002). **Reported Cases:** *Clark v. Experian Info. Solutions, Inc.*, 8:00cv1217-22, 2004 WL 256433, 2004 U.S. Dist. LEXIS 28324 (D.S.C., Jan. 14, 2004); *DeFrancesco v. First Horizon Home Loan Corp.*, 06-0058, 2006 WL 3196838, 2006 U.S. Dist. LEXIS 80718 (S.D.Ill. Nov. 2, 2006); *Jeppesen v. New Century Mortgage Corp.*, 2:05cv372, 2006 WL 3354691, 2006 U.S. Dist. LEXIS 84035 (N.D.Ind. Nov. 17, 2006); *Benedia v. Super Fair Cellular, Inc.*, 07 C 1390, 2007 WL 2903175, 2007 U.S. Dist. LEXIS 71911 (N.D.Ill. Sept. 26, 2007); *Gonzalez v. Codilis & Assocs., P.C.*, 03 C 2883, 2004 WL 719264, 2004 U.S. Dist. LEXIS 5463 (N.D.Ill. March 30, 2004); *Centerline Equipment Corp. v. Banner Personnel Svc., Inc.*, 07 C 1611, 2009 WL 1607587, 2009 U.S. Dist. LEXIS 48092 (N.D.Ill. June 9, 2009); *R. Rudnick & Co. v. G.F. Protection, Inc.*, 08 C 1856, 2009 WL 112380, 2009 U.S. Dist. LEXIS 3152 (N.D.Ill. Jan. 15, 2009); *Pollack v. Cunningham Financial Group, LLC*, 08 C 1405, 2008 WL 4874195, 2008 U.S. Dist. LEXIS 4166 (N.D.Ill. June 2, 2008); *Pollack v. Fitness Innovative Techs., LLC*, No. 08 CH 03430, 2009 WL 506280, 2009 TCPA Rep. 1858 (Ill. Cir. Ct., Jan. 14, 2009); *R. Rudnick & Co. v. Brilliant Event Planning, Inc.*, No. 09 CH 18924, 2010 WL 5774848, 2010 TCPA Rep. 2099 (Ill. Cir. Ct., Nov. 30, 2010); *West Loop Chiropractic & Sports Injury Center, Ltd. v. North American Bancard, LLC*, 16 C 5856,  2018 WL 3738281 (N.D. Ill. Aug. 7, 2018).

8.      **Cassandra P. Miller** is a graduate of the University of Wisconsin   – Madison (B.A. 2001) and John Marshall Law School (J.D. *magna cum laude* 2006).  **Reported Cases:** *Pietras v. Sentry Ins. Co.*, 513 F.Supp.2d 983 (N.D.Ill. 2007); *Hernandez v. Midland Credit Mgmt.*, 04 C 7844, 2007 WL 2874059, 2007 U.S. Dist. LEXIS 16054 (N.D.Ill. Sept. 25, 2007); *Balogun v. Midland Credit Mgmt.*, 1:05cv1790, 2007 WL 2934886, 2007 U.S. Dist. LEXIS 74845 (S.D.Ind. Oct. 5, 2007); *Herkert v. MRC Receivables Corp.*, 655 F. Supp. 2d 870 (N.D.Ill. 2008); *Miller v. Midland Credit Management, Inc.*, No. 08 C 780, 2009 WL 528796, 2009 U.S. Dist. LEXIS 16273 (N.D.Ill. March 2, 2009); *Frydman v. Portfolio Recovery Associates, LLC*, 11 C 524, 2011 WL 2560221, 2011 U.S. Dist. LEXIS 69502 (N.D.Ill. June 28, 2011).

9.      **Tiffany N. Hardy** is a graduate of Tuskegee University (B.A. 1998) and Syracuse University College of Law (J.D. 2001).   **Reported cases:** *Unifund v. Shah*, 407 Ill.App.3d 737, 946 N.E.2d 885 (1st Dist. 2011), later opinion, 2013 IL App (1st) 113658, 993 N.E.2d 518; *Tocco v. Real Time Resolutions*, 48 F.Supp.3d 535 (S.D.N.Y.  2014); *Balbarin v. North Star*, 10 C 1846, 2011 WL 211013, 2011 U.S. Dist. LEXIS 686 (N.D.Ill. Jan. 5, 2011)(class certified); *Diaz v. Residential Credit Solutions, Inc.*, 965 F.Supp.2d 249 (E.D.N.Y. 2013), later opinion,  297 F.R.D. 42 (E.D.N.Y.  2014), later opinion, 299 F.R.D. 16 (E.D.N.Y. 2014);  *Manlapaz v. Unifund*, 08 C 6524, 2009 WL 3015166,  2009 U.S. Dist. LEXIS 85527 (N.D.Ill. Sept. 15, 2009); *Matmanivong v. Unifund*, 08 C 6415, 2009 WL 1181529, 2009 U.S.

Dist. LEXIS 36287 (N.D.Ill. Apr. 28, 2009); *Kubiski v. Unifund*, 08 C 6421, 2009 WL 774450, 2009 U.S. Dist. LEXIS 26754 (N.D.Ill. Mar. 25, 2009); *Cox v. Unifund CCR Partners*, 08 C 1005 (N.D.Ill. Dec. 4, 2008) (Report and Recommendation for Class Certification); *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D.Ill. 2008) (class certified), later opinion, 07 C 3840, 2008 WL 2512679, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008) (summary judgment denied); *Cotton v. Asset Acceptance*, 07 C 5005, 2008 WL 2561103, 2008 U.S. Dist. LEXIS 49042 (N.D.Ill. June 26, 2008) (class certified); *Ketchem v. American Acceptance Co.*, 641 F. Supp. 2d 782 (N.D.Ind. 2008); *D'Elia v. First Capital*, 07 C 6042, 2008 WL 4344571, 2008 U.S. Dist. LEXIS 22461 (N.D.Ill. Mar. 19, 2008).  She is admitted in New York and the District of Columbia as well as Illinois.

10.  **Associates**:

a.  **David Kim** is a graduate of the University of Illinois (B.A., 2001, M.A., 2004) and  Illinois Institute of Technology, Chicago-Kent College of Law (J.D., 2010).

b.  **Bryan Lesser** is a graduate of Lawrence University (B.A. 2014) and Georgetown University Law Center (J.D., 2018).

c.  **Daniel Scott Miller** is a graduate of Durham University (B.A. 2014) and University of Illinois College of Law (J.D. 2018).

d.  **Kasun Wijegunawardana** is a graduate of Cornell College (B.A. 2010) and Loyola University Chicago Law School (J.D., 2019).

11.  The firm also has a dozen legal assistants and support staff.

12.  Since its inception, the firm has recovered more than $500 million for consumers.  The types of cases handled by the firm are illustrated by the following:

13.  **Collection practices:**  The firm has brought numerous cases under the Fair Debt Collection Practices Act, both class and individual.  Decisions include:  *Jenkins v. Heintz*, 25 F.3d 536 (7th Cir. 1994), aff'd  514 U.S. 291 (1995) (FDCPA coverage of attorneys); *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636 (7th Cir. 2014)(en banc); *Janetos v. Fulton, Friedman & Gullace, LLP*, 825 F.3d 317  (7th Cir. 2016); *Barbato v. Greystone Alliance, LLC,* No. 18-1042, 2019 WL 847920 (3d Cir. Feb. 22, 2019); *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076 (7th Cir. 2013); *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637 (7th Cir.  2012); *Ruth v. Triumph Partnerships*, 577 F.3d 790 (7th Cir. 2009); *Hale v. Afni, Inc.*, 08 C 3918, 2010 WL 380906, 2010 U.S. Dist. LEXIS 6715 (N.D.Ill. Jan. 26, 2010); *Parkis v. Arrow Fin Servs.*, 07 C 410, 2008 WL 94798, 2008 U.S. Dist. LEXIS 1212 (N.D.Ill. Jan. 8, 2008); *Foster v. Velocity Investments*, 07 C 824, 2007 WL 2461665, 2007 U.S. Dist. LEXIS 63302 (N.D. Ill. Aug. 24, 2007); *Foreman v. PRA III, LLC*, 05 C 3372, 2007 WL 704478, 2007 U.S. Dist. LEXIS 15640 (N.D. Ill. March 5, 2007); *Schutz v. Arrow Fin. Services*, 465 F. Supp. 2d 872 (N.D.Ill. 2006); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014),  later opinion, 807 F.3d 872 (7th Cir. 2015) (collection of time-barred debts); *Siwulec v. J.M. Adjustment Servs., LLC*, 465 Fed. Appx. 200 (3d Cir. 2012); (activities of mortgage company field agents); *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562 (7th Cir. 2004); *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534 (7th Cir. 2003) (FDCPA coverage of debt buyers); *Peter v. GC Servs. L.P.*, 310 F.3d 344 (5th Cir. 2002); *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002) (attorney letters without attorney involvement); *Boyd v. Wexler*, 275 F.3d 642 (7th Cir. 2001); *Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, L.L.C.*, 214 F.3d 872 (7th Cir. 2000); *Johnson v. Revenue Management, Inc.*, 169 F.3d 1057 (7th Cir.1999); *Keele v. Wexler & Wexler*, 95 C 3483, 1995 WL 549048,

