## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| SCOMA CHIROPRACTIC, P.A., WILLIAM P. GRESS, and FLORENCE MUSSAT M.D., S.C., individually and on behalf of a Class, | ) )<br>) )<br>) ) |
| Plaintiffs, | ) No. 2:16-cv-00041-JLB-MRM<br>) |
| v. | ) )<br>) ) |
| MASTERCARD INTERNATIONAL INC., | ) )<br>) ) |
| Defendant. | ) |

## PLAINTIFFS' *SECOND AMENDED* MOTION FOR CLASS CERTIFICATION

Plaintiffs, Scoma Chiropractic, P.A. ("Scoma"), Florence Mussat, M.D., S.C. ("Mussat"), and Dr. William P. Gress ("Gress"), submit this *Second Amended* Motion for Class Certification pursuant to Fed. R. Civ. P. 23(a) and (b)(3):

1.      As detailed in Plaintiffs' Memorandum, this case arises out of an advertising campaign in which facsimiles promoting a "Doctors Club World Elite MasterCard" credit card were successfully sent to Plaintiffs and hundreds of thousands of others between December 18, 2015, and December 23, 2015.

2.      Plaintiffs, three healthcare providers, promptly filed separate suits under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(3), and later jointly filed the operative Third Amended Complaint ("TAC") against Defendant, Mastercard International Inc. ("Mastercard"). (Doc. 55).[1]

---

[1] The TAC also named as defendants First Arkansas Bank & Trust and Dental Equities, LLC. Plaintiffs dismissed their claims against First Arkansas. (Doc. 119). Plaintiffs anticipate dismissing their claims against Dental Equities, and do not seek to certify a class against Dental Equities.

3.     The faxes Plaintiffs received, attached to the TAC as Exhibits A, B, and C, state "Happy Holiday" and invite recipients to apply for an "Exclusive Doctors Club World Elite MasterCard" and "Enjoy the Additional MasterCard Benefits." (Doc. 55-1, 55-2, 55-3).

4.     Exhibits A and C, sent December 22–23, 2015, and received by Plaintiffs Scoma and Gress on traditional "stand-alone" fax machines, contain an opt-out notice stating, "Recipient may Opt Out of any future faxes by emailing a request to OptOut@TheDrClub.com or by calling 949.202.1777." (Doc. 55-1, 55-3).

5.     Exhibit B, sent December 18, 2015, and received by Plaintiff Mussat using an "online fax service," contains no opt-out notice. (Doc. 55-2). Other than the opt-out notice, Exhibits A, B, and C are identical.

6.     Plaintiffs allege that the faxes are "advertisements," that Mastercard cannot show that it obtained recipients' "prior express invitation or permission" to send fax ads, that Mastercard is a "sender,"[2] and that Mastercard cannot assert "established business relationship" ("EBR") as a defense because the faxes lack the "opt-out notice" required by 47 U.S.C. § 227(b)(1)(C)(iii). (TAC ¶¶ 20, 23, 36–37).[3]

---

[2] "Sender" means "person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). The Court denied Mastercard's motion to dismiss on the "sender" issue. *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, 232 F. Supp. 3d 1201, 1205 (M.D. Fla. 2017) ("*Scoma I*").

[3] The TAC also alleged Mastercard could not assert "prior express invitation or permission" because the opt-out notice violated the FCC's so-called "Solicited Fax Rule." During the stay, the Eleventh Circuit held that rule was "eliminated." *Gorss Motels, Inc. v. Safemark Sys., LP*, 931 F.3d 1094, 1105 (11th Cir. 2019). Mastercard "does not contend that it had prior express invitation or permission from Plaintiffs or anyone else" to send the faxes at issue. (Mastercard Answers Interrogs. No. 11).

7.     In discovery, Plaintiffs obtained the electronic "transmission logs" relating to the Doctors Club faxes from a company called j2 Global Canada, Inc. ("jBlast"), which is the "fax broadcaster" that physically transmitted the faxes.

8.     Plaintiffs' expert analyzed the transmission logs and determined that the faxes were successfully sent in 381,011 error-free transmissions from December 18, 2015 through December 23, 2015, including one transmission to each of Plaintiffs' fax numbers, consistent with the header information in Exhibits A, B, and C.

9.     The case was stayed from June 1, 2018, to January 3, 2020, pending an order by the Consumer & Governmental Affairs Bureau of the FCC in *In re Amerifactors Fin. Group, LLC Pet.*, CG Docket Nos. 02-278, 05-338, 2019 WL 6712128 (CGAB Dec. 9, 2019) ("Amerifactors Bureau Order"), stating that an "online fax service" is not a "telephone facsimile machine" under the TCPA.[4]

10.     On January 29, 2021, Magistrate Judge McCoy issued a Report & Recommendation recommending that the Court deny class certification based on (1) the conclusion that the legal effect of the Amerifactors Bureau Order is that users of "online fax services" have no claim under the TCPA and no "concrete" injury that the TCPA was meant to redress; and (2) the conclusion that identifying members of the "Stand-Alone Fax Machine" Class would not be "administratively feasible," thus defeating ascertainability, predominance, and superiority. *Scoma Chiropractic, P.A. v.*

---

[4] The Amerifactors Bureau Order is currently on appeal to the full FCC pursuant to 47 C.F.R. § 1.115, which is a "condition precedent to judicial review." 47 U.S.C. § 155(c)(7). The Amerifactors Bureau Order is not a "final order" of the FCC covered by the Hobbs Act, 28 U.S.C. § 2342(1).

*Mastercard Int'l Inc.*, No. 2:16-CV-41-FTM-66MRM, 2021 WL 720347, at *16 (M.D. Fla. Jan. 29, 2021) ("*Scoma II*").

11.     On February 24, 2021, Judge Badalamenti vacated the Report. First, the district court ruled that the question of whether users of "online fax services" have a claim under the TCPA is "a merits contention that is common to the class" that is properly decided "at trial or in a ruling on a summary-judgment motion" and "should not be resolved in deciding whether to certify a proposed class." *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 2:16-CV-41-JLB-MRM, 2021 WL 719655, at *4 (M.D. Fla. Feb. 24, 2021) ("*Scoma III*") (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013)).

12.     Second, the district court held that the Eleventh Circuit rejected any "administrative feasibility" requirement for class certification four days after the Report was issued in *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021). *Id.* The district court ordered Plaintiffs to file this Second Amended Motion for Class Certification within 30 days of the Eleventh Circuit's issuance of the mandate in *Cherry*. *Id.* The parties jointly notified the Court that the mandate issued in *Cherry* on March 3, 2021 (Doc. 177), and Plaintiffs now submit this Second Amended Motion for Class Certification.