1995 U.S.Dist. LEXIS 13215 (N.D.Ill. Sept. 12, 1995) (motion to dismiss), later opinion, 1996 WL 124452, 1996 U.S.Dist. LEXIS 3253 (N.D.Ill., March 18, 1996) (class), aff'd, 149 F.3d 589 (7th Cir. 1998); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997); *Maguire v. Citicorp Retail Services, Inc.*, 147 F.3d 232 (2nd Cir. 1998); *Young v. Citicorp Retail Services, Inc.*, No. 97-9397, 1998 U.S.App. LEXIS 20268, 159 F.3d 1349 (2nd Cir., June 29, 1998) (unpublished); *Charles v. Lundgren & Assocs., P.C.*, 119 F.3d 739 (9th Cir. 1997); *Avila v. Rubin*, 84 F.3d 222 (7th Cir. 1996), aff'g *Avila v. Van Ru Credit Corp.*, 94 C 3234, 1994 WL 649101 (N.D.Ill., Nov. 14, 1994), later opinion, 1995 WL 22866 (N.D.Ill., Jan. 18, 1995), later opinion, 1995 WL 41425 (N.D.Ill., Jan. 31, 1995), later opinion, 1995 WL 55255 (N.D.Ill., Feb. 8, 1995), later opinion, 1995 WL 683775, 1995 U.S.Dist. LEXIS 17117 (N.D.Ill., Nov. 16, 1995); *Tolentino v. Friedman*, 833 F.Supp. 697 (N.D.Ill. 1993), aff'd in part and rev'd in part, 46 F.3d 645 (7th Cir. 1995); *Diaz v. Residential Credit Solutions, Inc.*, 965 F.Supp.2d 249 (E.D.N.Y. 2013), later opinion, 297 F.R.D. 42 (E.D.N.Y. 2014), later opinion, 299 F.R.D. 16 (E.D.N.Y. 2014); *Stubbs v. Cavalry SPV I*, 12 C 7235, 2013 WL 1858587 (N.D.Ill., May 1, 2013); *Osborn v. J.R.S.-I., Inc.*, 13 C 621, 2013 WL 2467654 (N.D.Ill., June 7, 2013); *Terech v. First Resolution Mgmt. Corp.*, 854 F.Supp.2d 537, 544 (N.D.Ill. 2012); *Casso v. LVNV Funding, LLC*, 12 C 7328, 2013 WL 3270654 (N.D.Ill., June 26, 2013); *Simkus v. Cavalry Portfolio Services, LLC*, 11 C 7425, 2012 WL 1866542 (N.D.Ill., May 22, 2012); *McDonald v. Asset Acceptance LLC*, 296 F.R.D. 513 (E.D.Mich. 2013); *Ramirez v. Apex Financial Management, LLC*, 567 F. Supp.2d 1035 (N.D. Ill. 2008); *Cotton v. Asset Acceptance, LLC*, 07 C 5005, 2008 WL 2561103, 2008 U.S. Dist. LEXIS 49042 (N.D.Ill., June 26, 2008); *Buford v. Palisades Collection, LLC*, 552 F. Supp. 2d 800 (N.D.Ill. 2008); *Martin v. Cavalry Portfolio Servs., LLC,* 07 C 4745, 2008 WL 4372717, 2008 U.S. Dist. LEXIS 25904 (N.D.Ill., March 28, 2008); *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D.Ill. 2008) (class certified), later opinion, 07 C 3840, 2008 WL 2512679, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008) (summary judgment denied); *Hernandez v. Midland Credit Mgmt.*, 04 C 7844, 2007 WL 2874059, 2007 U.S. Dist. LEXIS 16054 (N.D.Ill., Sept. 25, 2007) (balance transfer program); *Blakemore v. Pekay*, 895 F.Supp.972 (N.D.Ill. 1995); *Oglesby v. Rotche*, 93 C 4183, 1993 WL 460841, 1993 U.S.Dist. LEXIS 15687 (N.D.Ill., Nov. 5, 1993), *later opinion*, 1994 U.S.Dist. LEXIS 4866, 1994 WL 142867 (N.D.Ill., April 18, 1994); *Laws v. Cheslock*, 98 C 6403, 1999 WL 160236, 1999 U.S.Dist. LEXIS 3416 (N.D.Ill., Mar. 8, 1999); *Davis v. Commercial Check Control, Inc.*, 98 C 631, 1999 WL 89556, 1999 U.S. Dist. LEXIS 1682 (N.D.Ill., Feb. 12, 1999); *Hoffman v. Partners in Collections, Inc.*, 93 C 4132, 1993 WL 358158, 1993 U.S.Dist. LEXIS 12702 (N.D.Ill., Sept. 15, 1993); *Vaughn v. CSC Credit Services, Inc.*, 93 C 4151, 1994 WL 449247, 1994 U.S.Dist. LEXIS 2172 (N.D.Ill., March 1, 1994), adopted, 1995 WL 51402, 1995 U.S.Dist. LEXIS 1358 (N.D.Ill., Feb. 3, 1995); *Beasley v. Blatt*, 93 C 4978, 1994 WL 362185, 1994 U.S.Dist. LEXIS 9383 (N.D.Ill., July 11, 1994); *Taylor v. Fink*, 93 C 4941, 1994 WL 669605, 1994 U.S.Dist. LEXIS 16821 (N.D.Ill., Nov. 23, 1994); *Gordon v. Fink*, 93 C 4152, 1995 WL 55242, 1995 U.S.Dist. LEXIS 1509 (N.D.Ill., Feb. 7, 1995); *Brujis v. Shaw*, 876 F.Supp. 198 (N.D.Ill. 1995).

14.     *Jenkins v. Heintz* is a leading decision regarding the liability of attorneys under the Fair Debt Collection Practices Act.  Mr. Edelman argued it before the Supreme Court and Seventh Circuit.  *Avila v. Rubin* and *Nielsen v. Dickerson* are leading decisions on phony "attorney letters."  *Suesz v. Med-1 Solutions, LLC* is a leading decision on the FDCPA venue requirements.  *McMahon v. LVNV Funding, LLC* is a leading decision on the collection of time-barred debts.

15.     **Debtors' rights**.  Important decisions include: *Ramirez v. Palisades Collection LLC*, 250 F.R.D. 366 (N.D.Ill. 2008) (class certified), later opinion, 07 C 3840, 2008 WL 2512679, 2008 U.S. Dist. LEXIS 48722 (N.D.Ill., June 23, 2008) (summary judgment denied) (Illinois statute of limitations for credit card debts); *Parkis v. Arrow Fin Servs.*, 07 C 410, 2008 WL 94798, 2008 U.S. Dist. LEXIS 1212 (N.D.Ill. Jan. 8, 2008); *Rawson v. Credigy Receivables,*

6

*Inc.,* 05 C 6032, 2006 WL 418665, 2006 U.S. Dist. LEXIS 6450 (N.D.Ill., Feb. 16, 2006) (same); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014) (collection of time-barred debts without disclosure); *Jones v. Kunin*, 99-818-GPM, 2000 WL 34402017, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000) (scope of Illinois bad check statute); *Qualkenbush v. Harris Trust & Sav. Bank*, 219 F. Supp. 2d 935 (N.D.Ill. 2002) (failure to allow cosigner to take over obligation prior to collection action); *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636 (7th Cir. 2014) (en banc) (venue abuse).

16.     **Telephone Consumer Protection Act.**  The firm has brought a number of cases under the Telephone Consumer Protection Act, 47 U.S.C. §227, which prohibits "junk faxes," spam text messages, robocalls to cell phones, and regulates telemarketing practices. Important junk fax and spam text message decisions include:  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446 (7th Cir. 2005); *Sadowski v. Med1 Online, LLC*, 07 C 2973, 2008 WL 2224892, 2008 U.S. Dist. LEXIS 41766 (N.D.Ill., May 27, 2008); *Benedia v. Super Fair Cellular, Inc.*, 07 C 01390, 2007 WL 2903175, 2007 U.S. Dist. LEXIS 71911 (N.D.Ill., Sept. 26, 2007); *Centerline Equip. Corp. v. Banner Pers. Serv.*, 545 F. Supp. 2d 768 (N.D.Ill. 2008); *ABC Business Forms, Inc. v. Pridamor, Inc.*, 09 C 3222, 2009 WL 4679477, 2009 U.S. Dist. LEXIS 113847 (N.D.Ill. Dec. 1, 2009); *Glen Ellyn Pharmacy, Inc. v. Promius Pharma, LLC*, 09 C 2116, 2009 WL 2973046, 2009 U.S. Dist. LEXIS 83073 (N.D.Ill. Sept. 11, 2009); *Garrett v. Ragle Dental Laboratory, Inc.*, 10 C 1315, 2010 WL 3034709, 2010 U.S. Dist. LEXIS, 108339 (N.D.Ill., Aug. 3, 3010); *West Loop Chiropractic & Sports Injury Center, Ltd. v. North American Bancard, LLC*, 16 C 5856,  2018 WL 3738281 (N.D. Ill. Aug. 7, 2018).