## **Precise Relief Requested**

1.     Plaintiffs seek an Order certifying the following class (the "All Fax Recipients Class") under Rule 23(b)(3):

All persons or entities who were successfully sent a facsimile on or about December 18–23, 2015, stating "Happy Holiday" and inviting recipients to apply for an "Exclusive Doctors Club World Elite MasterCard" credit card, where the fax either (a) contains no "opt-out notice" explaining how to stop future faxes; or (b) contains an opt-out notice stating: "Recipient may Opt Out of any future faxes by emailing a request to OptOut@TheDrClub.com or by calling 949.202.1777."

2.      If the Court certifies the All Fax Recipients Class, Plaintiffs request that the Court appoint Scoma, Gress, and Mussat as class representatives.

3.      In the alternative, if the Court finds it necessary to distinguish between faxes received on a "stand-alone" fax machine and faxes received via "online fax service," then Plaintiffs seek to certify the following classes:

### Stand-Alone Fax Machine Class

All persons or entities who were successfully sent a facsimile on a stand-alone telephone facsimile machine on or about December 18–23, 2015, stating "Happy Holiday" and inviting recipients to apply for an "Exclusive Doctors Club World Elite MasterCard" credit card, where the fax either (a) contains no "opt-out notice" explaining how to stop future faxes; or (b) contains an opt-out notice stating: "Recipient may Opt Out of any future faxes by emailing a request to OptOut@TheDrClub.com or by calling 949.202.1777."

### Online Fax Service Class

All persons or entities who were successfully sent a facsimile via an "online fax service" on or about December 18–23, 2015, stating "Happy Holiday" and inviting recipients to apply for an "Exclusive Doctors Club World Elite MasterCard" credit card, where the fax either (a) contains no "opt-out notice" explaining how to stop future faxes; or (b) contains an opt-out notice stating: "Recipient may Opt Out of any future faxes by emailing a request to OptOut@TheDrClub.com or by calling 949.202.1777."

4.      If the Court certifies the alternative classes, Plaintiffs request the Court appoint Scoma and Gress to represent the Stand-Alone Fax Machine Class and Mussat to represent the Online Fax Service Class.

5.      Plaintiffs also request that the Court appoint the law firms of Anderson + Wanca ("A+W") and Edelman, Combs, Latturner & Goodwin ("ECLG"), and Curtis C. Warner ("Warner") as class counsel.

## Basis of the Relief Requested

6.      As argued below, the requirements of Rule 23(a) and (b)(3) are readily satisfied, and all of the proposed class definitions are "ascertainable" under *Cherry*, 986 F.3d at 1302. "The Supreme Court has made clear that district courts must grant class certification in 'each and every case' where the conditions of Rule 23(a) and (b) are met." *Id.* at 1303 (citing *Shady Grove Ortho. Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–400 (2010)).

## MEMORANDUM OF LAW

"Class certification is normal" in TCPA cases "because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Holtzman v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). The Third, Sixth, Seventh, Eighth, and Ninth Circuits have either affirmed certification in such cases, *see Turza*, 728 F.3d at 684; *Am. Copper & Brass, Inc. v. Lake City Indus. Prod., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014), or reversed a denial, *see True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("*True Health I*"); *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017); *Bridging Communities Inc.*

*v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016); *Sandusky Wellness Ctr. v. MedTox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016). There are hundreds of cases certifying TCPA fax cases, including from this Circuit in *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688 (S.D. Fla. Aug. 5, 2015). *See also Etter v. Allstate Ins. Co.*, 323 F.R.D. 308 (N.D. Cal. 2017); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712 (N.D. Ill. Sept. 27, 2016) ("*A-S Medication I*").

This is an ordinary "junk fax" case, where faxes advertising the defendant's "goods or services" (here, the Mastercard "Doctors Club" card) are sent to a list of fax numbers obtained from a third party (here, CarePrecise), using a third-party "fax broadcaster" (here, jBlast), with no attempt to obtain prior express permission from recipients. The overriding common issue is whether Mastercard is the "sender." There are no individualized issues, class treatment is plainly "superior" to the alternatives, and the Court should grant class certification.

### Factual Background[5]

**A.** **Mastercard and Dr. Shah enter the Co-Brand Agreement and agree to send 1 million faxes to promote the Doctors Club Card.**

Mastercard markets its products and services through "Co-Brand" agreements, where Mastercard enters "an exclusivity agreement" allowing the partner to use the Mastercard brand. (Zieg Dep. at 23:17–19). Beginning in November 2014, Dr. Kianor Shahmohammadi ("Dr. Shah") inquired with Mastercard about a co-brand

---

[5] Plaintiffs refer herein to the Appendix of Exhibits filed with their initial Motion for Class Certification. (Doc. 159-1).

agreement for a credit card catering to doctors, through a company he set up called Peer Equities, LLC. (Shah Dep. II at 15:6–7, 73:13, 18–22).

On or about August 25, 2015, Mastercard and Peer Equities entered into a "Co-Brand Agreement." (Mastercard Answers to Req. Admissions No. 1). Pursuant to the Co-Brand Agreement, Mastercard "creat[ed] a pool of funds for our co-brand partners for reimbursement of third-party marketing expenses as one of the incentives used to incent those co-brand partners to be exclusive with Mastercard." (Zieg Dep. at 24:25 to 25:5). The Co-Brand Agreement provided a budget of $200,000 for marketing the Doctors Club Mastercard, of which the "vast majority" was spent. (Shah Dep. I at 20, 31, 32, 33, 75, 76:1). The bank Peer Equities contracted with to issue the Doctors Club Mastercard was First Arkansas, through its Card Assets division. (Shah Dep. I at 36:13–16).

Dr. Shah's contact at Mastercard was Michael Zieg. (Shah Dep. I at 68:11). Zieg's role at Mastercard in 2015 was "business leader, business development." (Zieg Dep. at 8:14–15). Dr. Shah's contact at Card Assets was Mindy Peré. (Shah Dep. I at 48:11–15). On December 12, 2015, Dr. Shah sent an email to Zieg and Peré advising that "There are 500K unique faxes going out next week before Christmas and the telemarketing starts. Will keep you posted," and attaching a "call script" to be used in voice telemarketing phone calls. (Zieg Dep. at 44:13–15). Zieg responded to Peré, but not to Dr. Shah, stating, "Really . . .? We should talk. Glad to help with MC materials, but this is bad. The fax was even worse. Let's talk next week. Not that we

have any say but I wouldn't think this is an effective way to get card holders. Let me know if you want my help." (*Id.* at 20–24).

On December 14, 2015, Dr. Shah sent an email to JP Encarnacion, one of his contacts at Mastercard, stating that "[t]his week, we are running 500,000 faxes" to promote the DoctorsClub MasterCard, that he was attaching an invoice for these faxing services, and that he had already paid "the Faxing company" half of the invoiced amount, $5,000, out of the marketing budget "or they would not start this week." (Dec. 14, 2015 email).