17.     The firm has also brought a number of cases complaining of robocalling and telemarketing abuse, in violation of the Telephone Consumer Protection Act.  Decisions in these cases include: *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637 (7th Cir. 2012); *Balbarin v. North Star Capital Acquisition, LLC*, 10 C 1846, 2011 WL 211013, 2011 U.S. Dist. LEXIS 686 (N.D.Ill. Jan. 21, 2011), *motion to reconsider denied*, 2011 U.S. Dist. LEXIS 58761 (N.D.Ill. 2011); *Sojka v. DirectBuy, Inc.*, 12 C 9809 et al., 2014 WL 1089072 (N.D.Ill., Mar. 18, 2014), later opinion, 2014 WL 1304234 (N.D.Ill., March 31, 2014).  The firm has a leadership role in Portfolio Recovery Associates, LLC, Telephone Consumer Protection Act Litigation, MDL No. 2295, and Midland Credit Management, Inc., Telephone Consumer Protection Act Litigation, MDL No. 2286.

18.     **Fair Credit Reporting Act:** The firm has filed numerous cases under the Fair Credit Reporting Act, which include: *Henry v. Teletrack, Inc.,* 11 C 4424,  2012 WL 769763, 2012 U.S. Dist. LEXIS 30495 (N.D.Ill.  March 7, 2012).

19.     Another line of cases under the Fair Credit Reporting Act which we have brought, primarily as class actions, alleges that lenders and automotive dealers, among others, improperly accessed consumers' credit information, without their consent and without having a purpose for doing so permitted by the FCRA.  *Cole v. U.S. Capital, Inc.*, 389 F.3d 719 (7th Cir. 2004); *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006); *Perry v. First National Bank*, 459 F.3d 816 (7th Cir. 2006).

20.     **Class action procedure:**  Important decisions include *McMahon v. LVNV Funding, LLC*, 807 F.3d 872 (7th Cir. 2015);  *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076 (7th Cir. 2013); *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000); *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832 (7th Cir. 1999); *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997); *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014) (mootness); *Ballard RN Center, Inc. v. Kohll's Pharmacy and Homecare, Inc.*, 2015 IL 118644,

48 N.E.3d 1060 (Ill.Sup.Ct.) (mootness),  and *Gordon v. Boden,* 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991).

21.     **Landlord-tenant:**  The firm has brought more than 20 class actions against landlords to enforce tenants' rights.  Claims include  failing to pay interest on security deposits or commingling security deposits.  Reported decisions include *Wang v. Williams*, 343 Ill. App. 3d 495; 797 N.E.2d 179 (5th Dist. 2003); *Dickson v. West Koke Mill Vill. P'Ship*, 329 Ill. App. 3d 341; 769 N.E.2d 971 (4th Dist. 2002); and *Onni v. Apartment Inv. & Mgmt. Co.*,  344 Ill. App. 3d 1099; 801 N.E.2d 586 (2nd Dist. 2003).

22.     **Mortgage charges and servicing practices:**   The firm has been involved in dozens of cases, mostly class actions, complaining of illegal charges on mortgages and improper servicing practices.  These include MDL-899, *In re Mortgage Escrow Deposit Litigation*, and MDL-1604, *In re Ocwen Federal Bank FSB Mortgage Servicing Litigation*, as well as the Fairbanks mortgage servicing litigation.  Decisions in the firm's mortgage cases include:  *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525 (7th Cir.  2007); *Johnson v. Thomas*, 342 Ill.App.3d 382, 794 N.E.2d 919 (1st Dist. 2003);   *Handy v. Anchor Mortgage Corp.*, 464 F.3d 760 (7th Cir. 2006); *Christakos v. Intercounty Title Co.*, 196 F.R.D. 496 (N.D.Ill. 2000); *Flippin v. Aurora Bank, FSB*, 12 C 1996, 2012 WL 3260449 , 2012 U.S. Dist. LEXIS 111250 (N.D.Ill. Aug. 8, 2012); *Kesten v. Ocwen Loan Servicing, LLC*, 11 C 6981, 2012 WL 426933, 2012 U.S. Dist. LEXIS 16917   (N.D.Ill. Feb. 9, 2012); *Johnstone v. Bank of America, N.A.*, 173 F.Supp.2d 809 (N.D.Ill. 2001); *Leon v. Washington Mut. Bank, F.A.*, 164 F.Supp.2d 1034 (N.D.Ill. 2001); *Williamson v. Advanta Mortg. Corp.*, 99 C 4784, 1999 WL 1144940, 1999 U.S. Dist. LEXIS 16374 (N.D.Ill., Oct. 5, 1999); *McDonald v. Washington Mut. Bank, F.A.*, 99 C 6884, 2000 WL 875416, 2000 U.S. Dist. LEXIS 11496 (N.D.Ill., June 22, 2000); *GMAC Mtge. Corp. v. Stapleton*, 236 Ill.App.3d 486, 603 N.E.2d 767 (1st Dist. 1992), leave to appeal denied, 248 Ill.2d 641, 610 N.E.2d 1262 (1993); *Leff v. Olympic Fed. S. & L. Ass'n,* 86 C 3026, 1986 WL 10636 (N.D.Ill. Sept. 19, 1986); *Aitken v. Fleet Mtge. Corp.*, 90 C 3708, 1991 WL 152533,, 1991 U.S.Dist. LEXIS 10420 (N.D.Ill. July 30, 1991), later opinion, 1992 WL 33926, 1992 U.S.Dist. LEXIS 1687 (N.D.Ill., Feb. 12, 1992); *Poindexter v. National Mtge. Corp.*, 94 C 45814, 1995 WL 242287, 1995 U.S.Dist. LEXIS 5396 (N.D.Ill., April 24, 1995); *Sanders v. Lincoln Service Corp.*, 91 C 4542, 1993 WL 1125433, 1993 U.S.Dist. LEXIS 4454 (N.D.Ill. April 5, 1993); *Robinson v. Empire of America Realty Credit Corp.*, 90 C 5063, 1991 WL 26593, 1991 U.S.Dist. LEXIS 2084 (N.D.Ill., Feb. 20, 1991); *In re Mortgage Escrow Deposit Litigation*, M.D.L. 899, 1994 WL 496707, 1994 U.S.Dist. LEXIS 12746 (N.D.Ill., Sept. 9, 1994); *Greenberg v. Republic Federal S. & L. Ass'n*, 94 C 3789, 1995 WL 263457, 1995 U.S.Dist. LEXIS 5866 (N.D.Ill., May 1, 1995).

23.     The recoveries in the escrow overcharge cases alone are over $250 million.  *Leff* was the seminal case on mortgage escrow overcharges.

24.     The escrow litigation had a substantial effect on industry practices, resulting in limitations on the amounts which mortgage companies held in escrow.

25.     **Bankruptcy:**  The firm brought a number of cases complaining that money was being systematically collected on discharged debts, in some cases through the use of invalid reaffirmation agreements, including the national class actions against Sears and General Electric. *Conley v. Sears, Roebuck*, 1:97cv11149 (D.Mass); *Fisher  v. Lechmere Inc.*, 1:97cv3065 (N.D.Ill.).  These cases were settled and resulted in recovery by nationwide classes. Cathleen Combs successfully argued the first Court of Appeals case to hold that a bankruptcy debtor induced to pay a discharged debt by means of an invalid reaffirmation agreement may sue to recover the payment.  *Bessette v. Avco Financial Services*, 230 F.3d 439  (1st Cir. 2000).