On December 17, 2015, Dr. Shah sent Zieg an email stating "Fax to 500,000 Healthcare practices (All Medical/Dental/Optometry/Pharmacy/Audiology /Podiatry/Chiropractic/ Nursing/PA (and all subspecialties) set to go out tonight (Christmas Edition)" and "[a]nother 500,000 Faxes to go out for New Years." (Dec. 17, 2015 email chain). Zieg responded, "Great. Any new Apps?," meaning any new applications for a Doctors Club Mastercard. (*Id.*; *see also* Zieg Dep. at 56:25). Dr. Shah responded, in part, "I will share the faxes with you set to go out tonight and pass their compliance department. This is the latest draft that is being a bit modified by design right now as we speak. Said to go out tonight. This is our first large campaign." (Zieg Dep. at 57:25 to 58:6).

Dr. Shah testified that he purchased the list of fax numbers used to send the Doctors Club faxes from a company called "CarePrecise," using the MasterCard marketing budget. (Shah Dep. I at 52). CarePrecise is a list provider for the

healthcare industry. (*Id.* at 44). Dr. Shah testified that he hired "fax broadcaster" jBlast to physically transmit the faxes. (*Id.* at 54, 57-59).

On December 14, 2015, jBlast sent Dr. Shah an invoice for the upcoming fax broadcasts in the amount of $10,000 for "1,000,000 Delivered Faxes" regarding the "MasterCard Doctors Club Holiday and New Year Campaign," with 500,000 faxes to be sent "during Christmas" and another 500,000 faxes to be sent "after the New Year." (Shah Dep. II at 114:5–6). Dr. Shah paid the jBlast invoice through Dental Equities and submitted the invoice to Mastercard for reimbursement in accordance with the Co-Brand Agreement, stating "[t]his week, we are running 500,000 faxes," in addition to email and telemarketing efforts. (Encarnacion Dep. at 24:23–24, 26:15–16 & 30:9–13).

After jBlast transmitted the first round of Doctors Club faxes on December 18, 2015, "[a] lady" who "found us on the internet" called Dr. Shah to complain, stating that "[s]he wanted to opt out" of future faxes, but there was no "opt-out notice" on the fax by which to do so. (Shah Dep. II at 44:3–8). Dr. Shah then added an opt-out notice to the fax, and instructed jBlast to send the remaining faxes on December 22–23, 2015. (*Id.*)

On January 7, 2016, Plaintiff Mussat filed the first TCPA lawsuit arising out of the Doctors Club Mastercard faxes, *Florence Mussat, M.D., S.C. v. Kianor Shahmohammadi, et al.*, No. 16-cv-00171 (N.D. Ill.). Mussat's corporate representative, Loidy Tang, testified that Mussat received the December 18, 2015 fax via "Vonage eFax," where either office staff or Dr. Mussat log into a "portal" on the

computer and print out incoming faxes "throughout the day." (Tang Dep. at 17:12, 19:15). Tang testified that Mussat "is a medical office, so there's important documents that need to be printed out," and that in order to ensure that Dr. Mussat does not "miss any important documents" the company policy is that every fax "has to be printed out and placed on Dr. Mussat's desk for her review." (*Id.* at 18:8–12).

On or about January 12, 2016, Mastercard reimbursed Dental Equities for the jBlast invoice for $10,000. (Encarnacion Dep. at 26:19–21, 33:20–24; Shah Dep. II at 117:23). The "second round of five hundred thousand faxes" was never sent "because of the lawsuits." (Shah Dep. II at 118:4–8). Dr. Shah testified that, after the lawsuits were filed, he "wasn't going to knowingly violate the law." (*Id.* at 118:9–10).

Dr. Shah never contacted any person or entity on the CarePrecise list seeking permission to send fax advertisements. (Shah Dep. I at 99:4–8). Dr. Shah never instructed any person to seek prior express permission from persons or entities on the list. (Shah Dep. II at 32:23 to 33:2). Mastercard "does not contend that it had an EBR with Plaintiffs or anyone else as it pertains to the facsimiles at issue in this action . . . ." (Mastercard Answers Interrogs. No. 6). Mastercard "does not contend that it had prior express invitation or permission from Plaintiffs or anyone else as it pertains to the facsimiles at issue in this action . . . ." (*Id.*, No. 11). Rather, Mastercard claims it is not the "sender" of the faxes because it did not "authorize" Dr. Shah to transmit the faxes through jBlast, which was the basis for Mastercard's motion to dismiss. (Doc. 65). The Court denied Mastercard's motion to dismiss on

the "sender" issue on January 11, 2017. *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, 232 F. Supp. 3d 1201, 1205 (M.D. Fla. 2017) ("*Scoma I*").

**B.    The transmission logs reveal that jBlast successfully transmitted the Doctors Club Mastercard faxes to 381,010 fax numbers.**

In discovery, jBlast produced the electronic transmission records showing the results of the fax broadcasts at issue in this case. (*See* Biggerstaff Report ¶ 10). Plaintiffs' expert, Robert Biggerstaff, examined the transmission logs. (*Id.*) Biggerstaff is a certified computer-forensic examiner and a member of the International Society of Forensic Computer Examiners. (*Id.* ¶ 5). Biggerstaff has extensive experience in analyzing computer records in TCPA cases. (*Id.* ¶ 6). This District has found that Biggerstaff is "amply qualified" and his "relevant experience, education, and training" makes him "competent to offer expert testimony in TCPA cases." *Shamblin v. Obama for Am.*, 2015 WL 1909765, at *3 (M.D. Fla. Apr. 27, 2015); *see also Hunt v. 21st Mtg. Corp.*, 2014 WL 1664288, at *3–4 (N.D. Ala. Apr. 25, 2014) (rejecting *Daubert* challenge to Biggerstaff in TCPA action).

Biggerstaff found that the jBlast records "are consistent with fax logs produced by a computer-based fax broadcasting platform which contemporaneously and automatically records metadata including the outcome of the documented fax transmissions," and that "[s]uch fax logs are regularly relied upon as reliable records of faxing activity." (Biggerstaff Report ¶¶ 14, 16). In particular, Biggerstaff found that the jBlast records "are consistent with fax logs produced by j2, based on my prior experience with data produced by j2." (*Id.* ¶¶ 15, 17).