26.     **Automobile sales and financing practices:**  The firm has brought many cases challenging practices relating to automobile sales and financing, including:

a.      Hidden finance charges resulting from pass-on of discounts on auto purchases.  *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927 (7th Cir. 1998).

b.      Misrepresentation of amounts disbursed for extended warranties.  *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689 (7th Cir. 1998);  *Grimaldi v. Webb*, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996); *Slawson v. Currie Motors Lincoln Mercury, Inc.*, 94 C 2177, 1995 WL 22716, 1995 U.S.Dist. LEXIS 451 (N.D.Ill., Jan. 13, 1995); *Cirone-Shadow v. Union Nissan, Inc.*,  955 F.Supp. 938  (N.D.Ill. 1997) (same); *Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302 (N.D.Ill. 1995); *Shields v. Lefta, Inc.*, 888 F. Supp. 891 (N.D.Ill. 1995).

c.      Spot delivery.  *Janikowski v. Lynch Ford, Inc.*, 98 C 8111, 1999 WL 608714 (N.D.Ill., Aug. 5, 1999); *Diaz v. Westgate Lincoln Mercury, Inc.*, 93 C 5428, 1994 U.S.Dist. LEXIS 16300 (N.D.Ill. Nov. 14, 1994);  *Grimaldi v. Webb*, 282 Ill.App.3d 174, 668 N.E.2d 39 (1st Dist. 1996), leave to appeal denied, 169 Ill.2d 566 (1996).

d.      Force placed insurance.  *Bermudez v. First of America Bank Champion, N.A.*, 860 F.Supp. 580 (N.D.Ill. 1994); *Travis v. Boulevard Bank*, 93 C 6847, 1994 U.S.Dist. LEXIS 14615 (N.D.Ill., Oct. 13, 1994), modified, 880 F.Supp. 1226 (N.D.Ill. 1995); *Moore v. Fidelity Financial Services, Inc.*, 884 F. Supp. 288 (N.D.Ill. 1995).

e.      Improper obligation of cosigners.  *Lee v. Nationwide Cassell*, 174 Ill.2d 540, 675 N.E.2d 599 (1996); *Taylor v. Trans Acceptance Corp.*, 267 Ill.App.3d 562, 641 N.E.2d 907 (1st Dist. 1994), leave to appeal denied, 159 Ill.2d 581, 647 N.E.2d 1017 (1995); *Qualkenbush v. Harris Trust & Sav. Bank*, 219 F. Supp. 2d 935 (N.D.Ill. 2002).

f.      Evasion of FTC holder rule.  *Brown v. LaSalle Northwest Nat'l Bank*, 148 F.R.D. 584 (N.D.Ill. 1993), later opinion, 820 F.Supp. 1078 (N.D.Ill. 1993), later opinion, 92 C 8392, 1993 U.S.Dist. LEXIS 11419 (N.D.Ill., Aug. 13, 1993).

27.     These cases also had a substantial effect on industry practices.  The warranty cases, such as *Grimaldi, Gibson, Slawson, Cirone-Shadow, Chandler*, and *Shields*, resulted in the Federal Reserve Board's revision of applicable disclosure requirements, so as to prevent car dealers from representing that the charge for an extended warranty was being disbursed to a third party when that was not in fact the case.

28.     **Predatory lending practices:**  The firm has brought numerous cases challenging predatory mortgage and "payday" lending practices, both as individual and class actions. *Jackson v. Payday Financial LLC*, 764 F.3d 765 (7th Cir. 2014), *cert. denied*, 135 S.Ct. 1894 (2015); *Livingston v. Fast Cash USA, Inc.*, 753 N.E.2d 572 (Ind. Sup. Ct. 2001); *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748 (7th Cir. 2000); *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525 (7th Cir.  2007); *Handy v. Anchor Mortg. Corp.*, 464 F.3d 760 (7th Cir. 2006);  *Laseter v. Climateguard Design & Installation LLC*, 931 F.Supp.2d 862 (N.D.Ill. 2013); *Hubbard v. Ameriquest Mortg. Co.*, 624 F.Supp.2d 913 (N.D.Ill. 2008); *Martinez v. Freedom Mortg. Team, Inc.*, 527 F. Supp. 2d 827 (N.D.Ill. 2007); *Pena v. Freedom Mortg. Team, Inc.*, 07 C 552, 2007 WL 3223394, 2007 U.S. Dist. LEXIS 79817 (N.D.Ill., October 24, 2007); *Miranda v. Universal Fin. Group, Inc.*, 459 F. Supp. 2d 760 (N.D.Ill. 2006); *Parker v. 1-800 Bar None, a Financial Corp., Inc.*, 01 C 4488, 2002 WL 215530 (N.D.Ill.,  Feb. 12, 2002); *Gilkey v. Central Clearing Co.*, 202 F.R.D. 515 (E.D.Mich. 2001);  *Van Jackson v. Check 'N Go of Illinois, Inc.*, 193 F.R.D.

544 (N.D.Ill. 2000), later opinion,   114 F. Supp. 2d 731 (N.D.Ill. 2000), later opinion, 123 F. Supp. 2d 1079 (N.D.Ill. 2000), later opinion, 123 F. Supp. 2d 1085 (N.D.Ill. 2000); *Henry v. Cash Today, Inc.*, 199 F.R.D. 566 (S.D.Tex.  2000); *Donnelly v. Illini Cash Advance, Inc.*, 00 C 94, 2000 WL 1161076, 2000 U.S. Dist. LEXIS 11906 (N.D.Ill., Aug. 14, 2000); *Jones v. Kunin,* 99-818-GPM, 2000 WL 34402017, 2000 U.S. Dist. LEXIS 6380 (S.D.Ill., May 1, 2000); *Davis v. Cash for Payday*, 193 F.R.D. 518 (N.D.Ill. 2000); *Reese v. Hammer Fin. Corp*., 99 C 716, 1999 U.S. Dist. LEXIS 18812, 1999 WL 1101677  (N.D.Ill., Nov. 29, 1999); *Pinkett v. Moolah Loan Co.*, 99 C 2700,  1999 WL 1080596, 1999 U.S. Dist. LEXIS 17276 (N.D.Ill., Nov. 1, 1999); *Gutierrez v. Devon Fin. Servs.*, 99 C 2647, 1999 U.S. Dist. LEXIS 18696 (N.D.Ill., Oct. 6, 1999); *Vance v. National Benefit Ass'n*, 99 C 2627, 1999 WL 731764, 1999 U.S. Dist. LEXIS 13846 (N.D.Ill., Aug. 26, 1999).

29.     **Other consumer credit issues:**  The firm has also brought a number of other Truth in Lending and consumer credit cases, mostly as class actions, involving such issues as:

a.      Phony nonfiling insurance.  *Edwards v. Your Credit Inc.*, 148 F.3d 427 (5th Cir. 1998); *Adams v. Plaza Finance Co.*, 168 F.3d 932  (7th Cir. 1999); *Johnson v. Aronson Furniture Co.*, 96 C 117, 1997 U.S. Dist. LEXIS 3979 (N.D.Ill., March 31, 1997), later opinion, 1993 WL 641342 (N.D.Ill., Sept. 11, 1998).

b.      The McCarran Ferguson Act exemption.  *Autry v. Northwest  Premium Services, Inc.*, 144 F.3d 1037 (7th Cir. 1998).

c.      Loan flipping.  *Emery v. American General*, 71 F.3d 1343 (7th Cir. 1995). *Emery* limited the pernicious practice of "loan flipping," in which consumers are solicited for new loans and are then refinanced, with "short" credits for unearned finance charges and insurance premiums being given through use of the "Rule of 78s."

d.      Home improvement financing practices.  *Fidelity Financial Services, Inc. v. Hicks*, 214 Ill.App.3d 398, 574 N.E.2d 15 (1st Dist. 1991), leave to appeal denied, 141 Ill.2d 539, 580 N.E.2d 112; *Heastie v. Community Bank of Greater Peoria*,  690 F.Supp. 716 (N.D.Ill. 1989), later opinion, 125 F.R.D. 669 (N.D.Ill. 1990), later opinions, 727 F.Supp. 1133 (N.D.Ill. 1990), and 727 F.Supp. 1140 (N.D.Ill. 1990).

e.      Insurance packing.  *Elliott v. ITT Corp.*, 764 F.Supp. 102 (N.D.Ill. 1990), later opinion, 150 B.R. 36 (N.D.Ill. 1992).

30.     **Automobile leases:**  The firm has brought a number of a cases alleging illegal charges and improper disclosures on automobile leases, mainly as class actions.  Decisions in these cases include *Lundquist v. Security Pacific Automotive Financial Services Corp*., 993 F.2d 11 (2d Cir. 1993); *Kedziora v. Citicorp Nat'l Services, Inc.*, 780 F.Supp. 516 (N.D.Ill. 1991), later opinion, 844 F.Supp. 1289 (N.D.Ill. 1994), later opinion, 883 F.Supp. 1144 (N.D.Ill. 1995), later opinion, 91 C 3428,  1995 U.S.Dist. LEXIS 12137 (N.D.Ill., Aug. 18, 1995), later opinion, 1995 U.S.Dist. LEXIS 14054 (N.D.Ill., Sept. 25, 1995); *Johnson v. Steven Sims Subaru and Subaru Leasing*, 92 C 6355, 1993 WL 761231, 1993 U.S.Dist. LEXIS 8078 (N.D.Ill., June 9, 1993), and 1993 WL 13074115, 1993 U.S.Dist. LEXIS 11694 (N.D.Ill., August 20, 1993); *McCarthy v. PNC Credit Corp.*, 2:91CV00854 (PCD), 1992 U.S.Dist. LEXIS 21719 (D.Conn., May 27, 1992); *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434 (7th Cir. 1994); *Simon v. World Omni Leasing Inc.*, 146 F.R.D. 197 (S.D.Ala. 1992).

31.     *Lundquist* and *Highsmith* are leading cases; both held that commonly-used lease

forms violated the Consumer Leasing Act.  As a result of the *Lundquist* case, the Federal Reserve Board completely revamped the disclosure requirements applicable to auto leases, resulting in vastly improved disclosures to consumers.