Biggerstaff concluded that the logs "indicate that 2 distinct fax broadcasts took place," with the first "using a fax image with a size of 90,628 bytes that was sent and received without error in 33,080 fax transmissions on 12/18/2015," and the second using "a fax image with a size of 91,956 bytes and was sent and received without error in 347,931 fax transmissions on 12/22/2015 06:18:00 PM to 12/23/2015 2:36 PM." (*Id.* ¶ 22). In total, Biggerstaff concluded that "[t]hese two broadcasts combined resulted in 381,011 fully-received error-free fax transmissions sent to and received by 381,010 unique fax numbers." (*Id.*)[6]

Biggerstaff explained that telephone facsimile machines use the "T.30 standard," which "employs a positive confirmation protocol, whereby a fax transmission is positively confirmed by the receiving machine before the sending machine will record the transmission as successful." (*Id.* ¶ 27). Biggerstaff stated that "a record of a 'successful' transmission by computer based facsimile transmission systems reflects the successful completion of all the necessary phases of the T.30 fax transmission to a device with a fax-modem and appropriate software," and "[t]his is true regardless of the type of fax machine (i.e., a 'stand-alone' fax machine or a computer with a fax-modem) which received the T.30 fax transmission." (*Id.* ¶ 44). Biggerstaff explained that "[t]his is demonstrated by the receipt from the receiving machine of the positive confirmation of receipt of the transmission (e.g. the message confirmation or 'MCF')." (*Id.*) Biggerstaff states "categorically" that "without

---

[6] There were also two "test faxes," which Biggerstaff excluded from the totals: one fax sent to a number associated with Dental Equities and a second sent "To: Debbie." (Biggerstaff Report ¶ 20).

exception, every device of which I am aware that can receive a T.30 fax transmission, has the capacity to use a regular telephone line for the receipt of a T.30 fax transmission and to print the contents of the T.30 fax transmission," and that "a record of a successful transmission by a computer based facsimile transmission system is a record that such a transmission was sent to and received by equipment which has the capacity to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper." (*Id.* ¶¶ 47–48).

Biggerstaff submitted a Rebuttal Report to address the claim of Mastercard's expert, Ken Sponsler, that a fax is not sent to a "telephone facsimile machine" if it is received by a "fax server" and then forwarded to the end-user by email via an "efax" service. (Biggerstaff Rebuttal Report ¶¶ 11–13). Biggerstaff stated that Sponsler failed to recognize that from "point A (sending fax machine)" to "point B (receiving fax machine)," there is a transmission from one "telephone facsimile machine" to another, and "[t]he subsequent journey from the receiving fax machine at point B to some other device (such as a mail server or web server) at point C is irrelevant to the fax transmission from A to B." (*Id.* ¶¶ 13–15).

Biggerstaff also searched the logs for each Plaintiff's fax number and found, consistent with the header information on Exhibits A, B, and C to the TAC: one successful transmission to Plaintiff Mussat's fax number on December 18, 2015; one successful transmission to Plaintiff Gress's fax number on December 22, 2015; and

---

Debbie Wallace "was [Dr. Shah's] contact at jBlast." (Shah Dep. II at 112:15–16).

one successful transmission to Plaintiff Scoma's fax number on December 23, 2015.
(Biggerstaff Report ¶¶ 24–26).

**Argument**

To obtain class certification, Plaintiffs must establish the Rule 23 elements by
a simple preponderance. *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 624 (N.D.
Ala. 2009). There are four Rule 23(a) requirements: numerosity, commonality,
typicality, and adequacy of representation; and two Rule 23(b)(3) requirements: that
common questions "predominate" and that certification is "superior" to the
alternatives. There is also an implied "ascertainability" requirement. *Cherry v.
Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021).

As argued below, these standards are met both for the All Fax Recipients
Class and the alternative Stand-Alone Fax Machine Class and Online Fax Services
Class. Because each requirement is satisfied, the Court "must grant class
certification" here. *Id.* at 1303 (citing *Shady Grove Orthopedic Assocs., P.A. v. Allstate
Ins. Co.*, 559 U.S. 393, 398 (2010)).

## I.   All of the proposed class definitions are "ascertainable" under *Cherry*.

In *Cherry*, the Eleventh Circuit held class "ascertainability" merely means that
the class is defined by objective criteria. 986 F.3d at 1303. The Eleventh Circuit held
the "[a]dministrative feasibility" of identifying class members is not an "aspect of
ascertainability," and that "administrative feasibility is not a requirement for
certification under Rule 23" at all. *Id.* at 1304. The Eleventh Circuit rejected the

15

Third Circuit's "heightened" ascertainability standard, which concerns "both the definition of the class and its administrative feasibility." *Id.*

In this case, the district court has already ruled that "Plaintiffs' proposed class definitions meet the traditional ascertainability rule" adopted by *Cherry*. *Scoma III*, 2021 WL 719655, at *1. Plaintiffs seek to certify a Class (or classes) of persons or entities "successfully sent" particular faxes during a particular time frame, which are "objective" criteria. *Id.*; *see also Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014). The class definition is not "vague," and "identifies a particular group," that was "harmed in a particular way" in "a specific period." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660–61 (7th Cir. 2015). The definition is not based on subjective "state of mind," and it is not "fail-safe," since it entails no merits conclusions. *Id.* The class is therefore ascertainable under *Cherry*. *See also A Aventura Chiropractic Ctr., Inc. v. Med Waste Mgmt. LLC*, No. 12-21695-CIV, 2013 WL 3463489, at *5 (S.D. Fla. July 3, 2013); *C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 689 (S.D. Fla. 2014).[7]

In sum, each of the proposed Class definitions is ascertainable, and the Court should proceed to consider the Rule 23(a) factors.

---

[7] The Class would also be "ascertainable" under the Third Circuit standard, where Plaintiffs have the fax logs. *See Sarris*, 311 F.R.D. at 693; *Physicians Healthsource, Inc. v. Dr. Diabetic Supply, LLC*, No. 12-22330-CIV, 2014 WL 7366255, at *4 (S.D. Fla. Dec. 24, 2014).

III.   **The Rule 23(a) requirements are satisfied.**

A.   **Numerosity.**

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." There is no exact threshold. *See Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003). Generally, "less than twenty-one is inadequate, more than forty adequate." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Here, the faxes were sent in 381,011 transmissions. (Biggerstaff Report ¶ 22). Numerosity cannot reasonably be disputed. *See Doctor Diabetic*, 2014 WL 7366255, at *5 (numerosity met with 4,324 fax transmissions); *Palm Beach Golf*, 311 F.R.D. at 695 (7,058 transmissions); *A Aventura*, 2013 WL 3463489, at *3 ("thousands of fax numbers").

B.   **Commonality.**

Rule 23(a)(2) commonality requires "questions of law or fact common to the class." There need only be "one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009). The rule does not require that claims be identical. *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). Nor does it require that common questions "predominate," as required under Rule 23(b)(3). *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009). It merely requires "one issue" that can be decided classwide. *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001).