32.     **Insurance litigation:** Often securing recovery for a class requires enforcement of the rights under the defendant's insurance policy.  The firm has extensive experience with such litigation.  Reported decisions in such cases include:  *Record-A-Hit, Inc. v. Nat'l Fire Ins. Co.*, 377 Ill. App. 3d 642; 880 N.E.2d 205 (1st Dist. 2007);  *Pietras v. Sentry Ins. Co.*, 06 C 3576, 2007 WL 715759, 2007 U.S. Dist. LEXIS 16015 (N.D.Ill., March 6, 2007), later opinion, 513 F. Supp. 2d 983 (N.D.Ill. 2007); *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*,  06 C 2092, 2007 WL 2608559, 2007 U.S. Dist. LEXIS 65339 (N.D.Ill., Aug. 31, 2007); *National Fire Ins. Co. v. Tri-State Hose & Fitting, Inc.*,  06 C 5256, 2007 U.S. Dist. LEXIS 45685 (N.D.Ill., June 21, 2007); *Nautilus Ins. Co. v. Easy Drop Off, LLC*, 06 C 4286, 2007 U.S. Dist. LEXIS 42380 (N.D.Ill., June 4, 2007).

33.     Some of the other reported decisions in our cases include:  *Elder v. Coronet Ins. Co.*, 201 Ill.App.3d 733, 558 N.E.2d 1312 (1st Dist. 1990); *Smith v. Keycorp Mtge., Inc.*, 151 B.R.  870 (N.D.Ill. 1992); *Gordon v. Boden*, 224 Ill.App.3d 195, 586 N.E.2d 461 (1st Dist. 1991), leave to appeal denied, 144 Ill.2d 633, 591 N.E.2d 21, cert. denied, U.S. (1992); *Armstrong v. Edelson*, 718 F.Supp. 1372 (N.D.Ill. 1989); *Newman v. 1st 1440 Investment, Inc.,* 89 C 6708, 1993 U.S.Dist. LEXIS 354 (N.D.Ill. Jan. 15, 1993); *Mountain States Tel. & Tel. Co.*, v. District Court, 778 P.2d 667 (Colo. 1989); *Harman v. Lyphomed, Inc.*, 122 F.R.D. 522 (N.D.Ill. 1988); *Haslam v. Lefta, Inc.*, 93 C 4311, 1994 WL 117463, 1994 U.S.Dist. LEXIS 3623 (N.D.Ill., March 25, 1994); *Source One Mortgage Services Corp. v. Jones*, 88 C 8441, 1994 WL 13664, 1994 U.S.Dist. LEXIS 333 (N.D.Ill., Jan. 13, 1994); *Wilson v. Harris N.A.*, 06 C 5840, 2007 WL 2608521, 2007 U.S. Dist. LEXIS 65345 (N.D.Ill. Sept. 4, 2007). *Wendorf v. Landers*, 755 F.Supp.2d 972 (N.D.Ill. 2010); *QuickClick Loans LLC v. Russell*, 407 Ill.App.3d 46; 943 N.E.2d 166 (1st Dist. 2011), *pet. denied*, 949 N.E.2d 1103 (2011) and *Adkins v. Nestle Purina Petcare Co.,* 973 F.Supp.2d 905 (N.D.Ill. 2013).

34.     *Gordon v. Boden* is the first decision approving "fluid recovery" in an Illinois class action.  *Elder v. Coronet Insurance* held that an insurance company's reliance on lie detectors to process claims was an unfair and deceptive trade practice.

Executed at Chicago, Illinois.

                              /s/ Daniel A. Edelman
                              Daniel A. Edelman

EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 S. Clark Street, Suite 1500
Chicago, Illinois  60603
(312) 739-4200
(312) 419-0379 (FAX)

# EXHIBIT M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

PALM BEACH GOLF CENTER-BOCA, INC.,  )
and as the representative of a class of )
similarly situated persons,             )     No. 12-CV-80178
                                        )     Judge Kathleen M. Williams
                    Plaintiff,          )     Mag. Judge Hopkins
        v.                              )
                                        )
JOHN G SARRIS, D.D.S., P.A.,            )
                                        )
                    Defendant.          )

## ORDER ON CLASS NOTICE AND OPT-OUT DATE

**THIS MATTER** is before the Court on the Plaintiff's motion requesting an order approving the form, and manner, of class notice and also setting an opt-out date for exclusions (*e.g.*, Docs. 120, 123 and 126). The Court heard oral argument in this matter on October 16, 2015.

This Court has discretion to direct the form and manner of notice to comport with both the needs of justice and of due process, and as best practicable under the circumstances. *See United States v. Alabama*, 271 F. App'x 896, 900 (11th Cir. 2008). Here, the Court finds that, under the circumstances presented and subject to the modifications to the written notice and requirements as stated in open court, Plaintiff's proposal to send notice by fax to the class members identified in this case (*see* Dkt. #28-29, pp. 8-142), and, if unsuccessful after three attempts, by U.S. Mail, is reasonable, appropriate, and the best notice practicable under the circumstances. Specifically, if after three attempts the facsimile notice is unsuccessful, then the class notice shall be mailed to the remaining class members using the mailing addresses identified in this case.

Exhibit M

1

The Court also sets the opt-out date for exclusion from the Class as **January 4, 2016.** Any class member wishing to opt-out must mail their request to opt-out by **January 4, 2016**, and the envelope must be postmarked by that date. The Class is given at least 45 days to opt-out. Thus, all faxed notices and mailings must be completed by Class Counsel no later than **November 20, 2015**.

Subsequent to sending this notice, **on or before December 1, 2015,** Class counsel will provide to Defendant and the Court a Declaration(s) showing: (1) the dates and number of <u>successful</u> facsimile class notices sent, along with the relevant fax numbers and the names of the class members associated with the fax numbers; (2) the dates and number of <u>unsuccessful</u> facsimile notices, along with the relevant fax numbers and the names of the class members associated with the fax numbers; (3) the dates and number of mailed notices sent to those whose facsimile notices were unsuccessful, along with the relevant addresses and names of the class members associated with those addresses; and, (4) the class member addresses that were changed as a consequence of running those addresses through the U.S.P.S. National Change of Address database.

Finally, the Form of Notice is attached hereto as <u>Exhibit A</u> to this Order and will be the form that is used to inform the class.

**DONE AND ORDERED** in chambers in Miami, Florida, this 21st day of October, 2015.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

PALM BEACH GOLF CENTER-BOCA, INC.,   )
and as the representative of a class of similarly   )
situated persons,   )
  )
                 Plaintiff,   )
    v.   )
  )
JOHN G SARRIS, D.D.S., P.A.,   )
  )
             Defendant.   )

No. 12-80178-CIV-
WILLIAMS/HOPKINS

Judge Kathleen M. Williams

Mag. Judge Hopkins

## NOTICE OF PENDING CLASS ACTION

**TO:**    All persons who were sent one or more facsimiles on December 13 2005 or December 14, 2005, from "John G. Sarris, D.M.D., P.A." offering "Family, Cosmetic & Reconstructive Dentistry" and serving as a $50 "Gift Certificate."

### A.    WHY ARE YOU RECEIVING THIS NOTICE?

You might be a member of the Class defined above. Your name and contact information (including your fax number) were identified in discovery in the lawsuit. This notice informs you about the pending lawsuit, and about your rights to participate in or exclude yourself from the lawsuit. This notice is not an expression by the court of the merits of the case.

### B.    WHAT IS THIS LAWSUIT ABOUT?

In the lawsuit, Plaintiff alleges that John G Sarris, D.D.S., P.A. ("Defendant"), violated the federal Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.*, by faxing advertisements to the members of the Class without their prior express invitation or permission. Plaintiff seeks money damages for every Class member. The Court certified the case as a class action so that the claims about Defendant's faxes can be resolved class-wide in this single lawsuit. The Court's decision to certify the class as a class action did not decide any merits of the case. Defendant denies any liability to the Class. This description of the case is general and does not cover all the issues or proceedings.

### C.    WHO REPRESENTS THE CLASS?

The Court appointed Plaintiff to be the class representative and appointed Phillip A. Bock and the law firm of Bock & Hatch, LLC to be Class Counsel. Class Counsel are: Phillip A. Bock and BOCK & HATCH, LLC, 134 N. LaSalle St., Suite 1000, Chicago, IL 60602. Class Counsel represents the entire class. You also have the right to retain your own attorney at your own expense to assist you, but need not do so. You have the right to attend any hearing in this matter.

## D.    <u>WHAT ARE YOUR OPTIONS?</u>

You can remain in the Class or exclude yourself from the Class. Each choice has certain risks and consequences. You can discuss your choice with Class Counsel or your own attorney. The Court will exclude anybody who exercises his right to be excluded from the Class and this case.