Here, there are six common questions:

(1)   Whether the Doctors Club faxes are "advertisements";

(2)    Whether Mastercard is a "sender," meaning "person or entity on whose behalf" the fax is sent "or whose goods or services are advertised or promoted in the unsolicited advertisement," 47 C.F.R. § 64.1200(f)(10);

(3)    Whether the faxes were sent using a "telephone facsimile machine, computer, or other device" to "telephone facsimile machine[s]," including whether class members who viewed their faxes through an "online fax service" have a claim under the TCPA in light of the Amerifactors Bureau Order;

(4)    Whether Mastercard can carry its burden of establishing that it obtained "prior express invitation or permission" to send the faxes;[8]

(5)    Whether the faxes contain opt-out notice complying with 47 U.S.C. § 227(b)(1)(C)(iii);

(6)    Whether the violations were "willful" or "knowing," and if so, whether the Court should treble the statutory damages, along with the appropriate injunctive relief.

At least one of these issues can be resolved classwide, and so the minimal "commonality" requirement is satisfied.

## C.    Typicality.

To satisfy Rule 23(a)(3) typicality, a plaintiff must possess the same interest and have suffered the same injury as the other class members. *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). Typicality can be satisfied even if substantial factual differences exist between the plaintiff and the other class members if there is a "strong similarity of legal theories." *Id*. Typicality is present if "the claims or defenses of the class and the class representative arise from the same event or pattern

---

[8] Under the TCPA, "the burden of proof rests on the sender to demonstrate prior express invitation or permission." *In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 3812 ¶ 46 (Apr. 6, 2006) ("2006 Order").

or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

Typicality is satisfied because each class member was subjected to the same conduct, *i.e.*, the unsolicited Doctors Club fax-advertising campaign. Plaintiffs and the class members were sent fax ads for the same product, and each class member's claim is based on the same legal theory. *See Doctor Diabetic*, 2014 WL 7366255, at *6 (typicality satisfied where named plaintiff received same fax as rest of the class); *A Aventura*, 2013 WL 3463489, at *4 (typicality satisfied where "the course of conduct that produced [plaintiff's] TCPA claim also produced the claims of the proposed class," even though plaintiff was not targeted with every fax); *True Health Chiropractic Inc. v. McKesson Corp.*, 332 F.R.D. 589, 607 (N.D. Cal. 2019) ("*True Health II*") (typicality satisfied where plaintiff received 12 of the 34 subject faxes, holding claims were "reasonably co-extensive"). Plaintiffs' claims share the "same essential characteristics as the claims of the class at large," and typicality is satisfied. *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).

### D.     Adequacy of representation.

#### 1.     Plaintiffs are adequate class representatives.

In deciding adequacy of the class representative, the court asks "(1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Doctor Diabetic*, 2014 WL 7366255, at *7. With respect to the first factor, Plaintiffs' interests are aligned with the rest of the class. Mussat received the December 18, 2015 fax,

which contains no opt-out notice, via Vonage "eFax" service, and Plaintiffs Scoma
and Gress received the December 22–23, 2015 fax, which contains non-compliant
opt-out notice, via "stand-alone" fax machines. (Biggerstaff Report ¶¶ 24–26). To the
extent the Court deems it necessary to distinguish between faxes received via stand-
alone fax machines and "online fax services," Scoma and Gress should be appointed
to represent the Stand-Alone Fax Machine Class, and Mussat should be appointed to
represent the Online Fax Services Class. There is no conflict of interest, let alone a
"substantial" conflict.

Regarding the second factor, Plaintiffs have demonstrated they will adequately
prosecute the action. Dr. Scoma testified that he understands his duties to the class,
including "to meet in deposition, speak to my attorney, answer interrogatories and
try to settle for the best for the – for the group." (Scoma Dep. at 31:1–8). Dr. Scoma
testified he "want[s] to be a class representative in this case," and believes he would
be a good representative, given his "paralegal degree along with my chiropractic
degree," and "[h]aving been in practice so many times, been deposed many times, I
feel that I would do the best for the group." (*Id.* at 31:17–21). Dr. Scoma testified he
has been involved in this litigation, "answer[ing] interrogatories" and conferring with
counsel "every couple of weeks" and "appear[ing] today to come to the deposition
on my day off." (*Id.* at 31:24–32:2, 33:6).

Dr. Gress testified that he understands a class representative is "bringing the
lawsuit forward for the class that you're representing," and that he met with counsel
for "a couple of hours" to prepare for his deposition. (Gress Dep. at 20:22–23, 22:9).

Dr. Gress testified that he understands he has a duty to the rest of the class, including to "[f]ill out the interrogatories, try to give the best information I can, talk with my attorneys to decide what's the best for the class, you know, and be here for depositions and whatever the class needs to pursue the lawsuit." (*Id.* at 32:2–7). Asked if he "expected" to receive an incentive award for his service to the class, Dr. Gress responded that "[m]y only hope is to do the best I can for the class and if the court sees fit, then I'd accept whatever they see as just." (*Id.* at 19:15–17).

Mussat's representative, Loidy Tang, testified that Mussat understands a class representative's "duty to advocate for" the class, and that Mussat believes it would be a good class representative. (Tang Dep. at 57:8–16). Tang testified to the class representative's duty "[t]o make sure that the decisions that are being made are for the benefit of the whole class." (*Id.* at 59:22–24). Mussat has been found to be an adequate class representative in other contested TCPA cases. *Florence Mussat, M.D., S.C. v. E.S. Medical Supplies and Equipment Inc.,* 16-cv-1240, Doc 95, Order (N.D. Ill. Dec. 20, 2016); *Mussat v. Global Healthcare Res., LLC,* 2013 U.S. Dist. LEXIS 35107 *13, 2013 WL 1087551 (N.D. Ill. Mar. 13, 2013).

In sum, Plaintiffs understand their duties to the class members, they have no conflicts with the rest of the class, and Rule 23(a)(4)'s adequacy requirement is satisfied.

### 2.    Plaintiffs' counsel are adequate class counsel.

In determining adequacy of counsel, Rule 23(g)(1)(A) lists four factors: (1) the work counsel has done in identifying or investigating potential claims in the action;

(2) counsel's experience in handling class actions and the types of claims asserted in the action; (3) counsel's knowledge of the law; and (4) the resources that counsel will commit to representing the class.

Here, Plaintiffs' counsel—Anderson + Wanca ("A+W"), Curtis C. Warner, and Edelman, Combs, Latturner & Goodwin ("ECLG")—are experienced class-action and TCPA practitioners who are qualified to act as counsel for the classes. A+W has been appointed class counsel in many contested TCPA cases. *See, e.g.*, *Doctor Diabetic*, 2014 WL 7366255, at *6 (A+W "one of very few firms that specialize in TCPA class actions and so is knowledgeable of the applicable law and experienced in litigating TCPA classes").[9] A+W attorneys have litigated TCPA claims for many years and have negotiated many classwide settlements. (*See* A+W Firm Resume).