### 1.    <u>Do Nothing.</u>

If you do nothing, you will remain a member of the Class. You will lose your right to file your own separate lawsuit against Defendant about its alleged advertising faxes and you will be bound by the result of the lawsuit, whether that result is favorable or unfavorable. If Plaintiff prevails or if the parties reach a settlement, you will be entitled to a recovery in the amount the Court finds fair and reasonable. If Plaintiff prevails, you may receive up to $500.00 for each fax sent to you. If the Court finds that Defendant violated the TCPA willfully or knowingly, the Court may, in its discretion, increase the amount of the award up to $1,500 for each violation.

As a member of the Class, you will be represented by Class Counsel. This representation is entirely contingent; that is, Class Counsel will only be paid if they are successful and you will not have to pay them anything if they are unsuccessful. You will not have to pay any money as a result of staying in the Class, except that attorneys' fees may be deducted from any recovery to the Class. If you have not requested to be excluded from the class and should choose to file a separate appearance, you must do so on or before <u>January 4, 2016</u>.

### 2.    <u>Opt Out of the Class.</u>

You have the right to exclude yourself from the class action by mailing a written request for exclusion with the Clerk's Office of U.S. District Court for the Southern District of Florida, Wilkie D. Ferguson, Jr. United States Courthouse, 400 North Miami Avenue, Miami, Florida 33128. If you exclude yourself from the Class, you will retain any claims you might have against Defendant, you will not be bound by any judgment or disposition of this case, and you will not share in any recovery awarded by the Court or provided in a settlement agreement.

Your request for exclusion must be mailed on or before <u>January 4, 2016</u>, and it must contain (1) the name of this case (*Palm Beach Golf Center-Boca, Inc. v. John G Sarris, D.D.S., P.A. and John G. Sarris*, Case No. 12-80178-CIV-WILLIAMS/HOPKINS), (2) your name, address, and <u>fax number</u> (your fax number in December 2005) and (3) a statement that you wish to be excluded (for example, "Exclude me from the Palm Beach Golf Center-Boca, Inc v. John G Sarris, D.D.S., P.A. case.").

You must <u>also</u> mail a copy of the request for exclusion to Class Counsel at the following address, filed and postmarked by the same date:

Phillip A. Bock
Bock & Hatch, LLC
134 N. La Salle Street, Suite 1000
Chicago, IL 60602

**E.    HOW DO I LEARN MORE ABOUT THE LAWSUIT?**

You may view a copy (at your own expense) of the papers for this case in the Clerk's Office of U.S. District Court for the Southern District of Florida, Wilkie D. Ferguson, Jr. United States Courthouse, 400 North Miami Avenue, Miami, Florida 33128. If you have specific questions, you can write to Class Counsel. You may also call attorney Phillip A. Bock at 844-786-7772.

**Do not contact the Judge, the Judge's staff, or the Clerk of the Court because they cannot answer your questions or give you advice about this case**.

**BY ORDER OF THE COURT**
**THE HONORABLE JUDGE KATHLEEN WILLIAMS**

# EXHIBIT N

PROPRIETARY AND CONFIDENTIAL

# REBUTTAL EXPERT REPORT OF ROBERT BIGGERSTAFF

Prepared in the matter of:

### *Scoma Chiropractic, P.A. v. Dental Equities, LLC*

No. 16-cv-00041

Pending in the Federal District Court for the Middle District of Florida

March 14, 2018

**Notice**

This report is proprietary and confidential.  If you are not the intended recipient of this document, any use, dissemination, distribution, or duplication of this document or any portion of its contents is expressly prohibited. The information contained in this document may also be privileged and/or subject to nondisclosure under applicable court rules.

Copyright© 2016 Robert Biggerstaff.  All Rights Reserved.  No portion of this document or any exhibits, appendices, attachments, or any other parts hereof, in whole or in part, may be duplicated or used for any purposes by anyone other than the client for whom this document was prepared, without the express written permission of the author.

PROPRIETARY AND CONFIDENTIAL

**Disclaimer**

This document many contain or describe software, algorithms, methodologies, processes, texts, businesses methods, patents, or other items that are the property of other entities and used under license or other permitted use.  Any implementation, distribution, storage, copying, or other use of such property may be subject to restrictions.

Any registered marks used within this document are the property of their respective owners.  They are used herein only for the purposes of identification and do not indicate any endorsement or approval by those owners.

Linux® is a trademark of Linus Torvalds.

Windows® is a trademark of Microsoft Corporation.

Visual FoxPro® is a trademark of Microsoft Corporation.

HylaFAX® is a trademark of Silicon Graphics, Inc.

Slackware® is a trademark of Patrick Volkerding.

ReiserFS® is a trademark of Hans Reiser and the Naming System.

FaxFacts® is a registered trademark of Copia International, Ltd.

GNU® is a trademark of the Free Software Foundation.

CAAS® and ISETTLE® are trademarks of A.B. Data, LTD.

MySQL® is a trademark of Oracle Corporation.

MariaDB® is a trademark of Monty Program Ab.

FTK® is a trademark of Access Data, Inc.

Zetafax® is a trademark of Equisys.

RightFax® is a trademark of OpenText Corp.

Openfax® is a trademark of idigital Technologies, Inc.

PROFAX® is a registered trademark of CyberData, Inc and/or Profax, Inc.

WestFax® is a trademark of WestFax Inc.

WinHex® and X-Ways Forensics® are trademarks of X-Ways Software Technology AG.

ActFax® is a registered trademark of ActFax Communication

Encase® and EnScript® are trademarks of Guidance Software, Inc.

DB2® and RACF® are trademarks of IBM Corp.

WinFax® is a trademark of Symantec Corp.

eFax® is a registered trademark of j2 Global.

Reference Legal®, SalesGenie® and InfoUSA® are trademarks of Infogroup, Inc.

ACT!® is a trademark of Sage Software, Inc.

Goldmine® is a trademark of FrontRange Solutions USA Inc.

PROPRIETARY AND CONFIDENTIAL

## <u>Table of Contents</u>

**Executive Summary**.................................................................. **4**

**Retention and Scope of Work.** .................................................. **4**

**Background and Qualifications..**................................................ **4**

**Materials Reviewed**................................................................. **4**

**Analysis.** .............................................................................. **5**

    There Is Only One "Type" of Fax Machine............................................ 5

    Fax Services Merely Change the Location of the Telephone Line. ................... 8

    Automatic Printing................................................................. 9

    The Data Analysis Reported by Mr. Sponsler Is Wrong............................... 9

    Correction to Prior Report. ...................................................... 10

**Conclusions.**......................................................................... **10**

**Table of Exhibits**.................................................................... **11**

PROPRIETARY AND CONFIDENTIAL

## Executive Summary

1.  I was asked to examine documents provided by counsel in order to identify records of fax transmissions.  My original analysis found 1,049,745 fax transmission records documenting 381,013 fully-received error-free fax transmissions of a 1-page fax sent to and received by 381,012 unique fax numbers between the dates of 12/18/2015 to 12/23/2015 (inclusive).

2.  This report addresses claims made by Mr. Sponsler in the *Expert Report of Ken Sponsler* dated February 16, 2018.

## Retention and Scope of Work

3.  On June 15, 2016, Ryan Kelly requested that I review records in this case and to report my opinions regarding those records and fax transmissions recorded in those records.

4.  I submitted the *Revised Expert Report of Robert Biggerstaff* dated December 1, 2017 ("Prior Report").

5.  Subsequent to that date, I received a copy of the *Expert Report of Ken Sponsler* dated February 16, 2018.  After reviewing the contents of Mr. Sponsler's report, I elected to file this report rebut addressing claims made by Mr. Sponsler.

## Background and Qualifications

6.  My background and qualifications are the same as stated in my Prior Report.

## Materials Reviewed

7.  In addition to any materials cited elsewhere herein, I reviewed the following material in the process of producing this report:

    a.  *Revised Expert Report of Robert Biggerstaff* dated December 1, 2017 and materials cited therein ("Prior Report").

    b.  *Expert Report of Ken Sponsler*, dated February 16, 2018 and materials cited therein ("Sponsler Rpt.")

PROPRIETARY AND CONFIDENTIAL

8.  I have also relied generally on applicable facsimile standards including *Procedures for document facsimile transmission in the general switched telephone network, ITU-T T.30* and *Standardization of Group 3 facsimile terminals for document transmission, ITU-T T.4*.

9.  I have also relied generally on orders, notices, and other promulgations of the Federal Communications Commission ("the Commission") regarding the agency's administration of the TCPA.

10. In preparing this report, I have also relied on knowledge and skills I acquired through my education, training, career, and experience.

## Analysis

### *There Is Only One "Type" of Fax Machine*

11. Mr. Sponsler seems to think there is a difference between a "stand alone" desktop fax machine and "cloud-based, virtual, online" fax technology commonly referred to as "e-faxes" or "fax servers."  He makes widely inaccurate claims such as "[f]axes may also be sent and received via email account, be it Outlook, Gmail, Hotmail, etc."[1]  These claims are false.