Curtis C. Warner was the primary brief writer on the first two cases in the nation granting a contested class certification motion for claims brought under the TCPA for calls to cellular telephones without express prior consent. (Warner Decl. ¶ 12). Mr. Warner also contributed to the writing of the plaintiffs' joint brief in a TCPA matter of first impression of who is the "called party" and was second chair at oral argument in the Seventh Circuit in *Soppet v. Enhanced Recovery, Co., LLC*, 679 F.3d 637 (7th Cir. 2012). He has been appointed class counsel in TCPA contested

---

[9] *See also Advanced Rehab & Med., P.C. v. Amedisys Holding, LLC*, 2019 WL 4145239, at *7 (W.D. Tenn. Aug. 30, 2019) (A+W's "competent work thus far" showed adequacy); *A-S Medication I*, 318 F.R.D. at 724 (finding "no reason to doubt" A+W's adequacy); *Etter*, 323 F.R.D. at 312 (noting A+W's "experienced TCPA litigators").

cases, including *Florence Mussat, M.D., S.C. v. E.S. Medical Supplies and Equipment Inc.*, 16-cv-1240, Doc. 95, Order (N.D. Ill. Dec. 20, 2016). (Warner Decl. ¶ 10).

ECLG is "well-respected," has "vast experience litigating consumer class actions," and has "served as class counsel in hundreds of junk fax TCPA cases and several TCPA robocall" actions. *Smith v. State Farm Mutual Auto. Ins. Co.*, 301 F.R.D. 284, 289 (N.D. Ill. 2014); *see also West Loop Chiropractic & Sports Injury Ctr., Ltd. v. N. Am. Bancard, LLC*, 2018 WL 3738281 (N.D. Ill. Aug. 7, 2018); *Garrett v. Ragle Dental Lab., Inc.*, 2010 WL 4074379 (N.D. Ill. Oct. 12, 2010); *Sadowski v. Med1Online, LLC*, 2008 WL 2224892 (N.D. Ill. May 27, 2008). "[T]he fact that several courts have previously found Edelman & Combs adequate in similar suits, is persuasive evidence that the firm will adequately represent the class." *Murray v. E*Trade Fin. Corp.*, 240 F.R.D. 392, 398 (N.D. Ill. 2006). ECLG is committed to advancing the litigation and representing the classes. (*See* Edelman Decl.).

To date in this case, Plaintiffs' counsel have conducted significant discovery, including numerous depositions, have obtained the transmission records from jBlast, have defeated Mastercard's motion to dismiss, *see Scoma I*, 232 F. Supp. 3d at 1201, and have successfully challenged the Report recommending that class certification be denied, *see Scoma III*, 2021 WL 719655, at *4. Plaintiffs' counsel will continue to commit adequate resources, both staffing and monetary, to ensure that the Classes are properly represented.

**IV.    The Rule 23(b)(3) requirements are satisfied.**

Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

**A.    Common questions "predominate."**

Rule 23(b)(3) "predominance" asks "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Common issues tend to predominate in TCPA fax cases, since the facts "relate to Defendant's common course of conduct and the transmissions of the faxes," and the claims "are brought under the same federal statute and based on the same legal theories." *Sarris*, 311 F.R.D. at 699. Predominance fails only if the plaintiffs must "introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The Eleventh Circuit held in *Cherry* that "administrative feasibility" is "entirely unrelated to" Rule 23(b)(3) predominance and is considered only in its "limited relevance" to the "manageability" factor. 986 F.3d at 1302.

In this case, the overriding common question is the question on which Mastercard moved to dismiss: whether Mastercard is the "sender" of the faxes under 47 C.F.R. § 64.1200(f)(10). *See Scoma I*, 232 F. Supp. 3d at 1205. This critical question is a necessary element of each class member's claim against Mastercard; it can be decided as to the entire class in one fell swoop, and it should be decided in one fell swoop. *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019) (reversing denial of class certification on predominance grounds, where defense applied to all class members).

The question of whether the faxes are "advertisements" is the quintessential common question. *See Holtzman v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013). Whether Mastercard can prove "prior express invitation or permission" is a common question. *See True Health I*, 896 F.3d at 931 ("prior express invitation or permission" is a "defense on which [the defendant] bears the burden of proof"); *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1125 (6th Cir. 2016) (same). Whether the faxes "satisfy the TCPA's notice requirements" can be proved classwide. *Advanced Rehab*, 2019 WL 4145239, at *10 (citing *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016)). And any determination of whether the violations were "willful or knowing" will be based on evidence of Mastercard's conduct, not any individual class member's conduct.

In the face of these overwhelming common issues, Mastercard previously argued there are individual issues as to whether each member of the All Fax Recipients Class received a fax on a "stand-alone" fax machine or via an "online fax

service" in light of the Amerifactors Bureau Order. But, as the district court recognized in *Scoma III*, the pure legal question of whether users of "online fax services" have a claim under the TCPA in light of the Amerifactors Bureau Order—or any subsequent ruling by the full FCC on the Application for Review from that order—is "a merits contention that is common to the class" that is properly decided "at trial or in a ruling on a summary-judgment motion" and "should not be resolved in deciding whether to certify a proposed class." 2021 WL 719655, at *4 (quoting *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 470 (2013)); *see also Doctor Diabetic*, 2014 WL 7366255, at *5 (effect of FCC ruling was itself simply "another class-wide question"); *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016) ("*A-S Medication I*") (effect of FCC ruling "is a question that can be resolved on a class-wide basis").

Although the "online fax services" question is to be decided *after* class certification, not before, *see Scoma III*, 2021 WL 719655, at *4, it is notable that the only circuit court to decide the effect of the Amerifactors Bureau Order on the merits recently held that "telephone facsimile machine" "encompasses more than a traditional fax machine" and "does not require the actual printing of the advertisement, which dispels the defendants' argument that Congress was concerned only with the burdensome ink-and-paper costs of fax advertising." *Lyngaas v. Curaden AG*, --- F.3d ---, 2021 WL 1115870, at *10 (6th Cir. Mar. 24, 2021). The Sixth Circuit relied on FCC interpretations from 2003 and 2015 stating that the TCPA covers faxes received by the end-user via email on a computer. *Id.* at *9 (citing *In re Rules &*

*Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014 (July

3, 2003) ("2003 Commission Order"); *In re WestFax, Inc. Petition*, 30 FCC Rcd. 8620

(Aug. 28, 2015) ("WestFax Bureau Order")). The Sixth Circuit recognized that the

Amerifactors Bureau Order more recently stated that "efaxes sent through an 'online

fax service' are not covered by the TCPA," but it noted that "an application for

review of the Bureau's ruling is currently pending," and held that "the ruling in any

event would have no bearing on the case before us because the operative facts here

took place more than three years earlier," given that "[r]etroactivity is not favored in

the law." *Id.* (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).

Finally, the question of whether the faxes were *sent* to the Class using a

"telephone facsimile machine, computer, or other device" under 47 U.S.C.