12. First, a user can neither send nor receive a fax with an email.  You can receive an email that has an image file attached to it and that image can be an image of a faxed document—just like you can receive a Federal Express envelope with the printout of a fax in that envelope.  But you no more "received a fax" via email than you "received a fax" via the Federal Express envelope.  In telecommunications, what you have used is a store-and-forward delivery of a converted payload.  The payload (faxed document) is received by a fax machine, stored for some time, then forwarded on over a different medium.

13. A fax transmission takes place in near-real-time between point A (sending fax machine) and point B (receiving fax machine).  The fax machines at point A and B talk to each other in near-real-time.  With a fax server, and the implementations described by Mr. Sponsler, additional steps are done with the payload of the fax transmission

---

1.  Sponsler Rpt., ¶40.

*after* it was received at point B.  Those steps are a separate leg in the journey well after the leg from point A to B was completed.  The devices at points A and B are still "telephone facsimile machines" as defined by the TCPA despite the fact the fax payload is converted to a file and sent from B to C over the Internet attached to an email.   The subsequent journey from the receiving fax machine at point B to some other device (such as a mail server or web server) at point C is irrelevant to the fax transmission from A to B.

14.   Mr. Sponsler claims that "[t]hese services receive fax transmissions as digital files over computer servers, not regular telephone lines."[2]   This statement is nonsensical.  Servers are endpoints, not transmission media.  Digital files cannot be "transmitted" or "received" "over computer servers" any more than a fax can be "transmitted" or "received" over a post office box.

15.   What Mr. Sponsler leaves out is that the services he describes that forward faxes to recipients via e-mail, web browser, and other delivery paradigms all are based on the same underlying technology—fax servers.  Fax servers are "telephone fax machines" under the TCPA and the FCC has expressly declared that the provisions of the TCPA fully apply to fax servers:  "We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes."[3]

16.   In reality, every fax is a "digital file" and every desktop fax machine scans and converts a paper document to a digital file (or accepts an already digitized file).  Each one has the capacity to then send that digital file over a regular phone line.  Put another way, all faxes today[4] are sent as digital "files" consisting of a series of "0's" and "1's."

---

2.   Sponsler Rpt., ¶40.

3.   *Rules and Regulations Implementing the TCPA*, 18 FCC Rcd 14014 (2003) ¶200 ("2003 TCPA Order").  My citation to FCC orders and other promulgations is not intended to offer a legal opinion, but to set out some of the foundations informing my conclusions and application of existing FCC orders and other promulgations to my analysis.

4.   Fax technology is over 100 years old, and predates the telephone.  Some ancient forms of fax did employ analog data rather than digital data.  All fax data today is digital, regardless of whether the phone line over which it is sent is analog or digital.

PROPRIETARY AND CONFIDENTIAL

17.  Furthermore, practically every phone call today is in fact a digital communication because the our national telecommunications infrastructure is digital.  Every phone call (voice and fax) is converted to a digital signal that then proceeds as digital data across our telecom networks to the destination switch.  Indeed, the FCC is proceeding with a project to move every telephone call to a 100% fully digital network in the near future.[5]

18.  Mr. Sponsler seems unaware that the FCC anticipates the phase out of analog phone lines to be replaced with digital lines on a national basis.[6]  Pilot projects are already underway in some metropolitan areas.  At that point, every home and business will use only digital lines.  At that point, under Mr. Sponsler's position, the fax provisions of the TCPA would fade away into a dead hand statute.

19.  In addition, some areas hit hardest by Hurricane Sandy in 2012 suffered such extensive damage to the wired copper telephone infrastructure that the ILEC abandoned it and replaced it with a wireless system.  AT&T announced in 2012 that it was transitioning all of its 76 million landline customers in 22 states to fiber (VOIP) or wireless, and decommissioning its copper-line infrastructure.  Mr. Sponsler's position would leave these populations out of the TCPA's junk fax protections.

20.  The FCC recognized that all fax receiving devices—including standalone desktop fax machine, computers with fax modems, and fax servers (which are used by the entities listed by Mr. Sponsler) are subject to the TCPA.[7]  The FCC went on to explain that:

> Congress could not have intended to allow easy circumvention of its prohibition when faxes are (intentionally or not) transmitted to personal

---

5.  *See, e.g., Comment Sought on Transition from Circuit-switched Network to All IP Network*, DA 09-2517 (FCC, Dec. 1, 2009) (Public Notice).  In February of 2014 the FCC announced that Carbon Hill, Alabama and Delray Beach, Florida were selected as the first cities for such transitions on an experimental basis.

6.  *See, e.g., Comment Sought on Transition from Circuit-switched Network to All IP Network*, DA 09-2517 (FCC, Dec. 1, 2009) (Public Notice).  In February of 2014 the FCC announced that Carbon Hill, Alabama and Delray Beach, Florida were selected as the first cities for such transitions on an experimental basis.

7.  "We conclude that faxes sent to personal computers equipped with, or attached to, modems and to computerized fax servers are subject to the TCPA's prohibition on unsolicited faxes." 2003 TCPA Order, ¶200.

---

computers and fax servers, rather than to traditional stand-alone facsimile machines.[8]

Facsimile messages sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed. They may also tie up lines and printers so that the recipients' requested faxes are not timely received. Such faxes may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business. Finally, because a sender of a facsimile message has no way to determine whether it is being sent to a number associated with a stand-alone fax machine or to one associated with a personal computer or fax server, it would make little sense to apply different rules based on the device that ultimately received it.[9]

21.   Mr. Sponsler has ignored all of this analysis by the FCC.

### *Fax Services Merely Change the Location of the Telephone Line*

22.   Mr. Sponsler claims that "***the user*** of an online fax system does not need to have a telephone line dedicated to incoming faxes because there is no transmission over a regular telephone line to that user's fax machine when he or she receives a fax."[10] (Emphasis added).  What he fails to mention is that while the ***user*** of a service like eFax doesn't need a phone line, the service prover ***does*** have to have a phone line, and assign it a unique phone number that it has assigned to that user, in order for someone to send a Group III to the 10-digit phone number assigned to that user.

23.   Consider if you will be away from your office at a remote cabin for some time without access to a fax, and you appoint someone in your office to take incoming faxes, put them in a Federal Express envelope, and send them to you.  You don't need a fax line at your remote cabin in order for someone to send a fax to you at the office fax number.  Someone sends a fax from their fax machine (A) to your fax machine in the office (B) and then your agent (eFax) takes the fax from the fax machine (B) and forwards it to you at the cabin (C) via Federal Express.

---

8.   2003 TCPA Order, ¶201.

9.   2003 TCPA Order, ¶202

10.  Sponsler Rpt., ¶40.

PROPRIETARY AND CONFIDENTIAL

### *Automatic Printing*

24.  Mr. Sponsler is correct that there may not be "automatic printing"[11] but every device that can receive a fax transmission has the capacity to print it.  The fact some administrators of such systems may elect not to have incoming faxes automatically printed (leaving that decision up to the end user) does not negate the fact that the system has the capacity to print the received faxes.

### *The Data Analysis Reported by Mr. Sponsler Is Wrong*

25.  Mr. Sponsler claims that an employee, Mr. John Taylor, attempted to "duplicate Mr. Biggerstaff's methodology using the j2 records" and claimed that there were miscalculations in my analysis.

26.  First, Mr. Sponsler claims that Mr. Taylor identified 25 faxes "sent [to fax numbers] outside the United States."  However Mr. Sponsler does not explain what significance should be attached to a fax sent from inside the United States to a fax number outside the United States.  I am not aware of any authority that suggests such faxes are not subject to the provisions of the TCPA and FCC rules.  If, however, it is deemed appropriate to exclude such fax destinations, the j2 data has the information necessary to do so, as demonstrated by Mr. Sponsler's report.

27.  Second, Mr. Sponsler claims that "Mr. Taylor located one (1) additional fax that was mistakenly counted by Mr. Biggerstaff" in Transaction ID 738481034.[12]  Mr. Sponsler and Mr. Taylor are incorrect.

28.  First, I performed the de-duplication using two independent processes: one using Microsoft Visual FoxPro and the other using Oracle MySQL  Both reported the number of distinct (unique) rows of data for Transaction ID 738481034 as 99,871.

29.  Also, examining the records for Transaction ID 738481034, the largest value for Sub Transaction ID is 99,871 which indicates there should be 99,871 records for Transaction ID 738481034.  Indeed, my analysis found 99,871 unique rows of data for Transaction ID 738481034.

---

11.  Sponsler Rpt., ¶42.

12.  Sponsler Rpt., ¶49.

PROPRIETARY AND CONFIDENTIAL

### *Correction to Prior Report*

30. There is a transposition error in my prior report.  In paragraphs 50 and 51, I copied data for the total faxes received without error from the total in the table accompanying paragraph 18, instead of the total in the table accompanying paragraph 19.  Accordingly, the number "447,959" in paragraphs 50 and 51 of my prior report should read "381,013"

## Conclusions

31. All the forms of fax processing described by Mr. Sponsler which receive Group III fax transmissions sent to conventional 10-digit telephone numbers, have the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

32. All fax servers, on which cloud-based fax services such as eFax depend, have the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper.