§ 227(b)(1)(C) is common to the whole All Fax Recipients Class. Plaintiffs will

establish on the merits following class certification that jBlast used covered

"equipment" to end the faxes at issue based on common evidence. The Court should

find that common issues "predominate" under Rule 23(b)(3) and proceed to consider

whether class certification is "superior" to the alternatives.

### B.    Class certification is "superior" to the alternatives.

"Superiority" addresses "the relative advantages of a class action suit over

whatever other forms of litigation might be realistically available to the plaintiffs."

*Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004). Courts consistently find a

class action the superior way to resolve TCPA claims. *See Sarris*, 311 F.R.D. at 299

("the prevalence of class-wide issues suggests that a class action would be the

superior method"); *Doctor Diabetic*, 2014 WL 7366255, at *9 ("Congress expressly created the TCPA as a 'bounty' statute to increase the incentives for private plaintiffs to enforce the law."); *C-Mart*, 299 F.R.D. at 691 (noting the "large number of claims, along with the relatively small statutory damages"); *A Aventura*, 2013 WL 3463489, at *4; *Jay Clogg Realty Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304, 310 (D. Md. 2014) (class action more effective to eliminate "scourge" of unsolicited faxes); *Critchfield Physical Therapy v. Taranto Grp., Inc.*, 263 P.3d 767, 778 (Kan. 2011) (denial of certification would "frustrate the intent of the TCPA" and "protect junk fax advertisers from liability").

Rule 23(b)(3) states the relevant factors in determining superiority include (1) class members' interests in pursuing individual actions, (2) any existing individual litigation, (3) judicial efficiency, and (4) the "likely difficulties in managing a class action." Rule 23(b)(3)(A)–(D). Here, class members have little incentive to sue individually, especially against a behemoth like Mastercard. There are no existing individual lawsuits. Judicial efficiency is best served by adjudicating all claims in one proceeding, which also serves to deter defendant misconduct and without which class members may never know their rights were violated or be compensated.

With respect to the "manageability" factor, the Eleventh Circuit held in *Cherry* that administrative feasibility has some "limited relevance to Rule 23(b)(3)(D)," but "because Rule 23(b)(3) requires a balancing test, it does not permit district courts to make administrative feasibility a requirement." 986 F.3d at 1302. *Id.* Rather, a court "must balance its manageability finding against other considerations," and

"administrative difficulties—whether in class-member identification or otherwise—do not alone doom a motion for certification," and "manageability problems will 'rarely, if ever, be in [themselves] sufficient to prevent certification.'" *Id.* (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004)). In fact, "where a court has already made a finding that common issues predominate over individualized issues, we would be hard pressed to conclude that a class action is less manageable than individual actions." *Klay*, 382 F.3d at 1272–73.

This is not one of those "rare" cases where administrative feasibility outweighs the "countervailing interests" in class certification, such as the deterrent purpose of the underlying statute. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015). Manageability typically concerns three categories: "potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1304 (9th Cir. 1990). None of these concerns is present here.

First, there will be no unusual complications in providing class notice. Rule 23(c)(2) requires only the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Juris v. Inamed Corp.,* 685 F.3d 1294, 1321 (11th Cir. 2012) (noting "due process does not require that class members actually receive notice"). The Eleventh Circuit held in *Cherry* that Rule 23(c)'s notice requirement "imposes no prerequisite for certification." 986 F.3d at 1304.

Plaintiffs suggest that notice be first attempted by fax (three attempts) and if unsuccessful, by postcard (U.S. Mail). *See Palm Beach Golf Ctr- Boca, Inc. v. Sarris,* No. 9:12-cv-80178-KMW, Order on Class Notice, Doc. 134 (S.D. Fla. Oct. 22, 2015); *see also Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 971 (7th Cir. 2020) ("*A-S Medication II*"); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) (affirming class notice sent to target fax numbers, finding it best practicable). This dual-pronged approach is likely to reach more class members than mail notice alone and would defray costs and be particularly expeditious in this case, as all of the fax numbers to which notice would be sent are in the parties' possession.

Second, there will be no complications in calculating damages, since the TCPA is "relatively straightforward" in providing a fixed amount of statutory damages per violation. *C-Mart*, 299 F.R.D. at 692 (holding "the Court cannot see how it would become complicated" to calculate damages in TCPA fax class action). Even if the Court ultimately requires Plaintiffs to identify users of "online fax services" in light of the Amerifactors Bureau Order after class certification, Plaintiffs' counsel can do so using the transmission records as "a *starting point* from which" to use other methods, "including the use of self-identifying affidavits and subpoenas." *Reyes v. BCA Fin. Servs., Inc.*, 2018 WL 3145807, at *13 (S.D. Fla. June 26, 2018). Here, Plaintiffs' counsel can use a three-step process:

(1) Plaintiffs' counsel will subpoena the Local Number Portability Administrator ("LNPA") of the Number Portability Administrative Center

("NPAC") to identify phone carriers for all phone numbers in the certified class for the date range included in the class definition;

(2) Plaintiffs' counsel will use the NPAC subpoena response to subpoena each identified phone carrier to identify the subscriber of each phone number; and

(3) Plaintiffs' counsel will designate for the "Online Fax Services Class" all numbers where the subscriber is an "online fax service" provider, such as Vonage, j2 Global, RingCentral, etc., and designate for the "Stand-Alone Fax Machine Class" all other subscribers.

Plaintiff's counsel have used this subpoena process to identify subscribers in other TCPA cases. *See, e.g.*, *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 2014 WL 11429029, at *1 (W.D. Mich. Feb. 20, 2014); (Good Decl. ¶¶ 3–6). A+W is currently pursuing this process in *True Health Chiropractic Inc. v. McKesson Corp.*, No. 13-CV-02219-HSG, 2020 WL 7664484, at *8 (N.D. Cal. Dec. 24, 2020) ("*True Health III*"), where the court certified a separate "Stand-Alone Fax Machine Class" and "Online Fax Services Class," ruling it was "satisfied with Plaintiffs' proposed three-step subpoena process to distinguish members of these subclasses." The Eleventh Circuit held in *Cherry* that "membership can be capable of determination without being capable of *convenient* determination." 986 F.3d at 1303.

In addition, class members can be asked whether they used a stand-alone fax machine or an online fax service in December 2015. Plaintiffs' counsel have already collected that information from 66 clients who the transmission logs show received the Doctors Club faxes. (Good Decl. ¶ 9). Even under the "administrative feasibility"

31

standard rejected in *Cherry*, there "is no indication that, in this particular case, self-identification through affidavits is not administratively feasible or 'otherwise problematic.'" *Reyes*, 2018 WL 3145807, at *13; *see also Keim*, 328 F.R.D. at 677 2018) (holding plaintiff's proposed plan for identifying class members through subpoenas to carriers for subscriber information was "administratively feasible" based on part on Biggerstaff's expert opinion); *Reyes*, 2018 WL 3145807, at *13-14 (using cellular phone numbers to investigate additional contact information for the subscribers through use of an expert); *Northrup v. Innovative Health Ins. Partners, LLC*, 329 F.R.D. 443, 451 (M.D. Fla. Jan. 2, 2019) (granting class certification in TCPA call case); *Kron v. Grand Bahama Cruise Line, LLC*, 328 F.R.D. 694, 700 (S.D. Fla. 2018) (granting class certification, holding class "clearly ascertainable" where possible to "determine class members' identities using Defendant's phone records").