33. The facts, conclusions, and opinions stated herein are made to a reasonable degree of scientific certainly based upon examination of the information cited herein.  The principles and methods I have used are reliable, repeatable, and generally accepted.  To the extent any portion of this report is based on limited information or where further analysis, testimony, opinions, or information are provided, the contents of this report are subject to revision and supplementation.

Robert Biggerstaff, CCE

Cert. No. 1360

March 14, 2018

PROPRIETARY AND CONFIDENTIAL

## Table of Exhibits

None

# EXHIBIT O

**From:**        Kianor Shah <kianor.shah@gmail.com>
**Sent:**        Monday, December 14, 2015 4:56 PM
**To:**        'Encarnacion, JP'
**Subject:**    RE: Requested Invoices

**Importance:**    High

$2002 Telemarketing Pilot Retainer
$16,283.60 Marketing Design And Productions
$10,000 Fax Services (1 Mil fax communications at 1cents per – normally 6.5 cents per)

Total: $28,285.60

Should carry us for the Holiday and New Year campaigns. Thank you.

Best,

**Kianor Shah. DMD, MICOI**
**Chairman**

Peer Brands * Peer United* Peers Club



**E-MAIL CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information that is exempt from disclosure under applicable international, federal or state law. If you are not the intended recipient of this message or their authorized agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, distribution, or storage of this message or its attachment(s) is strictly prohibited.

**From:** Encarnacion, JP [mailto:JP_Encarnacion@mastercard.com]
**Sent:** Monday, December 14, 2015 2:13 PM
**To:** Kianor Shah <kianor.shah@gmail.com>
**Subject:** RE: Requested Invoices

What's the total amount being requested?

**JP Encarnacion**
Financial Planner
Independent Bank and Credit Union - IBCU

MasterCard
100 Manhattanville Rd | Purchase, NY 10577-2509

tel 914.249.6017 / 3N-129B
jp_encarnacion@mastercard.com





**MasterCard**

*Please think of the environment before printing this email.*

---

**From:** Kianor Shah [mailto:kianor.shah@gmail.com]
**Sent:** Monday, December 14, 2015 11:34 AM
**To:** Encarnacion, JP <JP_Encarnacion@mastercard.com>
**Subject:** RE: Requested Invoices
**Importance:** High

Hi JP,

I hope all is well. Please find 3 new invoices attached. I paid the initial installment ($2200) to telemarketing group and half ($5000) to the Faxing company or they would not start this week. This week, we are running 500,000 faxes, an email campaign, a social media campaign, a commercial is in production, and we begin the telemarketing campaign among others to get this in before the big holidays and for the new year. The postcards are to go out soon. Thanks JP.

Best,

Kianor Shah. DMD, MICOI
Chairman

Peer Brands * Peer United* Peers Club



**E-MAIL CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information that is exempt from disclosure under applicable international, federal or state law. If you are not the intended recipient of this message or their authorized agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, distribution, or storage of this message or its attachment(s) is strictly prohibited.

---

**From:** Kianor Shah [mailto:kianor.shah@gmail.com]
**Sent:** Wednesday, November 25, 2015 12:47 PM
**To:** jp_encarnacion@mastercard.com
**Cc:** Richard <richcwalker2@hotmail.com>; 'Zieg, Michael' <Michael_Zieg@mastercard.com>
**Subject:** Requested Invoices
**Importance:** High

Dear JP,

Please find the requested invoices attached. Thank you and Happy Thanksgiving.

Best,

Kianor Shah. DMD, MICOI
Chairman

Peer Brands * Peer United* Peers Club



**E-MAIL CONFIDENTIALITY NOTICE:**  The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information that is exempt from disclosure under applicable international, federal or state law. If you are not the intended recipient of this message or their authorized agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, distribution, or storage of this message or its attachment(s) is strictly prohibited.

CONFIDENTIALITY NOTICE This e-mail message and any attachments are only for the use of the intended recipient and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If you are not the intended recipient, any disclosure, distribution or other use of this e-mail message or attachments is prohibited. If you have received this e-mail message in error, please delete and notify the sender immediately. Thank you.

# EXHIBIT P

| | |
|---|---|
| **From:** | Kianor Shah <kianor.shah@gmail.com> |
| **Sent:** | Thursday, December 17, 2015 9:44 AM |
| **To:** | 'Zieg, Michael' |
| **Subject:** | RE: Progress |
| **Attachments:** | Fax-FaxDoctosClub.pdf |

Also, I will share the fax with you set to go out tonight and passed their compliance department. This is the latest draft that is being a bit modified by design right now as we speak, set to go out tonight. That is our first large campaign. Thanks.

**Best,**

**Kianor Shah, DMD, MICOI**
**Chairman**

Peer Brands * Peer United* Peers Club



**E-MAIL CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information that is exempt from disclosure under applicable international, federal or state law. If you are not the intended recipient of this message or their authorized agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, distribution, or storage of this message or its attachment(s) is strictly prohibited.

**From:** Zieg, Michael [mailto:Michael_Zieg@mastercard.com]
**Sent:** Thursday, December 17, 2015 9:37 AM
**To:** Kianor Shah <kianor.shah@gmail.com>
**Subject:** RE: Progress

Great. Any new apps?

Mike

Sent with Good (www.good.com)

**From:** Kianor Shah <kianor.shah@gmail.com>
**Sent:** Thursday, December 17, 2015 11:35:13 AM
**To:** ks@peerunited.com
**Subject:** Progress

"Our ad campaign has reached 35,000 people with about 725 clicks in the last 72 hours. We are now averaging 208 clicks per day, with 2% of those on FB who seeing our ads, now clicking on our ad. I consider this a very good success so far!"

1

EXHIBIT
#34
9-27-17

Best, Edwin Dearborn

A. Linked-In Campaign in 2 weeks for New Year (creating a comparable with Facebook)
B. Fax to 500,000 Healthcare practices (All Medical/Dental/Optometry/Pharmacy/Audiology/Podiatry/Chiropractic/Nursing/PA (and all subspecialties) set to go out tonight (Christmas Edition)
   a. Another 500,000 Faxes to go out for New Years
   b. These are regularly updated based on NPI (National Provider Identification) records submitted by our colleagues to regulatory bodies for license updates, medicare/medicaid billing and so on.
C. Telemarketing to Start Next Week
D. Post Cards to go out in Early January
E. Email Campaign to 720K unique Healthcare Provider names should go out around/after New Years. "Start The New Year With Doctors Club........."

Will keep you guys posted on results. We were just approached by Microsoft again to continue the discussion. Good week I 'd say. Thank you.

Best,

**Kianor Shah. DMD, MICOI**
**Chairman**

Peer Brands * Peer United* Peers Club



**E-MAIL CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information that is exempt from disclosure under applicable international, federal or state law. If you are not the intended recipient of this message or their authorized agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, distribution, or storage of this message or its attachment(s) is strictly prohibited.

CONFIDENTIALITY NOTICE This e-mail message and any attachments are only for the use of the intended recipient and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If you are not the intended recipient, any disclosure, distribution or other use of this e-mail message or attachments is prohibited. If you have received this e-mail message in error, please delete and notify the sender immediately. Thank you.



# Doctors**Club**®

As your colleagues, we want to wish you a *Happy Holiday*
and to inform you that the Doctors Club is finally here!



Doctors Club is about empowering the healthcare community without borders in a 3 pronged
approach: Administration, Academics, and Finance. One of the benefits of Doctors Club
is its member identification credit card exclusively created for Healthcare Providers.
The prestigious credit card is attached to a unique world of unprecedented discounts
and benefits catering to our personal and business needs.

Be the first to **Pre-Order** the Exclusive Doctors Club World Elite MasterCard!

**Your New Card Includes:**

» Access discounts and perks for your business and
  personal use with over 5,000 vendors and hundreds of
  thousands of offers

» Travel and vacation deals to more than 200 countries with
  over 100,000 hotel choices

» Local, Regional, National and Universal Privileges

**Also, Enjoy the Additional MasterCard Benefits:**

» Robust Reward Program
  with options for Cashback
  and Points redeemable for
  merchandise, gift cards,
  and travel*
» World Elite Concierge
  Services**
» Emergency Card
  Replacement

» MasterCard Identity Theft
  Resolution
» Master Rental Coverage
» Chauffeured Car Service**
» Lost and Delayed
  Baggage Insurance
» Purchase Protections
» Extended Warrantee
» Luxury Travel Program**

*Redemption of points for travel are subject to a ticketing fee of $31/
online or $36/phone
**Additional terms and conditions apply. Services provide are subject
to third party fees.

## The Only Credit Card that was Designed <u>BY DOCTORS FOR DOCTORS.</u>

### *It Pays to Unite!*

For more information and complete terms and conditions
or to APPLY, visit **TheDrClub.com** today!