If a combination of subpoenas and affidavits meets the heightened administrative feasibility standard, then it certainly satisfies the lower manageability standard in jurisdictions, like the Eleventh Circuit, that have rejected an administrative feasibility requirement. *See Chicago Car Care Inc. v. ARR Enter.'s, Inc.*, No. 19-CV-07687, 2021 WL 1172262, at *6 (N.D. Ill. Mar. 29, 2021) (denying motion to strike class allegations based on Amerifactors Bureau Order, holding "there is no reason to conclude that complex individualized inquiries are needed to determine whether or not class members used online fax services," that "[o]ne option is to just ask, using affidavit-based proof," and that "Defendants' due process rights

are not harmed by such case-management tools.") (quoting *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1030 (7th Cir. 2018)).

Third, there will be no complications in distributing damages. Since the TCPA provides statutory damages, Plaintiffs will seek an "aggregate award." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1258 (11th Cir. 2003). In *Allapattah*, 333 F.3d at 1258, n.13, the Eleventh Circuit declined to allow an aggregate award in an antitrust class action where actual damages varied widely by class member. *Id.* The Eleventh Circuit distinguished *Six Mexican Workers*, 904 F.2d at 1306–07, where the Ninth Circuit affirmed an aggregate statutory-damages award for a class of undocumented workers, the majority of whom could not be located, holding that "where the statutory objectives include enforcement, deterrence or disgorgement," a class action "may be the 'superior' and only viable method to achieve those objectives, even despite the prospect of unclaimed funds," with a cy pres "distribution of unclaimed funds to indirectly benefit the entire class." *Id.* The Eleventh Circuit also distinguished *Van Gemert v. Boeing Co.*, 553 F.2d 812, 813 (2d Cir. 1977), *aff'd* 444 U.S. 472 (1980), where "the precise aggregate damages of the class could be ascertained easily by a simple mathematical calculation." *Id.*

As in *Six Mexican Workers*, this case involves statutory damages with a deterrent purpose, and as in *Van Gemert*, the aggregate award can be determined through "simple mathematical calculation" by multiplying the number of violations by $500 (or an increased amount if the Court finds the violations willful or knowing).

33

Whatever money remains in the fund after deducting attorney fees and expenses and paying class claims can be distributed via cy pres. *Six Mexican Workers*, 904 F.2d at 1303–04; *Hughes v. Kore of Indiana Enter., Inc.*, 731 F.3d 672, 677 (7th Cir. 2013) (cy pres "prevent[s] the defendant from walking away from the litigation scot-free because of the infeasibility of distributing the proceeds," especially in class actions involving statutory damages, which have an inherent "deterrent objective"); *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2021 WL 631906, at *1 (M.D.N.C. Feb. 10, 2021) (holding that "reverting unclaimed funds" to TCPA defendant found liable to the class was "inappropriate given the deterrence purpose" of the TCPA).

Mastercard may complain that its potential liability is substantial, with 381,011 faxes translating to $190,505,500 at $500 per violation. But the magnitude of the exposure does not affect superiority. *See Klay*, 382 F.3d at 1274 ("It would be unjust to allow corporations to engage in rampant and systematic wrongdoing, and then allow them to avoid a class action because the consequences of being held accountable for their misdeeds would be financially ruinous."). In *Doctor Diabetic*, 2014 WL 7366255, at *9–10, the court held a class was superior under *Klay*, rejecting the "ruinous liability" argument because the TCPA "reflects Congress's judgment" that $500 per violation is appropriate. *See also Manno v. Healthcare Rev. Recovery Grp., LLC*, 289 F.R.D. 674, 681–82 (S.D. Fla. 2013) (superiority met for TCPA class, where Congress has determined the "proportionate and appropriate" damages).

Any complaint by Mastercard that it will be "difficult to identify" class members should be rejected. *James D. Hinson Elec. Contracting Co. v. BellSouth*

*Telecommc'ns, Inc.*, 275 F.R.D. 638, 648 (M.D. Fla. 2011). In *James D. Hinson*, the Court stated that when deciding superiority, "we are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives," including "thousands of separate lawsuits by the class members)." *Id.* (quoting *Klay*, 382 F.3d at 1273). The Court held that some "identification" issues are "intrinsic in large class actions" and did not outweigh the benefits of certification where the case "at bottom" presented a common liability issue. In this case, the transmission logs sufficiently identify the class, and the notice can "require[] class members to verify that their information" is accurate. *A-S Medication II*, 950 F.3d at 971 (affirming summary judgment for certified TCPA fax class). Any level of "identification" that the Court requires will be "manageable," and "at bottom" the case presents the overriding common issue of whether Mastercard is the "sender" of the faxes. The Court should grant class certification to decide that question in one fell swoop.

## CONCLUSION

For the foregoing reasons, the Court should certify the proposed All Fax Recipients Class or, in the alternative, the Stand-Alone Fax Machine Class and Online Fax Services Class, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel.

Respectfully submitted,

SCOMA CHIROPRACTIC, P.A.,
FLORENCE MUSSAT, M.D., S.C, and DR.
WILLIAM P. GRESS, individually, and as
the representatives for a class of similarly-
situated persons

By:      /s/ Ryan M. Kelly

Daniel A. Edelman (*pro hac vice*)        Ryan M. Kelly – FL Bar No.: 90110
Heather Kolbus                            Ross M. Good – FL Bar No.: 116405
EDELMAN COMBS                             ANDERSON + WANCA
LATTURNER                                 3701 Algonquin Road, Suite 500
& GOODWIN                                 Rolling Meadows, IL  60008
20 S. Clark St., Suite 1500               Telephone:  (847) 368-1500
Chicago, IL 60603                         rkelly@andersonwanca.com
Telephone: (312) 739-4200                 rgood@andersonwanca.com
dedelman@edcombs.com
hkolbus@edcombs.com

Curtis C. Warner                          *Attorneys for Plaintiffs*
5 E. Market St., Suite 250
Corning, NY 14830
(888) 551-8685 (TEL)
cwarner@warner.legal

## <u>CERTIFICATE OF SERVICE</u>

I declare under penalty of perjury that on April 2, 2021, Plaintiffs' Second

Amended Motion for Class Certification was filed with the CM/ECF system which

will serve copies on all parties of record.


/s/ Ryan M. Kelly _____